UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

SECURITIES INVESTOR PROTECTION : 
CORPORATION, : Adv. Proc. No. 08-01789 (SMB)
 :
            Plaintiff, : SIPA LIQUIDATION
 :
         -against- : (Substantively Consolidated)
 :
BERNARD L. MADOFF INVESTMENT :
SECURITIES LLC, :
 :
            Defendant. :
-------------------------------------------------------X
 :
In re: :
 :
BERNARD L. MADOFF, :
 :
            Debtor. :
-------------------------------------------------------X
 :
IRVING H. PICARD, trustee for the liquidation :
of Bernard L. Madoff Investment Securities : Adv. Proc. No. 10-04387 (SMB)
LLC :
 :
            Plaintiff, :
 :
         -against- :
 :
JAMES LOWREY, *et al.*, :
 :
            Defendants. :
-------------------------------------------------------X
 :
IRVING H. PICARD, trustee for the liquidation :
of Bernard L. Madoff Investment Securities : Adv. Proc. No. 10-04488 (SMB)
LLC :
 :
            Plaintiff, :
 :
         -against- :
 :
SOUTH FERRY BUILDING CO., *et al.*, :
 :
            Defendants. :

```
--------------------------------------------------------X
                                                        :
IRVING H. PICARD, trustee for the liquidation           :
of Bernard L. Madoff Investment Securities              :          Adv. Proc. No. 10-04350 (SMB)
LLC                                                     :
                                                        :
              Plaintiff,                                :
                                                        :
              -against-                                 :
                                                        :
SOUTH FERRY #2 LP, et al.,                              :
                                                        :
              Defendants.                               :
--------------------------------------------------------X
                                                        :
IRVING H. PICARD, trustee for the liquidation           :
of Bernard L. Madoff Investment Securities              :          Adv. Proc. No. 10-05110 (SMB)
LLC                                                     :
                                                        :
              Plaintiff,                                :
                                                        :
              -against-                                 :
                                                        :
UNITED CONGREGATIONS MESORA, et al.,                    :
                                                        :
              Defendants.                               :
--------------------------------------------------------X
```

**REPORT AND RECOMMENDATION TO THE DISTRICT COURT TO
GRANT THE PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT,
DENY THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
AND ENTER MONEY JUDGMENTS IN FAVOR OF THE PLAINTIFF**

**A P P E A R A N C E S :**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111

     David J. Sheehan, Esq.
     Keith R. Murphy, Esq.
     Nicholas J. Cremona, Esq.
     Robertson D. Beckerlegge, Esq.
     Elyssa S. Kates, Esq.
     Heather J. McDonald, Esq.
     Anat Maytal, Esq.
     Maximillian S. Shifrin, Esq.
          Of Counsel

*Attorneys for Irving H. Picard, Trustee*
  *for the Liquidation of Bernard L. Madoff*
  *Investment Securities LLC*

BAKER & MCKENZIE LLP
815 Connecticut Avenue, N.W.
Washington, D.C. 20006

> Richard A. Kirby, Esq.
> Laura K. Clinton, Esq.
> Graham R. Cronogue, Esq.
>   Of Counsel

*Attorneys for Defendants*

SECURITIES INVESTOR PROTECTION CORPORATION
1667 K Street, N.W., Suite 1000
Washington, D.C. 20006

> Josephine Wang, Esq.
> Kevin H. Bell, Esq.
> Nathanael S. Kelley, Esq.
>   Of Counsel

*Attorneys for Securities Investor Protection*
  *Corporation*

Plaintiff Irving H. Picard, as trustee (the "Trustee") for the liquidation of Bernard

L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa *et seq.* ("SIPA"), moves for summary judgment, (*see*

*Trustee's Memorandum of Law In Support of Motion for Summary Judgment*, dated

Aug. 11, 2017 ("*Trustee Motion*") (ECF Doc. # 79)[1]), on his claims to avoid and recover

as intentional fraudulent transfers under 11 U.S.C. § 548(a)(1)(A) fictitious profits

transferred by BLMIS to the defendants (collectively, the "Defendants") in *Picard v.*

*Lowrey*, Adv. Proc. No. 10-4387; *Picard v. South Ferry Building Co.*, Adv. Proc. No. 10-

04488; *Picard v. South Ferry #2 LP*, Adv. Proc. No. 10-04350; and *Picard v. United*

---

[1]       "ECF Doc. # _" refers to documents filed on the docket of *Picard v. Lowrey*, Adv. Proc. No. 10-04387 (SMB).  References to documents filed on dockets of other cases will include the case number of such case.

*Congregations Mesora*, Adv. Proc. No. 10-05110 (collectively, the "Avoidance Actions")

between December 11, 2006 and December 11, 2008. The Defendants move for

summary judgment on those same claims, (*see Memorandum of Law In Support of*

*Lowrey Customers' Motion for Summary Judgment*, dated Aug. 11, 2017 ("*Defendants*

*Motion*") (ECF Doc. # 83-1)), asserting that they received the transfers "for value and in

good faith" pursuant to 11 U.S.C. § 548(c) and the Trustee's method for calculating their

fraudulent transfer liability violates the two-year reach-back period set forth in 11 U.S.C.

§ 548(a).[2]

The Court respectfully recommends for the reasons that follow that the *Trustee*

*Motion* be granted, the *Defendants Motion* be denied and that judgments be entered in

favor of the Trustee for the amounts set forth below.

## STIPULATED FACTS

The parties have stipulated to the following material facts:[3]

At all relevant times, Bernard L. Madoff ("Madoff") controlled BLMIS, first as its

sole member, and thereafter, as its chairman and chief executive. (*Lowrey Stip.* ¶ 1.)

BLMIS was an investment advisor and was registered with the SEC as a broker-dealer

---

[2]     Except for the amounts involved and the timing of the transfers, the relevant facts and the legal
arguments made by the parties on their summary judgment motions are identical in each of the
Avoidance Actions; for ease of reference, and unless otherwise indicated, this decision refers to the
documents and briefs submitted in the *Lowrey* case when addressing the parties' substantive arguments.

[3]     The parties submitted a factual stipulation for each Avoidance Action. To the extent citation to a
case-specific stipulation is necessary, the Court will refer to paragraphs in the stipulation for the *Lowrey*
case as "*Lowrey Stip.* ¶ _" (*see* ECF Doc. # 75); the *South Ferry Building Co.* case as "*SF Stip.* ¶ _" (*see*
ECF Adv. Proc. No. 10-04488 Doc. # 83); the *South Ferry #2 LP* case as "*SF #2 Stip.* ¶ _" (*see* ECF Adv.
Proc. No. 10-04350 Doc. # 90); and the *United Congregations Mesora* case as "*Mesora Stip.* ¶ _" (*see*
ECF Adv. Proc. No. 10-05110 Doc. # 57). In addition, the parties have stipulated to other facts which the
Court has not included in this report because it views them as immaterial.

under section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b), and a member of the Financial Industry Regulatory Agency (formerly known as the National Association of Securities Dealers).  (*Id.* ¶¶ 6-7.)

Madoff was arrested on December 11, 2008, and the Securities and Exchange Commission (the "SEC") contemporaneously commenced proceedings against BLMIS and Madoff in the United States District Court for the Southern District of New York (the "District Court").  *See Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791.  The Securities Investor Protection Corporation ("SIPC") filed an application pursuant to SIPA § 78eee(a)(4)(B) in the District Court based on BLMIS' inability to meet its obligations to securities customers as they became due, and the SEC consented to a combination of its own action with an application of SIPC pursuant to SIPA § 78eee(a)(4)(A).  (*Id.* ¶¶ 2-5.)[4]

Madoff admitted to running a Ponzi scheme through BLMIS at all times relevant to the Avoidance Actions.  (*Id.* ¶ 8.)  The Defendants stipulated to the following facts solely for the purpose of these proceedings (*id.* ¶ 9):

1.      BLMIS was operating a Ponzi scheme (*id.* ¶ 10);

2.      BLMIS was insolvent from at least December 11, 2002 and all points after (*id.* ¶ 11);

3.      BLMIS utilized commingled customer moneys to fund its operations, as well as to fund the withdrawal of fictitious profits and principal for other customers (*id.* ¶ 12);

4.      the investment advisory business (the "IA Business") did not actually trade securities for customers and did not generate any legitimate profits for customer accounts (*id.* ¶ 13);

---

[4]      The District Court issued a protective decree, appointed Mr. Picard as the Trustee of BLMIS, and removed the SIPA case to this Court pursuant to SIPA § 78eee(b)(4).

5.      the IA Business did not receive legitimate financial support from the other business units of BLMIS in amounts sufficient to satisfy the cash requirement needs of the IA Business customer withdrawals (*id.* ¶ 14);

6.      the IA Business did not receive any legitimate outside financial support from loans or otherwise (*id.* ¶ 15); and

7.      BLMIS received each deposit with the intent not to apply such funds to the purchase of securities for the accounts of its clients.  (*Id.* ¶ 16.)

The Defendants were customers of BLMIS.  They opened accounts at BLMIS in good faith and with no knowledge of BLMIS' fraud, and BLMIS accepted their funds for the stated purpose of trading securities for their benefit.  (*Id.* ¶¶ 42, 47.)  The Defendants' only business relationship with BLMIS was as customers of its IA Business.  (*Id.* ¶ 48.)  The Defendants did not invest in BLMIS, either as partners, shareholders or other equity stakeholders, and never purported to own a share of, or have a financial stake in, the business of BLMIS.  (*Id.* ¶ 49.)

During the lives of their accounts, each Defendant withdrew more money than it deposited in its BLMIS account.  The Court will refer to the amount of each Defendant's withdrawals that exceed its deposits as "fictitious profits."  During the two-year period preceding the December 11, 2008 commencement of the SIPA proceeding (the "Two Year Period"), each Defendant withdrew the amount of fictitious profits (the "Two Year Transfers") depicted in the following table:

**Table No. 1**

| ADV. PRO. NO. | DEFENDANT(S) | BLMIS ACCOUNT | FICTITIOUS PROFITS |
|---|---|---|---|
| 10-04387 | Turtle Cay Partners | 1CM585 | $7,845,089[5] |
| 10-04387 | Coldbrook Associates Partnership | 1CM880 | $1,093,402[6] |
| 10-04387 | James Lowrey; and Marianne Lowrey | 1CM832 | $582,182[7] |
| 10-04488 | South Ferry Building Co.; Emanuel Gettinger; Abraham Wolfson; and Zev Wolfson | 1S0451 | $6,620,000[8] |
| 10-04350 | South Ferry #2; Emanuel Gettinger; Aaron Wolfson; and Abraham Wolfson | 1S0047 | $21,955,000[9] |
| 10-05110 | United Congregations Mesora[10] | 1U0013 | $3,200,000[11] |

BLMIS made the Two Year Transfers to the Defendants with the actual intent to hinder, delay, or defraud some or all of its then existing and/or future creditors, (*id.* ¶ 44), but Defendants made each of the withdrawals (*i.e.*, received the Two Year Transfers) in good faith, believing that they were entitled to these funds and lacking knowledge of the Ponzi scheme.  (*Id.* ¶ 43.)

---

[5]    (*See Lowrey Stip.* ¶¶ 17-24.)

[6]    (*See Lowrey Stip.* ¶¶ 25-32.)

[7]    (*See Lowrey Stip.* ¶¶ 26-40.)

[8]    (*See SF Stip.* ¶¶ 17-26.)

[9]    (*See SF #2 Stip.* ¶¶ 17-26.)

[10]    United Congregations Mesora is a religious based charity, formed as New York religious corporation and recognized as a public charity under section 501(c)(3) of the Internal Revenue Code. (*Mesora Stip.* ¶ 16.)

[11]    (*See Mesora Stip.* ¶¶ 18-28.)

The Defendants received monthly account statements from BLMIS reporting purported securities transactions effected on their behalf.  At all times, BLMIS defrauded the Defendants by intentionally misrepresenting the purported securities transactions in their BLMIS accounts.  These misrepresentations made to the Defendants were an integral and essential part of the fraud, and were made to avoid detection of the fraud, retain existing investors, and lure other investors into the Ponzi scheme.  (*Id.* ¶ 50.)  The Defendants relied in good faith on BLMIS' reports of securities transactions that it purportedly made on behalf and for the benefit of the Defendants, (*id.* ¶ 51), they reasonably relied on the representations in the BLMIS account agreements and account statements, (*id.* ¶ 52), they were injured by BLMIS' fraud, (*id.* ¶ 54), and such injuries occurred in the state of New York.  (*Id.* ¶ 55.)

In addition, BLMIS did not comply with its obligations under the BLMIS account agreements, (*id.* ¶ 53), and the Trustee has not sought to avoid the BLMIS account agreements, (*id.* ¶ 56), or any of BLMIS' obligations to the Defendants.  (*Id.* ¶ 46.)

## PROPOSED CONCLUSIONS OF LAW

### A.    Jurisdiction, Standing, and Venue

This Court has jurisdiction over the Avoidance Actions pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the District Court's Amended Standing Order of Reference Re: Title 11, 12 misc. 00032, M10-468(LAP) (S.D.N.Y. Jan. 31, 2012).  Moreover, the District Court removed the BLMIS SIPA liquidation to this Court pursuant to SIPA § 78eee(b)(4),[12] (*see Order*, dated Sept. 15, 2008 at ¶ IX (ECF Case No. 08-01789 Doc. #

---

[12]    Section 78eee(b)(4) of SIPA provides:

**Removal to bankruptcy court**

1)), which conferred on this Court "all of the jurisdiction, powers, and duties" granted under SIPA.

The Avoidance Actions are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(H), but this Court may not enter a final judgment on these fraudulent transfer claims under the Supreme Court's ruling in *Stern v. Marshall*, 564 U.S. 462, 487 (2012); *accord SIPC v. BLMIS* (*In re BLMIS*), 490 B.R. 46, 51-52 (S.D.N.Y. 2013) ("Resolution of an avoidance action brought under SIPA would thus require an exercise of the judicial power reserved for Article III courts."), absent the parties' consent. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1944-46, 1949 (2015). The Defendants do not consent to this Court's entry of final judgment, (*see, e.g.*, *Defendants' Answer to Amended Complaint*, dated Jan. 16, 2014, at p. 24, ¶ 3 (ECF Doc. # 43)), but this Court may recommend proposed findings of fact and conclusions of law to the District Court. *Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2172-74 (2014).

The Trustee has demonstrated Article III standing. He brings the Avoidance Actions as a representative of an insolvent customer property estate to avoid and recover transfers for the benefit of the customer property estate which was injured by the fraudulent transfers of customer property, and the Trustee's action will redress that injury by replenishing the funds in the customer property estate available to satisfy the

---

Upon the issuance of a protective decree and appointment of a trustee, or a trustee and counsel, under this section, the court shall forthwith order the removal of the entire liquidation proceeding to the court of the United States in the same judicial district having jurisdiction over cases under Title 11. The latter court shall thereupon have all of the jurisdiction, powers, and duties conferred by this chapter upon the court to which application for the issuance of the protective decree was made.

The reference to the "court of the United States in the same judicial district having jurisdiction over cases under Title 11" means the bankruptcy court. *Turner v. Davis, Gillenwater & Lynch* (*In re Inv. Bankers, Inc.*), 4 F.3d 1556, 1564-65 (10th Cir. 1993), *cert. denied*, 510 U.S. 1114 (1994).

customers' net equity claims in the SIPA proceeding.  *SIPC v. BLMIS* (*In re BLMIS*), 531 B.R. 439, 449 (Bankr. S.D.N.Y. 2015).

The Trustee has also demonstrated that he has statutory and prudential standing under 15 U.S.C. § 78fff-2(c)(3).  The BLMIS estate has been insolvent since December 11, 2002 and at all points thereafter, and the customer property is "not sufficient" to pay in full the claims referenced in 15 U.S.C. § 78fff-2(c)(3).[13]

Finally, venue of the Avoidance Actions in this Court is proper under 28 U.S.C. § 1409(a).

## B.   The Trustee's *Prima Facie* Case

The *Trustee Motion* seeks summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, made applicable by Rule 7056 of the Federal Rules of Bankruptcy Procedure, to avoid and recover the Two Year Transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code.[14]   Section 548(a)(1)(A) provides in pertinent part:

> The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made . . . within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily made such transfer . . . with actual intent to hinder, delay, or defraud any [creditor].

---

[13]    Section 78fff-2(c)(3) of SIPA states:

Whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1), the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11.  Such recovered property shall be treated as customer property.  For purposes of such recovery, the property so transferred shall be deemed to have been the property of the debtor and, if such transfer was made to a customer or for his benefit, such customer shall be deemed to have been a creditor, the laws of any State to the contrary notwithstanding.

[14]    The Trustee had brought other avoidance claims against the Defendants that have been dismissed.  His sole remaining claims seek to avoid the fictitious profit withdrawals as intentional fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A).

If the Trustee avoids the initial transfer, he may recover the transfer or its value from, *inter alia*, the initial transferee (*i.e.*, the Defendants), 11 U.S.C. § 550(a)(1), and any immediate or mediate transferee of the initial transferee.  11 U.S.C. § 550(a)(2).

The Trustee has satisfied his *prima facie* case to avoid and recover the Two Year Transfers.  First, although customer funds held by a broker (such as BLMIS) are not the broker's property under state law, and an ordinary bankruptcy trustee cannot avoid a transfer of non-debtor property, "SIPA circumvents this problem through a statutorily created legal fiction that confers standing on a SIPA trustee by treating customer property as through it were 'property of the debtor' in an ordinary liquidation."  *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 213 (2d Cir. 2014) ("*Fairfield Greenwich*"); *see* 15 U.S.C. § 78fff-2(c)(3).  Thus, the Two Year Transfers represent "transfer[s] . . . of an interest of the debtor in property" for purposes of section 548(a).  Second, the parties stipulated to the amount of the Two Year Transfers,[15] and that BLMIS made the Two Year Transfers with "actual intent to hinder, delay, or defraud" creditors.  Alternatively, BLMIS' fraudulent intent may be presumed from the existence of the Ponzi scheme, because "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors."  *Bear, Stearns Sec. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 8 (S.D.N.Y. 2007) (quotation marks and citations omitted).

## C.    The Defenses

---

[15]    The Defendants challenge the Trustee's method for calculating fraudulent transfer liability, and that argument is addressed below.

The Defendants offer two lines of defense against the Trustee's *prima facie* case. First, they contend that they received the Two Year Transfers in good faith and for value within the meaning of 11 U.S.C. § 548(c) because the Two Year Transfers satisfied antecedent debts.  (*Defendants Motion* at 2-3, 11-31.)  Second, they maintain that the Trustee's method for calculating fraudulent transfer liability violates the two-year reach-back period in section 548(a)(1) of the Bankruptcy Code.  (*Id.* at 5, 40-49.)

These defenses are neither new nor untested.  The Defendants asserted and the District Court, exercising original bankruptcy jurisdiction, rejected both in *SIPC v. BLMIS* (*In re BLMIS*), 499 B.R. 416 (S.D.N.Y. 2013) ("*Antecedent Debt Decision*").  Ordinarily, the law of the case doctrine would foreclose "'reconsideration of issues that were decided—or that could have been decided—during prior proceedings in the same case." *Manolis v. Brecher*, 634 F. App'x 337, 338 (2d Cir. 2016) (quoting *United States v. Williams*, 475 F.3d 468, 471 (2d Cir. 2007)) (summary order).  But, a court may revisit a prior decision if there was "an intervening change of controlling law," *DiLaura v. Power Auth. of the State of N. Y.*, 982 F.2d 73, 76 (2d Cir. 1992) (quotation omitted), and the Defendants now assert that two subsequent decisions—*Picard v. Ida Fishman Revocable Trust* (*In re BLMIS*), 773 F.3d 411 (2d Cir. 2014) ("*Ida Fishman*"), *cert. denied*, 135 S. Ct. 2859 (2015) and *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042 (2017) ("*CalPERS*")—changed the law regarding Bankruptcy Code §§ 548(c) and 548(a)(1), respectively, in their favor.  (*See Defendants Motion* at 2-5.)  Accordingly, the Court will consider the arguments in the *Defendants Motion* to the extent they are tied to a purported change in controlling law.  Nevertheless, a discussion of the prior

proceedings is appropriate and necessary to determine if the Defendants' new authorities actually reflect an intervening change in the law.

### 1.     Value

A defendant may defend against a fraudulent transfer claim to the extent he "takes for value and in good faith." 11 U.S.C. § 548(c). "Value," for purposes of Bankruptcy Code § 548, includes satisfaction of an antecedent debt. 11 U.S.C. § 548(d)(2)(A). The parties have stipulated that the Defendants acted in good faith and concededly gave value to the extent they withdrew their principal deposits. The sole issue is whether the Defendants gave value for their excess withdrawals, the fictitious profits.

The Defendants argue, in substance, that BLMIS owed obligations under federal and state law at the time of each Two Year Transfer, and the fictitious profits satisfied those debts. Specifically, they contend that SIPA does not alter the scope of the defense set forth in 11 U.S.C. § 548(c). (*Defendants' Motion* at 15-18.) "Value" under section 548 is determined at the time the transfer is made and not in hindsight after the commencement of a SIPA liquidation. Accordingly, SIPA's priority distribution scheme is irrelevant, (*id.* at 18-22), and SIPA's computation of "net equity" does not bear on fraudulent transfer litigation. (*Id.* at 22-24.) At the time of the transfers, the Defendants had enforceable obligations against BLMIS arising under sections 28(a)(2) and 29(b) of the Securities Exchange Act of 1934 ("1934 Act") and section 8-501(b)(1) of the New York Uniform Commercial Code ("N.Y.U.C.C.), which the Trustee has not avoided, (*id.* at 24-29), as well as statutory and common law claims sounding in fraud and breach of fiduciary duty at the time of each Two Year Transfer. (*Id.* at 37-40.) The

Two Year Transfers satisfied these obligations at least in part.  Finally, brokerage customers of a Ponzi scheme must be treated differently than equity investors in such scheme.  (*Id.* at 31-36.)

### a.     The Prior Proceedings

Each of these arguments was previously raised or adopted by the Defendants and rejected by the District Court expressly or by implication.  Judge Rakoff initially visited the antecedent debt question in *Picard v. Greiff,* (*In re BLMIS*), 476 B.R. 715 (S.D.N.Y. 2012) ("*Greiff*"), *aff'd on other grounds,* 773 F.3d 411 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2859 (2015).  He observed that "every circuit court to address this issue has concluded that an investor's profits from a Ponzi scheme . . . are not 'for value.'"  *Greiff,* 476 B.R. at 725 (citing *Donell v. Kowell*, 533 F.3d 762, 771-72 (9th Cir.), *cert. denied*, 555 U.S. 1047 (2008); *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir.) (Posner, J.), *cert. denied,* 516 U.S. 1028 (1995) and *Sender v. Buchanan* (*In re Hedged-Invs. Assocs., Inc.*), 84 F.3d 1286, 1290 (10th Cir. 1996)).  Consequently, even if the defendants had claims against BLMIS under state or federal law, the transfers from BLMIS exceeding the return of defendants' principal were not made "for value."  *Id.*  In addition, treating the satisfaction of the state and federal claims as value would conflict with SIPA:

> To allow defendants, who have no net equity claims, to retain profits paid out of customer property on the ground that their withdrawals satisfied creditor claims under state law would conflict with the priority system established under SIPA by equating net equity and general creditor claims.

*Id.* at 727.

The Defendants were not parties to the *Greiff* proceeding, but they were parties to the next proceeding that culminated in the rulings they now seek to reverse.  In 2012,

the District Court withdrew the reference under 28 U.S.C. § 157(d) to decide whether "transfers made by Madoff Securities that the Trustee seeks to avoid were made in exchange for value, such as antecedent debts that Madoff Securities owed to the Antecedent Debt Defendants at the time of the transfers." (*Order*, dated May 12, 2012, ¶ 1 (ECF Dist. Dt. Case No. 12-MC-0115 Doc. # 107).)  The *Lowrey* case was one of the withdrawn proceedings, (*id.*, Ex. A., row 176), and the other Defendants in these Avoidance Actions participated through joinders.  (*See Joinder in Memorandum of Law In Support of Motion to Withdraw the Reference*, dated Dec. 14, 2011 (ECF Adv. Proc. No. 10-04488 Doc. # 26; ECF Adv. Proc. No. 10-04350 Doc. # 20; ECF Adv. Proc. No. 10-05110 Doc. # 17).)

The defendants submitted a consolidated brief to the District Court.  (*See Consolidated Memorandum of Law In Support of Motion to Dismiss Regarding Antecedent Debt Issues on Behalf of Withdrawal Defendants, as Ordered by the Court on May 12, 2012*, dated June 25, 2012 ("*Defendants 2012 Brief*") (ECF Dist. Dt. Case No. 12-MC-0115 Doc. # 199).)  They made the same arguments that the Defendants now make as shown the in following chart which compares the arguments in the Defendants' current memoranda and the arguments in their 2012 memoranda: [16]

---

[16]     This is no coincidence.  The Defendants' lead counsel Richard A. Kirby, Esq. authored the *Defendants 2012 Brief.*

**Table No. 2**

| Defendants' Arguments | Defendants Motion | Defendants 2012 Brief |
|---|---|---|
| SIPA does not alter the scope of the defense set forth in 11 U.S.C. § 548(c). | 15-18 | 5-6, 13-18 |
| "Value" for purposes of 11 U.S.C. § 548(c) is measured when the transfer is made and not in hindsight after the commencement of a SIPA liquidation. | 18-22 | 23 |
| The computation of net equity claims under SIPA does not bear on fraudulent transfer litigation. | 22-24 | 22-23 |
| The Defendants had enforceable obligations against BLMIS arising under sections 28(a)(2) and 29(b) of the 1934 Act and N.Y.U.C.C. 8-501(b)(1), which the Trustee has not avoided. | 24-29 | 2-6, 11-12, 44-45 |
| Brokerage customers of a Ponzi scheme must be treated differently than equity investors in such scheme. | 31-36 | 18-22 |
| The Defendants held statutory and common law claims sounding in fraud and breach of fiduciary duty at the time of each Two Year Transfer. | 36-40 | 9-11 |

The District Court rejected these arguments in the *Antecedent Debt Decision*. Citing *Greiff*, Judge Rakoff reiterated that the defendants did not have valid state law claims based on their account statements because the fictitious account statements were invalid and unenforceable. *Antecedent Debt Decision*, 499 B.R. at 421 n. 4. Moreover, even if the defendants held valid claims under the federal securities laws or state law, the claims did not provide value as against the BLMIS customer property estate under SIPA. *Id.* at 422 n. 6. He explained that a SIPA liquidation consists of two estates, and the assets of the customer property estate must be used to satisfy the customers' net equity claims on a priority basis. *Id.* at 419-21; *accord SIPC v. 2427 Parent Corp.* (*In re BLMIS*), 779 F.3d 74, 77 (2d Cir.) ("In a SIPA liquidation, a fund of customer property, separate from the broker-dealer's general estate, is established for priority distribution

exclusively among customers."), *cert. denied*, 136 S. Ct. 218 (2015); *In re BLMIS*, 654 F.3d 229, 233 (2d Cir. 2011) ("*Net Equity Decision*") ("In a SIPA liquidation, a fund of 'customer property,' separate from the general estate of the failed broker-dealer, is established for priority distribution exclusively among customers."), *cert. denied*, 567 U.S. 934 (2012); *Rosenman Family, LLC v. Picard*, 395 F. App'x 766, 768 (2d Cir. 2010) (summary order) ("Generally, SIPA liquidations involve two kinds of claimants: customers and general unsecured creditors.  To protect customers of failed brokerages, their claims are satisfied from a customer property estate, which is separate from the general estate used to satisfy the claims of general unsecured creditors. . . . To effectuate its purposes, SIPA accords 'those claimants in a SIPA liquidation proceeding who qualify as 'customers' of the debtor priority over the distribution of 'customer property.'") (footnote and citations omitted); *see CarVal UK Ltd. v. Giddens* (*In re Lehman Bros., Inc.*), 791 F.3d 277, 281 (2d Cir. 2015) ("SIPA trustees administer what is in effect a 'bankruptcy within a bankruptcy' for investors who had property on account with the broker-dealer.  *See* 15 U.S.C. § 78fff–2.  The trustee amasses 'customer property' and '[e]ach customer shares ratably in this fund of assets to the extent of the customer's net equity at the time of filing.'") (quoting *Stafford v. Giddens* (*In re New Times Sec. Servs., Inc.*)*,* 463 F.3d 125, 127 (2d Cir. 2006) (internal quotations marks and citation omitted)), *cert. denied*, 136 S. Ct. 1158 (2016).  SIPA prioritizes net equity claims and incorporates its priority system into the fraudulent transfer rules by allowing the trustee to recover fraudulent transfers if the customer property is insufficient, and deeming the recoveries to be part of the customer property estate rather than the general estate.  *Antecedent Debt Decision*, 499 B.R. at 423.

Judge Rakoff also rejected the defendants' argument that a SIPA trustee's rights in fraudulent transfer litigation are no greater than the rights of an ordinary bankruptcy trustee.  SIPA expressly provides that the Bankruptcy Code applies only to the extent that it is consistent with SIPA.  *Id.* (citing SIPA § 78fff(b)).  While the SIPA trustee can avoid transfers to the extent that the transfer is avoidable under the Bankruptcy Code, *id.* (citing SIPA § 78fff–2(c)(3)), Bankruptcy Code § 548(c) is not an element of the Trustee's avoiding powers; instead, it is an affirmative defense to an otherwise avoidable transfer.  SIPA does not necessarily imply that the section 548(c) defense must apply in the same way to the customer property estate as it would to the general estate.  *Id.* at 423-24.  More fundamentally, the assertion of a general damage claim as an offset against the recovery of customer property has the same effect as the assertion of that claim against the customer property estate.[17]  The satisfaction of general claims owed by BLMIS from the customer property estate would defeat the priority that SIPA intended customers to have against the separate and distinct customer property estate. *Id.* at 424-25.

Following a discussion of other issues not germane to the instant proceeding, the District Court concluded:

> Accordingly, defendants' motion to dismiss on all of the above grounds is denied.  Except to the extent provided in other orders, the Court directs that the following adversary proceedings be returned to the Bankruptcy Court for further proceedings consistent with this Opinion and Order: (1) those cases listed in Exhibit A of item number 107 on the docket of 12 Misc. 115 . . . .

---

[17]   In fact, it has a greater effect where the customer property estate is insufficient as here.  The setoff grants the defendant a dollar for dollar benefit for his "claim," while the net losers that hold net equity claims and are not fully compensated by SIPC insurance will receive less than a dollar for dollar recovery on their net equity claims.

*Id.* at 430.  This adversary proceeding was case number 200 on Exhibit A.  Although Judge Rakoff was exercising bankruptcy rather than appellate jurisdiction, his mandate on re-referral, to conduct further proceedings consistent with this Opinion and Order, necessarily implies the rejection of any other antecedent debt/value arguments made by the defendants that were inconsistent with the conclusions he reached.  *Cf. United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001) (The mandate rule "compels compliance on remand with the dictates of the superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court.") (quoting *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993) (emphasis omitted)).

Following the issuance of the *Antecedent Debt Decision*, several of the defendants, including the Defendants in these Avoidance Actions, moved before Judge Rakoff to certify an interlocutory appeal.  (*Antecedent Debt Defendants' Memorandum of Law in Support of Motion to Amend October 15, 2013 Opinion and Order Regarding Antecedent Debt Issues to Add 28 U.S.C. §1292(b) Certification for Interlocutory Appeal*, dated Oct. 29, 2013 (ECF Dist. Ct. Case No. 12-mc-0115 Doc. # 491).)[18]  The movants identified seven issues as to which, among other things, they argued there was a substantial ground for a difference of opinion.  (*Id.* at 4-11.)  Six of the issues centered on Judge Rakoff's conclusions relating to the antecedent debt/value issue.[19]  These included whether the satisfaction of the defendants' state and federal claims constituted value under Bankruptcy Code § 548(c), whether the Trustee had to first avoid a BLMIS obligation before disregarding its value under § 548(c), and whether SIPA authorized a

---

[18]    Once again, the Defendants' counsel authored the supporting memorandum submitted on behalf of all of the moving defendants.

[19]    The seventh concerned inter-account transfers.

departure from the usual rules, specifically those relating to the value defense under § 548(c), that govern fraudulent transfer litigation under the Bankruptcy Code.

The Trustee's response methodically addressed each of the movants' issues and explained why there was no substantial ground for a difference of opinion from the one the District Court had expressed.  (*Trustee's Memorandum of Law in Opposition to the Antecedent Debt Defendants' Motion to Amend October 15, 2013 Opinion and Order Regarding Antecedent Debt Issues to Add 28 U.S.C. § 1292(b) Certification for Interlocutory Appeal*, dated Nov. 19, 2013, at 9-23 (ECF Dist. Ct. Case No. 12-mc-0115 Doc. # 504).)  In the main, the Trustee argued that the District Court's reading of value in a SIPA case was consistent with the Second Circuit's decision in *Net Equity Decision*. In the latter case, the Second Circuit ruled that a customer's net equity claim should be computed under the Net Investment Method which deducts withdrawals from deposits without regard to the monthly statements generated by BLMIS because this method relies on unmanipulated deposits and withdrawals and ignores Madoff's arbitrary assignment of fictitious gains in the monthly statements sent to customers.  *Net Equity Decision*, 654 F.3d at 238.  The Trustee argued that the determination of net equity was "inherently intertwined" with the definition of value under § 548(c) in fraudulent transfer litigation because allowing the defendants to offset non-SIPA, non-net equity claims, would, in effect, draw money out of the customer property estate to pay those claims in violation of SIPA.

The District Court denied the certification motion.  Among other reasons, it was "not of the opinion that there is a substantial ground for difference of opinion as to the holding of the Opinion and Order, substantially for the reasons stated in the Trustee's

memorandum of law in opposition to the motion." *SIPC v. BLMIS* (*In re BLMIS*), 987 F. Supp. 2d 309, 311 (S.D.N.Y. 2013).

The antecedent debt/value issue was also litigated in subsequent proceedings.  In *Picard v. Cohen*, the Court extensively reviewed that history and extracted two rules regarding the determination of "value" given by a Ponzi scheme transferee.[20]  Adv. Proc. No. 10-04311(SMB), 2016 WL 1695296, at *5-10 (Bankr. S.D.N.Y. Apr. 25, 2016) ("*Cohen*") (report and recommendation), *adopted by*, No. 16 CV 5513(LTS), slip op. (S.D.N.Y. Feb. 24, 2017).  First, in both SIPA and non-SIPA cases, "[a] transferee does not give value beyond his deposits of principal." *Cohen*, 2016 WL 1695296, at *10-11 (discussing *Silverman v. Cullin* (*In re Agape World, Inc.*), 633 F. App'x 16 (2d Cir.) (summary order), *cert. denied*, 137 S. Ct. 160 (2016)).  Second, in SIPA Ponzi scheme cases, "[n]et winners cannot argue that the payment of fictitious profits satisfied an antecedent debt or obligation and provided value within the meaning of Bankruptcy Code § 548(c)." *Id.*, at *11.  SIPA creates a priority customer property estate to be distributed pro rata to customers holding net equity claims, and "[p]ermitting a net winner to offset a non-net equity claim against the trustee's claim for the return of customer property effectively allows the net winner to recover his non-SIPA claim at the expense of net losers in violation of SIPA's priority rules." *Id.*

---

[20]     The Court refers to the *Cohen* decision for a detailed account of the numerous BLMIS proceedings addressing the section 548(c) defense and the principles generated therefrom.

### b.    The Defendants' Motion

Seeking to reverse these adverse rulings, the Defendants argue that the Second Circuit's decision in *Ida Fishman* mandates a different result.  In *Ida Fishman*, defendants across numerous cases, including the Avoidance Actions, moved to dismiss the Trustee's avoidance claims (other than the intentional fraudulent transfer claims under § 548(a)(1)(A)), arguing that the transfers were protected by the safe harbor under 11 U.S.C. § 546(e).[21]   *Ida Fishman*, 773 F.3d at 414-15.

The Second Circuit agreed with the movants for two, independent reasons.  First, the account opening documents executed by the defendants, which authorized BLMIS to trade securities and options for the defendants, constituted "securities contracts" for purposes of section 546(e), and hence, the transfers were made "in connection with a securities contract."  *Id.* at 418-19.  Thus, although the transfers were made in connection with a Ponzi scheme and were fraudulent, they were still protected by the safe harbor.  *Id.* at 422.

Second, the customer withdrawals constituted "settlement payments" made by a stockbroker within the meaning of section 546(e).  The Trustee argued that the transfers could not be settlement payments because BLMIS never engaged in actual securities

---

[21]    Section 546(e) provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section 101 or 741 of this title, made by . . . a . . . stockbroker . . . , or that is a transfer made by . . . a . . . stockbroker . . . in connection with a securities contract, as defined in section 741(7), . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).  The safe harbor "operates as an exception to the avoiding powers afforded to the trustee under the substantive avoidance provisions" except for "an actually fraudulent transfer under § 548(a)(1)(A)."  *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018).

trading.  *Id.*  Disagreeing with the Trustee's premise, the Court observed that "[e]ach time a customer requested a withdrawal from BLMIS, he or she *intended* that BLMIS dispose of securities and remit payment to the customer."  *Id.* (emphasis added) (citing N.Y.U.C.C. § 8–501(b)(1) & cmt. 2 (broker's written crediting of securities to a customer's account creates an enforceable securities entitlement)).  "[I]f I instruct my broker to sell my shares of ABC Corporation and remit the cash, that payment is a "settlement" even if the broker may have failed to execute the trade and sent me cash stolen from another client."  *Id.*

Finally, the Second Circuit rejected the Trustee's argument that the application of the section 546(e) safe harbor would be inconsistent with the *Net Equity Decision*.  The *Net Equity Decision* interpreted "net equity" under the SIPA statutory framework, but section 546(e) is part of the Bankruptcy Code, not SIPA.  *Ida Fishman*, 773 F.3d at 423. This distinction is important "because, in enacting the Bankruptcy Code, Congress struck careful balances between the need for an equitable result for the debtor and its creditors, and the need for finality."  *Id.*  "[B]y enacting § 546(e), Congress provided that, for a very broad range of securities-related transfers, the interest of finality is sufficiently important that they cannot be avoided by a bankruptcy trustee at all, except as actual fraudulent transfers under § 548(a)(1)(A)."  *Id.*

Although *Ida Fishman* did not concern or consider "value" under § 548(c), the Defendants contend that it mandates the reconsideration and the reversal of all of the prior case law that ruled that fictitious profits do not constitute value.  They mainly contend that *Ida Fishman* distinguished between the calculation of a customer's net equity claim under SIPA and the application of the section 546(e) safe harbor to the

Trustee's avoidance claim, and reason that the distinction between SIPA and the Bankruptcy Code "applies equally" to the application of section 548(c) to the Trustee's avoidance claim.  Accordingly, the section 548(c) defense must apply to an avoidance claim in a SIPA case in the same manner as it does in an ordinary bankruptcy case.  (*Defendants Motion* at 23.)  As a result, the satisfaction of BLMIS' antecedent debts, valid at the time they were paid, constitutes value under § 548(c).  (*Id.*)

Non-bankruptcy law, however, makes the same distinction that the Defendants contend exists only under SIPA.  BLMIS, like any broker, was the steward of two separate estates.  It owned its own property which it could use to carry on its business and pay its personal debts.  It also held customer deposits in what amounted to a trust, and a broker's use of customer property is restricted by the "Customer Protection Rule" promulgated in 17 C.F.R. § 240.15c3-3.[22]

---

[22]   The provisions of the Customer Protection Rule most relevant to this analysis are subsections (b) and (e), which provide in pertinent part

>   (b) Physical possession or control of securities.
>
>>   (1)  A broker or dealer shall promptly obtain and shall thereafter maintain the physical possession or control of all fully-paid securities . . . carried by a broker or dealer for the account of customers.
>
>   . . .
>
>   (e)  Special reserve bank accounts for the exclusive benefit of customers . . . .
>
>>   (1)  Every broker or dealer must maintain with a bank . . . at all times when deposits are required or hereinafter specified a "Special Reserve Bank Account for the Exclusive Benefit of Customers" (hereinafter referred to as the Customer Reserve Bank Account) . . . separate from . . . any other bank account of the broker or dealer.  Such broker or dealer must at all times maintain in the Customer Reserve Bank Account . . . through deposits made therein, cash and/or qualified securities in amounts computed in accordance with the formula attached as Exhibit A (17 CFR 240.15C3-3a), as applied to [the] customer account[].
>
>>   (2)  With respect to each computation required pursuant to paragraph (e)(1) of this section, a broker or dealer must not accept or use any of the amounts under items comprising Total Credits under the formula referred to in paragraph (e)(1) of this section except for the specified purposes indicated under items comprising Total Debits under the formula, and, to the extent Total Credits exceed Total Debits, at

> The [Customer Protection] Rule requires broker-dealers to safeguard both the cash and securities of their customers so that customer assets can be quickly returned if the firm fails.  In broad strokes, a broker-dealer cannot use customer assets to finance the business activities of the firm, and it cannot place customer assets in locations or accounts that make them vulnerable to claims made against the broker-dealer by third parties.

*In re Merrill Lynch, Pierce, Fenner & Smith Inc.*, Exchange Act Release No. 34-78141, 2016 WL 4363431, at *1 (June 23, 2016); *see* Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1070 (2002) ("*Jamroz*") ("The rule, which can be loosely described as a 'segregation' rule, divides the customer and proprietary activities of the firm."); *cf. Barclays Capital Inc. v. Giddens* (*In re Lehman Bros. Inc.*), 478 B.R. 570, 596 (S.D.N.Y. 2012) (Customer Protection Rule applied to a SIPA trustee because he was continuing to resolve claims for securities and close out transactions), *aff'd*, 761 F.3d 303 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2048 (2015).

Subsection (b) of the Customer Protection Rule safeguards securities in a customer's account by requiring that the broker-dealer "promptly obtain" and "thereafter maintain the physical possession or control" of such securities.  17 C.F.R. § 240.15c3-3(b)(1).  "Physical possession or control generally means that the broker-dealer must hold these securities in one of several locations . . . and that they be held free of liens or any other interest that could be exercised by a third-party to secure an

---

least the net amount thereof must be maintained in the Customer Reserve Bank Account . . . pursuant to paragraph (e)(1) of this section.

(3)  Reserve Bank Account computations.

　　(i)  Computations necessary to determine the amount required to be deposited in the Customer Reserve Bank Account . . . as specified in paragraph (e)(1) of this section must be made weekly, as of the close of the last business day of the week, and the deposit so computed must be made no later than one hour after the opening of banking business on the second following business day . . . .

17 C.F.R. § 240.15c3-3(b) & (e).

obligation of the broker dealer." *Merrill Lynch*, 2016 WL 4363431, at *5 (citing 17
C.F.R. § 240.15c3-3(c)); *accord Jamroz,* 57 Bus. Law. at 1070 (same).  This requirement
is in accord with the fact that a customer's securities are not assets of the broker-dealer,
and instead, the broker-dealer holds the securities in a "custodial capacity . . . designed
to ensure that the carrying broker-dealer treats them in a manner that allows for their
prompt return." *Merrill Lynch*, 2016 WL 4363431, at *5 n. 3.

 A customer's cash is protected under subsection (e) through the creation of a
separate "Customer Reserve Bank Account" (hereinafter, the "Customer Reserve
Account") which "is designed to prevent broker-dealers from using funds or securities
held on behalf of customers to finance proprietary and other non-customer transactions,
by requiring that the broker-dealer keep a separate bank account for the benefit of
customers, based on a weekly calculation." *Upton v. SEC*, 75 F.3d 92, 93 (2d Cir. 1996).
The Customer Reserve Account must have enough funds to cover the net amount the
broker-dealer owes to its customers:

> The *reserve requirement is designed to prevent the carrying broker-dealer from using customer funds for business activities* [and] to put [such broker-dealer] in a position to be able to meet its cash obligations to customers by requiring the firm to make deposits of cash and/or U.S. government securities into the Reserve Account in the amount of the net cash owed to customers.

*Merrill Lynch*, 2016 WL 4363431, at *4 n. 2 (emphasis added).

 The broker must calculate the amount of the Reserve Account on a weekly basis,
17 C.F.R. § 240.15c3-3(e)(3)(i), comparing the total "customer credits" (including
customer funds held by the broker-dealer) with "customer debits" (including amount

owed to the broker-dealer by customers).[23]  *Upton,* 75 F.3d at 93 & n. 1.  Moreover, the broker-dealer must obtain a "written contract" from the bank, which provides "that the cash . . . will at no time be used directly or indirectly as security for a loan to the broker or dealer by the bank and will not be subject to any right, charge, security interest, lien, or claim of any kind in favor of the bank or any person claiming through the bank."  17 C.F.R. § 240.15c3-3(f).  Lastly, if a broker-dealer fails to maintain the amount required under 17 C.F.R. § 240.15c3-3(e) in the Customer Reserve Account, such broker-dealer must "immediately notify" the Securities and Exchange Commission and Financial Industry Regulatory Authority.  17 C.F.R. § 240.15c3-3(i).

In short, customer securities and cash "held by a broker on behalf of its customers is not the broker's property," *Fairfield Greenwich*, 762 F.3d at 213, and cannot be used to pay the broker's personal liabilities.  To the extent BLMIS paid fictitious profits prior to the SIPA proceeding, it used customer funds it held in trust to discharge its personal debts which, according to the Defendants, were imposed by the federal securities laws, the N.Y.U.C.C. and state tort and contract law.[24]  The use of customer funds for this purpose was the equivalent of the forbidden practice of making customer property "vulnerable to claims made against the broker-dealer by third parties."  *Merrill Lynch,* 2016 WL 4363431, at *1.

---

[23]     Exhibit A to the Customer Protection Rule lists the specific items that are considered on the "credit" and "debit" side of the equation.  *See* 17 C.F.R. § 240.15c3-3a.

[24]     It does not matter whether BLMIS actually established a Customer Reserve Account or held the transferred funds in a Customer Reserve Account.  If the funds are a credit item under the formula, they are subject to the strictures governing transfers from the Customer Reserve Account.  *Barclays Capital, Inc. v. Giddens*, 478 B.R. at 595. "Customer credits" include customer funds held by the broker-dealer.  *Upton*, 75 F.3d at 93 n. 1.  "Transferring assets from outside the Reserve Bank Account that clearly were debited to it would violate Rule 15c3–3's requirement that the Reserve Bank Account hold a specified amount 'at all times.'"  *Barclays Capital, Inc. v. Giddens*, 478 B.R. at 595 (citations omitted).

The Defendants nonetheless argue that the Customer Protection Rule "does not prohibit the broker-dealer from paying general debts out of customer funds; it merely requires the broker-dealer to replenish the funds." (*Letter from Richard A. Kirby, Esq.*, dated Dec. 20, 2017 ("*Kirby Letter*") at 2 (ECF Doc. # 96).) To the contrary, subsection (e)(2) of the Customer Protection Rule specifically restricts the use of funds in the Customer Reserve Account:

> With respect to each computation required pursuant to paragraph (e)(1) of this section, *a broker* or dealer *must not* accept or *use any of the amounts under items comprising Total Credits* under the formula referred to in paragraph (e)(1) of this section *except for the specified purposes indicated under items comprising Total Debits* under the formula, and, to the extent Total Credits exceed Total Debits, at least the net amount thereof must be maintained in the Customer Reserve Bank Account . . . .

17 C.F.R. § 240.15c3-3(e)(2) (emphases added); *accord Jamroz*, 57 BUS. LAW. at 1114 ("Although the [SEC] has accepted the weekly Reserve Formula computation as an accommodation to the operational limitations of the industry, its application of paragraph (e)(2) would suggest that the broker-dealer is nevertheless prohibited from using Credit Items received between computations in its business."). In the end, BLMIS stole customer funds to pay fictitious profits in satisfaction of BLMIS' own liabilities. A thief has no right to steal another person's property simply because he is obligated to pay it back.

The rules governing a SIPA liquidation recognize and continue the dual nature of the broker's estate. SIPA trustees administer the broker's general estate and also "administer what is in effect a 'bankruptcy within a bankruptcy' for investors who had property on account with the broker-dealer." *Lehman Bros.*, 791 F.3d at 281. SIPA recognizes the simultaneous existence of the two estates by apportioning assets and

liabilities between them.  *See, e.g.,* SIPA § 78fff(d) ("[A]ny cash or securities remaining after the liquidation of a lien or pledge made by a debtor shall be apportioned between his general estate and customer property in the proportion in which the general property of the debtor and the cash and securities of the customers of such debtor contributed to such lien or pledge"); SIPA § 78fff-2(c)(1)(D) ("Any customer property remaining after allocation in accordance with this paragraph shall become part of the general estate of the debtor."); SIPA § 78fff-2(c)(3) (property recovered as fraudulent transfers "shall be treated as customer property"); SIPA § 78eee(b)(5)(E) ("Allowances granted by the court. . .  shall be charged against the general estate of the debtor as a cost and expense of administration."); SIPA § 78fff(e) ("All costs and expenses of administration of the estate of the debtor and of the liquidation proceeding shall be borne by the general estate of the debtor to the extent it is sufficient therefor, and the priorities of distribution from the general estate shall be as provided in section 726 of Title 11.").

Although *Ida Fishman* distinguished between computing net equity under SIPA and the reach of the safe harbor under the Bankruptcy Code, *Ida Fishman* did not address the question of value or convert a pre-filing diversion of customer property into the valid payment in satisfaction of the broker's antecedent debt.  Even if BLMIS owed obligations to the Defendants, the customers did not, and the use of their property to pay fictitious profits was not supported by value.  *Trs. of the Upstate N. Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 567 (2d Cir. 2016) ("[I]t is incontestable that any amount withdrawn in excess of the Plan's net investment would have been money taken from other BLMIS customers through a fraudulent transfer.  *See*

*Picard*, 773 F.3d at 421–22 ("these transfers were … made 'in connection with' a Ponzi scheme and, as a result, were fraudulent"); *Balaber–Strauss v. Sixty–Five Brokers* (*In re Churchill Mortg. Inv. Corp.*), 256 B.R. 664, 682 (Bankr. S.D.N.Y. 2000) (noting "the universally-accepted rule that investors may retain distributions from an entity engaged in a Ponzi scheme to the extent of their investments, while distributions exceeding their investments constitute fraudulent conveyances")), *cert. denied*, 137 S. Ct. 2279 (2017). The Two Year Transfers did not satisfy an antecedent debt owed by the customers or provide value to the other customers — to the contrary, they denuded the customer property.

The Defendants also repeat their 2012 argument (*see Defendants 2012 Brief* at 18-23), that the Ponzi scheme jurisprudence limiting value to principal deposits does not apply to brokerage customers as it would to an equity investor. (*Defendants Motion* at 31-36.) According to the Defendants, *Ida Fishman*'s ruling that their withdrawals were settlement payments or transfers in connection with a securities contract requires the Court to revisit Judge Rakoff's earlier conclusions. (*Defendants Motion* at 33-34.) In other words, if a transfer was a "settlement payment" within the meaning of 11 U.S.C. § 546(e), it must have been made for value within the meaning of 11 U.S.C. § 548(c).

In enacting section 546(e), Congress made the decision that intentional fraudulent transfers should be excluded from its protection. *Ida Fishman* did not discuss the "value" defense, or upset the general rule in Ponzi scheme cases limiting value to principal deposits. *See Silverman v. Cullin*, 633 F. App'x at 17 ("Other courts of appeals have held that payments of "interest" to Ponzi scheme investors should be treated as fraudulent transfers, because "fair consideration" is not present in the context

of such schemes. . . .  While we have not addressed this issue, the prevailing view in the district and bankruptcy courts in this Circuit has agreed with this consensus.").  Furthermore, *Ida Fishman*'s parenthetical reference to N.Y. U.C.C. § 8-501(b)(1) was made in the context of the customer's understanding that he or she was entitled to the securities identified in the monthly statement and the customer's "intent" each time the customer requested a withdrawal "that BLMIS dispose of securities and remit payment to the customer."  *Ida Fishman*, 773 F.3d at 422.  The customer's intent or understanding may bear on his good faith but not on value.  That a transfer qualified as a "settlement payment" under 11 U.S.C. § 546(e) in light of the customer's understanding and intent does not mean that it conferred value on the customer property BLMIS estate.[25]

## 2.    Section 548(a)(1) and "Repose"

Section 548(a)(1) of the Bankruptcy Code limits transfers subject to avoidance to those made "within 2 years before the date of the filing of the petition . . . ."  In *Greiff*, the District Court adopted the Trustee's "Net Investment Method" for calculation of a defendant's fraudulent transfer exposure but limited the Trustee's ability to avoid and recover transfers to those occurring within the Two Year Period:

> First, amounts transferred by [BLMIS] to a given defendant at any time are netted against the amounts invested by that defendant in [BLMIS] at any time.  Second, if the amount transferred to the defendant exceeds the amount invested, the Trustee may recover these net profits from that defendant to the extent that such monies were transferred to that defendant in the two years prior to [BLMIS'] filing for bankruptcy.  Any net profits in excess of the amount transferred during the two-year period

---

[25]     A transfer of fictitious profits also does not confer any value on the broker's general estate.  It merely substitutes the broker's obligation to replenish the Customer Reserve Account for the obligation to the transferee.

are protected recovery by the Bankruptcy Code's statute of limitations.  *See* 11 U.S.C. § 548(a)(1).

476 B.R. at 729 (adopting approach set forth in *Donell v. Kowell*, 533 F.3d at 771-72).

The Defendants subsequently challenged this approach in 2012 before the District Court arguing that the Net Investment Method violated section 548(a)(1) by permitting the Trustee to avoid withdrawals prior to the Two Year Period by considering such withdrawals in his liability calculation.  (*See Defendants 2012 Brief* at 28-29 ("[A] fatal flaw to the Trustee's approach is that time-barred fraudulent transfer claims would be used offensively to increase the maximum fraudulent transfer exposure of Defendants").)  They even argued as they do here that the two-year limit was a statute of repose.  (*See Defendants 2012 Brief* at 25 ("The limitation simply reflects the same statutory policies of repose and certainty that are incorporated into any statute of limitation."); 28 ("The Trustee should not be given license to extend indefinitely the two-year statutory Reach-Back Period, thus thwarting the salutary policies underlying Section 548(a)'s reach-back – repose, certainty and finality."); 39-40 ("Like statutes of limitations, reach-back periods are statutes of repose established by legislatures in recognition of the fact that it would be unfair and unreasonable to force a person to litigate a particular issue more than a certain number of years after the occurrence giving rise to the claim.").)

The District Court rejected this argument.  Although section 548(a)(1) permits the Trustee to avoid only those transfers occurring in the Two Year Period, "there is no similar limitation in section 548(c) with respect to whether a given transfer is 'for value.'"  *Antecedent Debt Decision*, 499 B.R. at 427.  "The concept of harm or benefit to

the estate is separate from the concept of the reach-back period, which merely serves to allow finality to ancient transactions," and "there is no reason why a line should be drawn at the beginning of the reach-back period in determining whether a transfer was for value." *Id.* Judge Rakoff additionally opined that the Net Investment Method created a more equitable result because the Defendants' proposed method of considering only deposits and withdrawals in the Two Year Period "shifts the point at which principal turns into fictitious profits for some defendants, granting them a windfall based on the happenstance of the timing of those investments of principal." *Id.* at 428. Lastly, the Net Investment Method "harmonize[d] the avoidance and recovery scheme with the Second Circuit's [*Net Equity Decision*] upholding the Trustee's net-equity calculation, even if the issue of the scope of the Trustee's avoidance power was not explicitly before the Second Circuit in that case." *Id.*

The Defendants now argue that the Supreme Court's 2017 *CalPERS* decision requires a different conclusion. (*Defendants Motion* at 44-46.) In *CalPERS*, investors in certain publically offered securities issued in 2007 and 2008 by Lehman Brothers filed a timely putative class action against the underwriters of the offering alleging that the registration statements contained material misstatements or omissions in violation of § 11 of the Securities Act of 1933. 137 S. Ct. at 2047-48. A claim brought under § 11 is subject to certain time limits imposed under § 13, including that "[i]n no event shall any such action be brought to enforce a liability created under [§ 11] more than three years after the security was bona fide offered to the public . . . ." (*Id.* at 2047 (quoting 15

U.S.C. § 77m)).[26]  The class action was consolidated in a multi-district litigation with other Lehman securities suits ("MDL").  *Id.* at 2048.

In February 2011—more than three years after the relevant Lehman securities were publically offered—the California Public Employees' Retirement System ("CalPERS") commenced a separate action against the underwriters asserting the same claims as in the class action, and the CalPERS action was transferred and consolidated with the MDL.  *Id.*  Soon thereafter, a proposed settlement was reached in the class action, but CalPERS opted out of the class.  *Id.*  The underwriters subsequently moved to dismiss the CalPERS action asserting that the action was commenced in violation of the Three Year Rule.  *Id.*

The primary issue before the Supreme Court was whether the Three Year Rule was a statute of limitations, which may be subject to equitable tolling, *see Am. Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 559 (1974), or a statute of repose, which typically is not.  *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2183 (2014).  The Supreme Court held that the Three Year Rule was a statute of repose, and therefore, not subject to tolling, and the Supreme Court dismissed the CalPERS action as untimely.  *CalPERS*, 137 S. Ct. at 2049-55.

*CalPERS* does not represent intervening law mandating a reexamination or modification of the reasoning or the result reached in the *Antecedent Debt Decision*. *CalPERS* did not concern section 548 or the Bankruptcy Code, and merely resolved a circuit split as to whether the tolling rule in *Am. Pipe* applied to the Three Year Rule

---

[26]     This time restriction is referred to as the "Three Year Rule."

under section 13.  *See CalPERS*, 137 S. Ct. at 2048.  The Defendants nonetheless assert that the two-year lookback period set forth in section 548(a)(1) is likewise a statute of repose, and the Net Investment Method violates the statute of repose because it has the effect of avoiding withdrawals prior to the Two Year Period.  (*Defendants Motion* at 42-45.)  As noted, the *Antecedent Debt Decision* rejected this precise argument.

In any event, and assuming that the two-year lookback period in section 548(a)(1) is a statute of repose, the Trustee is only attempting to recover transfers made within the Two Year Period.  The parties have stipulated that the Trustee has satisfied his *prima facie* burden under 11 U.S.C. § 548(a)(1)(A).  The question raised by the Defendants arises as a result of the good faith/value defense under section 548(c), which is their burden to prove and not an element of the Trustee's intentional fraudulent transfer claim.  If the Defendants did not argue that they gave value for the Two Year Transfers, this issue would not arise.

In conclusion, the Court respectfully recommends that the District Court adopt these proposed findings of fact and conclusions of law, and enter judgments in favor of the plaintiff and against the Defendants in the amounts of the Two Year Transfers of fictitious profits listed in Table No. 1, *supra*.

One last point concerns prejudgment interest.  The Trustee argues that he is entitled to prejudgment interest, and reserves the right to request a post-judgment hearing to determine the appropriate interest rate.  (*Trustee's Motion* at 3 n. 2.)  The award of prejudgment interest is discretionary, and absent a sound reason to deny it, it should be awarded.  *Hechinger Inv. Co. of Del., Inc. v. Universal Forest Prods., Inc.* (*In*

*re Hechinger Inv. Co. of Del., Inc.*), 489 F.3d 568, 579–80 (3d Cir. 2007); *In re Milwaukee Cheese Wis., Inc.,* 112 F.3d 845, 849 (7th Cir. 1997); *Savage & Assocs., P.C. v. Mandl* (*In re Teligent, Inc.*), 380 B.R. 324, 344 (Bankr. S.D.N.Y. 2008).  In exercising discretion whether to award prejudgment interest, a court should consider: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *McHale v. Boulder Capital LLC* (*In re 1031 Tax Grp., LLC*), 439 B.R. 84, 87 (Bankr. S.D.N.Y. 2010) (quoting and applying the criteria set forth in *Wickham Contracting Co., Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL–CIO,* 955 F.2d 831, 833–34 (2d Cir. 1992) to an award of prejudgment interest in connection with an avoided fraudulent transfer).

The Defendants responded that the Trustee did not provide any factual or legal foundation for an award of interest, but if the Court were inclined to award interest, the only remaining claim is a federal claim under Bankruptcy Code § 548, and the Court should use the post-judgment interest rate under 28 U.S.C. § 1691.  (*Lowrey Customers' Memorandum of Law in Opposition to Trustee's Motion for Summary Judgment*, dated Sept. 25, 2017, at 30 n. 14. (ECF Doc. # 86).)  In reply, the Trustee emphasized that the Defendants keep relitigating the same antecedent debt/value issue, and the resulting delays have come at the expense of the net losers.  (*Trustee's Reply Memorandum of Law in Further Support of His Motion for Summary Judgment*, dated Oct. 25, 2017, at 5 n. 7 (ECF Doc. # 92).)

This battle over interest has been fought out entirely in isolated footnotes included in lengthy legal memoranda.  Since the Trustee has sought to reserve his right to litigate the amount of interest after judgment is entered, the parties can at that time also address in a more conventional manner whether a discretionary award of interest is appropriate.

The Court has reviewed the Defendants' arguments and, to the extent not addressed herein, concludes that they lack merit or are moot.  Based on the foregoing, the Clerk of the Court is respectfully directed to mail a copy of these proposed findings of fact and conclusions of law to all parties and note the date of mailing on the docket. FED. R. BANKR. P. 9033(a).

Dated:  New York, New York
        March 22, 2018

                                    /s/ *Stuart M. Bernstein*
                                    STUART M. BERNSTEIN
                                    United States Bankruptcy Judge