ORAL ARGUMENT REQUESTED

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br>            Plaintiff-Applicant,<br>     v.<br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br>            Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br>BERNARD L. MADOFF,<br>            Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>            Plaintiff,<br>     v.<br>SOUTH FERRY BUILDING COMPANY et al.,<br><br>            Defendants. | Adv. Pro. No. 10-04488 (SMB) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>            Plaintiff,<br>     v.<br>SOUTH FERRY #2 et al.,<br>            Defendants. | Adv. Pro. No. 10-04350 (SMB) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>            Plaintiff,<br>     v.<br>UNITED CONGREGATIONS MESORA,<br>            Defendant. | Adv. Pro. No. 10-05110 (SMB) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>            Plaintiff,<br>     v.<br>JAMES LOWREY et al.,<br>            Defendants. | Adv. Pro. No. 10-04387 (SMB) |

**DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF RULE 9033**
**OBJECTIONS TO BANKRUPTCY COURT'S REPORT AND RECOMMENDATIONS**

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT AND SUMMARY OF OBJECTIONS ..................................................... 1

STATEMENT OF THE CASE .............................................................................................................. 6

    A.   Trustee's claims and Defendants' defenses ..................................................................... 6

        1.   SF Defendants ..................................................................................................... 8

        2.   Lowrey Defendants .............................................................................................. 8

    B.   Madoff Securities' fraudulent scheme ............................................................................ 9

    C.   Madoff Securities' representations and Defendants' reliance ....................................... 10

    D.   Account and transaction history ................................................................................... 10

    E.   Defendants' lost opportunity costs ............................................................................... 12

    F.   Bankruptcy court proceedings ..................................................................................... 13

STANDARD OF REVIEW ................................................................................................................ 13

OBJECTIONS TO PROPOSED CONCLUSIONS OF LAW AND FINDINGS OF FACT ................... 14

  I.   The bankruptcy court erred by rejecting the statutory affirmative defenses ................................... 14

    A.   Section 548(c) bars the Trustee's claims: it precludes a trustee from avoiding any transfer where the transferee acted in good faith and received the payment in satisfaction of a present or antecedent debt owed, or an obligation incurred, by the transferor. ................................... 16

        1.   SIPA incorporates 548(c)'s value defense, thereby barring a trustee from avoiding transfers received in satisfaction of a valid obligation incurred by the broker under non-bankruptcy law ... 16

        2.   Value is measured at the time of the transfer and from the transferee's perspective .............. 18

        3.   Section 28(a) of the 1934 Act preserves Defendants' state law rights and remedies against Madoff Securities ............................................................................................... 19

        4.   Section 29(b) of the 1934 Act ensures that the broker's obligations are enforceable despite Madoff's fraud ................................................................................................... 21

        5.   Each transfer was made in satisfaction of these state law obligations ................................... 22

    B.   Alternatively, the text of Section 548(a), which precludes a trustee from avoiding any obligations incurred by the debtor more than two years before the liquidation case, severely limits the Trustee's potential right of recovery. ............................................................................ 23

  II.   The bankruptcy court erred because it did not apply the statutory defenses as written and improperly permitted equitable concerns to override statutory directives .......................................... 26

    A.   In a SIPA case, the court must apply the substantive terms of both the 1934 Act and Bankruptcy Code. ............................................................................................................................. 26

    B.   The bankruptcy court disregarded the text of the controlling statutory provisions in favor of equitable principles. ...................................................................................................... 27

  III.   The bankruptcy court erred in concluding that SIPA repeals part of the Bankruptcy Code's avoidance statute and grants a SIPA trustee greater rights than an ordinary bankruptcy trustee because SIPA does not "necessarily imply" that the Code governs exclusively. ................................. 28

A.   SIPA borrows Section 548's avoidance statute and its defenses which are integral to the federal avoidance remedy. ...................................................................................................29

B.   The bankruptcy court's statutory analysis ignores the provision of SIPA that adopts the Code's avoidance statute in whole and is directly contrary to fundamental norms of statutory construction 29

C.   The bankruptcy court's conclusion disregards controlling Second Circuit holdings in these cases that limit a SIPA trustee to the same avoidance powers as an ordinary bankruptcy trustee. ..............31

IV.   The bankruptcy court erred in disregarding the Second Circuit's mandate in the *Section 546(e) Decision*: Madoff Securities' fraud did not abrogate Madoff Securities' preexisting obligation to pay settlement payments and contractual debts, and SIPA does not alter the Bankruptcy Code's avoidance statutes. ...............................................................................................................................32

A.   The *Section 546(e) Decision* established that Defendants' contracts with Madoff Securities are enforceable in these proceedings, even though Madoff acted fraudulently, and that the Bankruptcy Code controls here. ........................................................................................................................32

B.   The bankruptcy court's proposed conclusions violate the express holdings of the *Section 546(e) Decision* and its mandate. ......................................................................................................34

V.   The bankruptcy court erred in deferring to the *Antecedent Debt Decision*, which has been superseded by later controlling authority and the precedential value, if any, is cabined by its limited procedural posture...............................................................................................................................37

A.   The *Antecedent Debt Decision* was superseded by later controlling Second Circuit holdings...37

B.   In any event, the *Antecedent Debt Decision* is inapposite because subsequent facts developed in discovery and later affirmative defenses not at issue in 2013 Rule 12(b)(6) motions have altered the key operative questions at issue. .................................................................................................38

C.   The other cases relied upon by the bankruptcy court are also inapposite for the same reasons the *Antecedent Debt Decision* is inapplicable...............................................................................41

VI.   The bankruptcy court erred in concluding that a valid payment of a pre-petition claim owed by a debtor at the time of the transfer is inconsistent with SIPA because it adversely affects the later customer distribution of customer property in a subsequent SIPA estate; the decision is in direct disregard of the holding in *Fairfield*. ......................................................................................................................42

A.   SIPA's net equity principles have no bearing on an avoidance action. .....................................43

1.   Transferred property is not part of the SIPA estate unless and until avoided and recovered by the trustee. .........................................................................................................................44

2.   A SIPA trustee has no greater power over unavoided property than an ordinary bankruptcy trustee...................................................................................................................................44

3.   SIPA §8(c)(3) does not change this treatment of unavoided and unrecovered transfers. .......45

B.   The bankruptcy court prematurely treated the unavoided transfers as customer property. ........47

VII.   The bankruptcy court erred in granting the Trustee an unpleaded claim against innocent Defendants and concluding that the debtor violated the SEC's financial responsibility rules; in all events, the Second Circuit's decision in *JPMorgan* confirms that the Trustee has no standing to assert any non-bankruptcy claim...............................................................................................................48

A.   The bankruptcy court erred in determining that the Trustee had standing to assert an equitable claim because JPMorgan expressly holds that he does not.............................................................49

1.   Even if the SEC rules allowed a private right of action, JPMorgan would bar the Trustee from asserting it, because the Trustee inherits the debtor's bad faith status and therefore lacks standing to assert such claims on the debtor's or its creditor's behalf. ........................................................49

2.   The bankruptcy court disregarded *JPMorgan* by granting the Trustee powers outside the Bankruptcy Code. ..................................................................................................................50

B.   Even if the Trustee had standing to invoke them, the SEC's financial responsibility rules have no bearing on Defendants' state law rights to receive the specific transfers at issue..........................50

1.   The bankruptcy court misreads the SEC's financial responsibility rules: they do not prohibit a broker from paying a valid debt to a customer at the time of payment...........................................50

2.   Even if the rules prohibited such payments, the action would be brought against the offending party—Madoff Securities—in whose shoes the Trustee stands....................................................51

3.   Even if the SEC rules prohibited a broker from paying a valid debt to its customer, the SEC rules do not provide the wrongdoer or its successor with a private right of action to recover money from a good faith customer. ...................................................................................................53

4.   In all events, the bankruptcy court improperly assumed, without any factual basis in the record that there was a violation of the SEC's financial responsibility rules; the stipulated facts do not address how customer funds were segregated or what source Madoff Securities used to pay the defendants. ..................................................................................................................................53

C.   The bankruptcy court's decision is procedurally improper because it raises unpleaded claims, thereby depriving Defendants of basic procedural rights. ..................................................................54

1.   In a summary judgment proceeding, the bankruptcy court has no authority to amend a complaint *de facto* to consider a claim that no party ever raised....................................................54

2.   There is no evidence to support relief based on the SEC rules. ...............................................55

VIII.   The bankruptcy court erred in concluding that Madoff Securities' fraud matters because its treatment of property stolen by a thief contradicts the Second Circuit's *Sharp* holding that fraudulent transfer law does not govern such a transaction..................................................................................56

A.   Controlling precedent—including the Second Circuit's *Sharp* holding—dictates that a good faith transferee may retain payments made in satisfaction of a valid debt, even if that payment is derived from stolen funds. ...................................................................................................................57

1.   Madoff Securities' fraud is irrelevant to the Section 548(c) inquiry because value is measured at the time of the transfer from the transferee's perspective. ...........................................................58

2.   Section 29(b) of the 1934 Act gives an innocent fraud victim the option of enforcing securities contractual rights against the wrongdoing broker notwithstanding any fraud................59

3.   The Second Circuit's holdings teach that a good faith defendant may keep stolen funds if the payments satisfied valid obligations at the time of the payments: any cause of action lies against the thief who chose to use stolen funds, and not the good faith recipient of the stolen funds. .......59

B.   The bankruptcy court's conclusion that a thief cannot satisfy valid obligations with stolen money is directly contrary to *Sharp*. ................................................................................................62

IX.   The bankruptcy court erred in concluding that Section 548(a)'s two-year reach back limit is not a statute of repose..................................................................................................................................65

A.   Federal bankruptcy courts consistently treat the time limits in Section 548(a) as a statute of repose. ....................................................................................................................................65

B.   The Supreme Court's *CalPERS* decision treats statutes like Section 548 as statutes of repose. 65

C.   As a statute of repose, Section 548(a)(1) cannot be tolled..........................................................68

iii

D.   The bankruptcy court erred in adopting the Trustee's calculation method because it directly negates the effect of the statute of repose in Section 548(a) and disregards material facts establishing this defense.................................................................................................................................. 69

X.   The bankruptcy court erred in concluding that the Trustee need not avoid obligations incurred in addition to transfers within the two-year period; the Trustee's failure to plead any avoidance of obligation claims is fatal to his case..................................................................................................... 71

XI.   The bankruptcy court erred in ignoring Defendants' alternative grounds for summary judgment: the value defense also allows them to retain amounts due them at the time of the transfers based on their unliquidated state and federal tort claims ..................................................................................... 73

CONCLUSION.................................................................................................................................. 75

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.,*
    626 F.3d 699 (2d Cir. 2010) ............................................................................................. 54

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ......................................................................................................... 38

*In re Asia Global Crossing Ltd.,*
    333 B.R. 199 (Bankr. S.D.N.Y. 2005) ............................................................................ 21

*Baker v. Metro. Life Ins. Co.,*
    364 F.3d 624 (5th Cir. 2004) ........................................................................................... 13

*Baldi v. Lynch (In re McCook Metals, L.L.C.),*
    319 B.R. 570 (Bankr. N.D. Ill. 2005) .............................................................................. 58

*In re Bethune,*
    18 B.R. 418 (Bankr. N.D. Ala. 1982) ............................................................................... 65

*BFP v. Resolution Trust Corp.,*
    511 U.S. 531 (1994) ......................................................................................................... 58

*In re BLMIS,*
    654 F.3d 229 (2d Cir. 2011) ............................................................................................. 41

*Boguslavsky v. Kaplan,*
    159 F.3d 715 (2d Cir. 1998) ............................................................................................. 48

*Boston Trading Grp., Inc. v. Burnazos,*
    835 F.2d 1504 (1st Cir. 1987) ................................................................................... *passim*

*Breeden v. Thomas (In re Bennett Funding Group, Inc.),*
    1999 Bankr. LEXIS 1843 (Bankr. N.D.N.Y. Apr. 29, 1999) ........................................... 74

*Butner v. United States,*
    440 U.S. 48 (1979) ........................................................................................................... 19

*California Pub. Empls. Retirement Sys. v. ANZ Secs., Inc.,*
    137 S. Ct. 2042 (2017) ............................................................................................. *passim*

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ................................................................................................. 13, 55

*CFTC v. Kimberlynn Creek Ranch, Inc.,*
    276 F.3d 187 (2d Cir. 2002) ............................................................................................. 52

*Cox v. Nostaw (In re Central. Ill. Energy Coop.)*,
  526 B.R. 786 (Bankr. C.D. Ill. 2015) ................................................................ 23, 71, 72

*CTS Corp. v. Waldburger*,
  134 S. Ct. 2175 (2014) ................................................................................ 6, 38, 68

*Daly v. Fusco (In re All-Type Printing, Inc.)*,
  274 B.R. 316 (Bankr. D. Conn. 2002) .................................................................. 23, 72

*In re Davis*,
  138 B.R. 106 (Bankr. M.D. Fla. 1992) ...................................................................... 65

*Donell v. Kowell*,
  533 F.3d 762 (9th Cir. 2008) .................................................................................. 68

*FDIC v. Hirsch (In re Colonial Realty Co.)*,
  980 F.2d 125 (2d Cir. 1992) ...................................................................... 31, 43, 44, 45

*Found. Ventures, LLC v. F2G, Ltd.*,
  2010 U.S. Dist. LEXIS 81293 (S.D.N.Y. Aug. 11, 2010) .................................................. 22

*Fourco Glass Co. v. Transmirra Prods. Corp.*,
  353 U.S. 222 (1957) ............................................................................................. 30

*Freeman v. Marine Midland Bank-N.Y.*,
  419 F. Supp. 440 (E.D.N.Y. 1976) .......................................................................... 21, 40

*Goenaga v. March of Dimes Birth Defects Found.*,
  51 F.3d 14 (2d Cir. 1995) ........................................................................................ 55

*Gowan v. Patriot Grp., LLC (In re Dreier LLP)*,
  452 B.R. 391 (Bankr. S.D.N.Y. 2011) ........................................................................ 39

*Greater Buffalo Press, Inc. v. Fed. Reserve Bank*,
  866 F.2d 38 (2d Cir. 1989) ...................................................................................... 53

*Grede v. FC Stone LLC*,
  867 F.3d 767 (7th Cir. 2017) .................................................................................... 34

*Grede v. FCStone, LLC*,
  746 F.3d 244 (7th Cir. 2014) .................................................................................... 26

*Harris v. TD Ameritrade, Inc.*,
  805 F.3d 664 (6th Cir. 2015) ................................................................................ 51, 53

*HBE Leasing Corp. v. Frank*,
  61 F.3d 1054 (2d Cir. 1995) .................................................................................... 61

*Husky Int'l Elecs., Inc. v. Ritz*,
  136 S. Ct. 1581 (2016) ........................................................................................... 58

*Jahn v. Char (In re Incentium, LLC)*,
  473 B.R. 264 (Bankr. E.D. Tenn. 2012) ............................................................ 72

*Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*,
  310 F.3d 796 (5th Cir. 2002) ................................................................ 18, 58

*Kawasaki Kisen Kaisha, Ltd. v. Regal-Beloit Corp.*,
  561 U.S. 89 (2010) .................................................................................. 29

*Kidder Peabody & Co. v. Unigestion Int'l, Ltd.*,
  903 F. Supp. 479 (S.D.N.Y. 1995) .................................................................. 53

*Kokesh v. SEC*,
  137 S. Ct. 1635 (2017) ............................................................................. 52

*Law v. Siegel*,
  134 S. Ct. 1188 (2014) ............................................................................. 26

*Lehman Bros. Holding v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings
  Inc.)*,
  469 B.R. 415 (Bankr. S.D.N.Y. 2012) .......................................................... 20, 71

*Lutz v. Chitwood (In re Donahue Secs., Inc.)*,
  304 B.R. 797 (Bankr. S.D. Ohio 2003) ......................................................... 28, 31

*In re Lyon*,
  360 B.R. 749 (Bankr. E.D.N.C. 2007) .............................................................. 65

*In re Maui Indus. Loan & Fin. Co.*,
  454 B.R. 133 (Bankr. D. Haw. 2011) ............................................................... 65

*McHenry v. Dillworth (In re Caribbean Fuels of Am.)*,
  2017 U.S. App. LEXIS 11043 (11th Cir. June 22, 2017).............................................. 18

*Mills v. Electric Auto-Lite Co.*,
  396 U.S. 375 (1970) .................................................................................. 22

*Nat'l Union Fire Ins. Co. v. Camp (In re Gov't Secs. Corp.)*,
  972 F.2d 328 (11th Cir. 1992)........................................................................ 29

*Ogle v. JT Miller, Inc. (In re HDD Rotary Sales, LLC)*,
  512 B.R. 877 (Bankr. S.D. Tex. 2014) ........................................................... 24, 72

*Patel v. Hall*,
  849 F.3d 970 (7th Cir. 2017)......................................................................... 54

*In re Petters Co.*,
  557 B.R. 711 (Bankr. D. Minn. 2016)................................................................. 67

*Picard v. Cohen*,
  2016 WL 1695296 (Bankr. S.D.N.Y. Apr. 25, 2016) .................................................... 41

*Picard v. Fairfield Greenwich Ltd.*,
    762 F.3d 199 (2d Cir. 2014) ........................................................................................*passim*

*Picard v. Greiff*,
    476 B.R. 715 (S.D.N.Y. 2012) ....................................................................................... 38

*Picard v. HSBC Bank PLC*,
    454 B.R. 25 (S.D.N.Y. 2011) ................................................................................... 48, 49

*Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*,
    773 F.3d 411 (2d Cir. 2014) ........................................................................................*passim*

*Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    721 F.3d 54 (2d Cir. 2013) ..........................................................................................*passim*

*In re Pitt Penn Holding Co.*,
    2012 Bankr. LEXIS 325 (Bankr. D. Del. 2012) ................................................ 65, 67, 68

*Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*,
    721 F.3d 95 (2d Cir. 2013) ....................................................................................... 26, 69

*Raskin v. Wyatt Co.*,
    125 F.3d 55 (2d Cir. 1997) .......................................................................................... 13

*Redmond v. SpiritBank ( In re Brooke Corp.)*,
    541 B.R. 492 (Bankr. D. Kan. 2015).............................................................................. 58

*Rosenman Family, LLC v. Picard*,
    395 F. App'x 766 (2d Cir. 2010).................................................................................... 41

*Rousset v. Atmel Corp.*,
    2017 U.S. App. LEXIS 8786 (2d Cir. May 19, 2017)...................................................... 34

*Sagor v. Picard (In re Bernard L. Madoff Inv. Sec., LLC)*,
    2017 U.S. App. LEXIS 9842 (2d Cir. June 1, 2017)....................................................... 42

*Schlossberg v. Abell (In re Abell)*,
    549 B.R. 631 (Bankr. D. Md. 2016)................................................................... 25, 65, 68

*SEC v. Cavanagh*,
    155 F.3d 129 (2d Cir. 1998) ........................................................................................ 52

*SEC v. Goble*,
    682 F.3d 934 (11th Cir. 2012) ................................................................................. 51, 52

*SEC v. Ross*,
    504 F.3d 1130 (9th Cir. 2007)...................................................................................... 52

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
    403 F.3d 43 (2d Cir. 2005) ..........................................................................................*passim*

*Silverman v. Cullin* (*In re Agape World, Inc.*),
    633 Fed. App'x. 16 (2d Cir. Feb. 4, 2016) ................................................................. 36

*Silverman v. Paul's Landmark, Inc.* (*In re Nirvana Rest.*),
    337 B.R. 495 (Bankr. S.D.N.Y. 2006) ................................................. 25, 36, 42, 72

*SIPC v. 2427 Parent Corp.* (*In re BLMIS*),
    779 F.3d 74 (2d Cir. 2015) ......................................................................................... 41

*SIPC v. Bernard L,. Madoff Inv. Secs. LLC*,
    499 B.R. 416 (S.D.N.Y. 2013) ........................................................................ *passim*

*SIPC v. Bernard L,. Madoff Inv. Secs. LLC*,
    490 B.R. 46 (S.D.N.Y. 2013) ....................................................................................... 8

*SIPC v. Charisma Secs. Corp.*,
    506 F.2d 1191 (2d Cir. 1974) ..................................................................................... 31

*Smith v. American Founders Fin. Corp.*,
    365 B.R. 647 (S.D. Tex. 2007) .................................................................................... 67

*Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*,
    762 F.3d 165 (2d Cir. 2014) ....................................................................................... 34

*Statek Corp. v. Development Specialists, Inc.* (*In re Coudert Bros. LLP*),
    809 F.3d 94 (2d Cir. 2015) ......................................................................................... 34

*Stern v. Marshall*,
    564 U.S. 462 (2011) ................................................................................................... 14

*Teamsters of Upstate N. Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
    843 F.3d 561 (2d Cir. 2016) ....................................................................................... 42

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*,
    549 U.S. 443 (2007) ................................................................................................... 30

*United States v. Minicone*,
    994 F.2d 86 (2d Cir. 1993) ......................................................................................... 34

*Wellness Int'l Network, Ltd. v. Sharif*,
    135 S. Ct. 1932 (2015) ............................................................................................... 14

**Statutes**

11 U.S.C. § 101 ..................................................................................................... 20, 21

11 U.S.C. § 546 ..................................................................................................... 66, 67

11 U.S.C. § 548 ..................................................................................................... *passim*

15 U.S.C. § 78bb ........................................................................................................ 19

15 U.S.C. §78bbb ............................................................................................................. 21

15 U.S.C. § 78cc ............................................................................................................... 22

15 U.S.C. § 78fff .......................................................................................................... 28, 30

15 U.S.C. § 78fff-2 ............................................................................................... 3, 16, 29, 30

N.Y.U.C.C. § 8-501 ..................................................................................................... 14, 20

Securities Exchange Act of 1934 § 28(a) ................................................................... *passim*

Securities Exchange Act of 1934 § 29(b) ................................................................... *passim*

**Other Authorities**

17 C.F.R. § 240.15c3-3 ............................................................................................... *passim*

5 *Collier on Bankruptcy* ¶ 548.09 (16th ed. 2017) ......................................................... 15

Fed. R. Bankr. P. 7001 ........................................................................................................ 73

Fed. R. Bankr. P. 9033 ........................................................................................................ 13

Fed. R. Civ. P. 12(b)(6) .............................................................................................. *passim*

Fed. R. Civ. P. 12(d) ........................................................................................................... 39

Fed. R. Civ. P. 15(a) ........................................................................................................... 54

Fed. R. Civ. P. 56(a) ........................................................................................................... 13

Fed. R. Civ. P. 56(c) ........................................................................................................... 55

## PRELIMINARY STATEMENT AND SUMMARY OF OBJECTIONS

Defendants[1] are innocent former customers of Bernard L. Madoff Investment Securities LLC ("Madoff Securities") who, in the ordinary course of their relationship with their broker, withdrew amounts reported to them on their account statements.  As customers of a broker-dealer, Defendants had a right under applicable law to demand and receive the full amount of their securities entitlements reported by Madoff Securities on these statements.  Years after those transfers were completed, the Trustee sued them to avoid these payments as fraudulent transfers under the Bankruptcy Code Section 548(a)(1)(A).  In affirmative defenses, Defendants invoked their rights under the 1934 Act and the Bankruptcy Code, which ensure that, in the event of a fraud, innocent customers of a broker-dealer are able to retain payments received in the normal course of business.  On cross motions for summary judgment, based on stipulated facts, the bankruptcy court entered a Report and Recommendation setting forth proposed findings and conclusions denying judgment to Defendants and granting judgment to the Trustee ("RR").

Defendants object to the RR and request that this Court, on *de novo* review of the case, grant summary judgment to Defendants.  As explained below, the bankruptcy court's RR rests on a misreading and misapplication of the protections afforded brokerage customers under the Bankruptcy Code's avoidance provisions - borrowed by SIPA - and disregard substantive non-bankruptcy law that governs Defendants' rights.

The bankruptcy court's proposed decision is premised on the following erroneous conclusions:

---

[1]  This memorandum of law is jointly submitted in support of objections filed by the defendants in four separate actions, *Picard v. South Ferry, et al.* 10-4488; *Picard v. South Ferry #2, et al.* 10-4350; *Picard v. Mesora.* 10-5110; *Picard v. Lowrey, et al.* 10-4387.  For these purposes, the defendants were identified collectively in the bankruptcy court proceedings as the SF Defendants and the Lowery Defendants.  All defendants are identified in Addendum 1.  We collectively identify them here as "Defendants."  Where necessary to distinguish between particular defendants, they are identified by name.

1. Because of Madoff Securities' fraud, SIPA limits the protection of Bankruptcy Code § 548(c)'s "value defense" to the total of principal deposits made by a good faith defendant, such that customers' contractual rights to be paid the securities entitlements reported by the broker at the time of the transfers are unenforceable.

2. Even though Defendants filed no separate SIPA net equity claims, the Trustee's "net investment method" of calculating a SIPA customer's net equity in a later liquidation supersedes the statutory limits to the Trustee's avoidance powers under Section 548.

3. SIPA impliedly repeals Section 548's requirement that, if a debtor's obligations are not first avoided, they must be credited under the Section 548(c) value defense. In so holding, the bankruptcy court negated the accepted principle that, when the transferor owes unavoidable or unavoided obligations to the transferee under substantive law, payments on account of those obligations provide a defense to the avoidance of payments that reduce or fully satisfy such obligations.

4. The Trustee has standing to enforce the SEC's financial responsibility rules against innocent brokerage customers, such that where a broker transfers to an innocent customer funds that should have been held as customer property under those rules, the transferee can never take for value unless the transfer provides value to the other customer beneficiaries of the broker's "trust."

Defendants object to the bankruptcy court's proposed conclusions in their entirety because they are contrary to law, disregard the statutory text, and depart from accepted principles of statutory construction repeatedly reiterated by the Supreme Court. At its core, Defendants' argument is simple: The Court must apply the statutes Congress wrote to address what happens when a broker defrauds his customers.

Following the collapse of the securities markets in the great depression, Congress enacted the Securities Exchange Act of 1934 ("1934 Act") as part of a comprehensive federal regulation of securities markets and securities professionals including broker-dealers. That Act and its later amendments (including the Securities Investor Protection Act of 1970 ("SIPA")), expressly preserve securities customers' state law rights and remedies against their broker, and grants them additional protections against fraud, including fraud by a broker. SIPA is expressly made an amendment to and part of the 1934 Act, ensuring a victim of a broker's fraud has more, rather than fewer, rights. In enacting SIPA as a special liquidation provision for brokers, Congress did

not intend to repeal or nullify the 1934 Act or any state law substantive protections for securities customers.  Rather it intended to broaden their scope and operation.

Contrary to the bankruptcy court's belief, SIPA does not imbue a SIPA trustee with avoidance powers broader than those of a trustee in an ordinary bankruptcy case.  By its express terms, SIPA only "borrows" the Bankruptcy Code avoidance remedy as respects payments made to brokerage customers, and it reaches those transfers only "to the extent [they are] void or voidable" under the Bankruptcy Code. 15 U.S.C. § 78fff-2(3)(3).  Because SIPA adopts the Bankruptcy Code, the statutory defense in Section 548(c) necessarily applies in a SIPA proceeding, and sets the degree to which a defendant may retain amounts *received in good faith and for val*ue at the time of payment.  A SIPA proceeding necessarily is subject to the 1934 Act (and any state law rights it protects), which supports Defendants' value defense: (1) Section 28(a)(2) of the 1934 Act preserves the customers' state law rights to their securities entitlements and tort remedies, and (2) Section 29(b) of the 1934 Act protects their federal rights to enforce their substantive securities rights against the defrauding broker.  These statutes, therefore, preserve the customer's state and federal rights to receive payments satisfying the brokers' obligations due them *at the time of the transfers*.  Bankruptcy law and SIPA do not abrogate those substantive rights conferred by federal and state law.

Defendants also object to the bankruptcy court's proposed conclusions because the court disregards four governing holdings of the Second Circuit:

- The Second Circuit, in *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 54–55 (2d Cir. 2005) ("*Sharp*"), determined that fraudulent transfer law does *not* prevent a debtor from satisfying valid debts existing at the time of the transfer, even if the funds were stolen from third parties and/or were made in connection with a

fraud.  The bankruptcy court's reasoning that an innocent transferee cannot retain a payment that, at the time of the transfer, satisfied the broker's state law obligations to the transferee, violates *Sharp*.

- The Second Circuit, in *Picard v. Ida Fishman Revocable Trust (In re BLMIS)*, 773 F.3d 411 (2d Cir. 2014) *cert. denied*, 135 S. Ct. 2859 (2015) ("*Section 546(e) Decision*")—in which the Trustee, SIPC and each of the Defendants were parties and therefore controls these proceedings on remand—held that Section 546(e) limited the Trustee's avoidance reach.  The Court reasoned that the Trustee could not avoid Madoff Securities' payments to innocent customers because they were either "settlement payments" or "payments made in connection with securities contracts," and that Madoff Securities' written crediting of securities to the customers' accounts created "an enforceable securities entitlement" under New York state law. The mandate of this ruling requires that such transfers are treated as economically and legally meaningful at the time of each transfer – i.e., valid – for purposes of the Bankruptcy Code avoidance statute at the time notwithstanding the broker's fraud.  Likewise, the Second Circuit held that SIPA does not repeal the Bankruptcy Code's limits on a trustee's avoidance powers. The bankruptcy court's proposed decision is therefore directly contrary to the mandate of the *Section 546(e) Decision*.

- In *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199 (2d Cir. 2014) ("*Fairfield*"), the Second Circuit held that, until property transferred by the debtor pre-petition is avoided and recovered under the Bankruptcy Code, it does not become property of the estate (or, in this SIPA proceeding, customer property).  A SIPA trustee has no more power over an unavoided transfer than a trustee in an ordinary bankruptcy.  Disregarding *Fairfield*, the bankruptcy court wrongly treated the Trustee's claims as if the property sought was already in the SIPA customer estate

and as though the value defense should be applied as if they submitted net equity claims for those sums in the later SIPA proceeding.

• The Second Circuit, in *Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54 (2d Cir. 2013) ("*JPMorgan*"), held that the Trustee lacks standing to pursue any remedy except those expressly granted to him under (and only to the extent of those in) the Bankruptcy Code. This bars any claims for pre-petition violations by the debtor of the SEC financial responsibility rules. Yet, the bankruptcy court disregarded *JPMorgan* by resting its RR on the application of the SEC rules – a claim never pleaded by the Trustee – that arise and operate wholly outside the Bankruptcy Code. In practice, the SEC rules do not prohibit a broker's payments due innocent brokerage customers, nor does the SEC rule require an innocent customer to return such payments. Finally, this holding is a procedurally flawed violation of Defendants' due process rights:  (1) there are no facts in the summary judgment record proving that any specific transfers actually violated the SEC rule, and (2) the Trustee never pleaded the SEC rule as a basis to challenge or recover a transfer. The bankruptcy court has no authority to imagine a claim on behalf of the Trustee not otherwise pleaded in the case.

The bankruptcy court also erred by disregarding the two-year statute of repose in Section 548(a)(1) because it refused to credit the broker's pre-existing obligations owed to its customers as of December 10, 2006 (the day immediately preceding the repose period), even though those obligations are unavoidable by the Trustee as a matter of law. The bankruptcy court's failure to enforce the statute of repose departs from every bankruptcy court decision on the question and is contrary to the Supreme Court's directives that courts cannot alter the effect of  a statute repose

*for any reason. See California Pub. Empls. Retirement Sys. v. ANZ Secs., Inc.*, 137 S. Ct. 2042 (2017) ("*CalPERS*"); *CTS Corp. v. Waldburger*, 134 S. Ct. 2175 (2014) ("*CTS*").

Likewise, the bankruptcy court erred in ignoring the broker's obligations owed to the customers within the two-year reach back period because the Trustee either took no steps to avoid them or affirmatively abandoned them with prejudice. Because the obligations were not avoided, each transfer necessarily constitutes value on account of these obligations; every payment made during the period satisfied or reduced an enforceable debt or obligation against Madoff Securities.

Finally, the bankruptcy court erred by ignoring Defendants' alternative value defense based upon tort obligations arising from Madoff Securities' fraud and breaches of fiduciary duty at the time of each transfer. The court wholly ignored this alternative defense and failed to make any findings of law or fact regarding this defense.

For these reasons, Defendants request that this Court grant summary judgment on their statutory affirmative defenses against the Trustee's avoidance claims, and deny the Trustee's motions for summary judgment.

## STATEMENT OF THE CASE

### A.  Trustee's claims and Defendants' defenses

On December 11, 2008, the SEC filed its securities fraud action against Madoff Securities, and SIPC promptly thereafter filed the SIPA liquidation proceeding for Madoff Securities. Two years later, the Trustee filed avoidance actions against Defendants, who are innocent former customers of Madoff Securities. Because Madoff Securities was a registered broker and Defendants were its former customers, the Trustee had standing to initiate these avoidance actions under Section 8(c)(3) of SIPA, part of the 1934 Act, which permits a trustee

standing to challenge transfers of what would have been customer property at the time of the transfers but only to the extent they are "void or voidable" under the Bankruptcy Code.

Against this backdrop, the Trustee filed four adversary proceedings against entities that the parties collectively identify as Defendants. The Trustee stipulated that each Defendant acted in good faith at all times, without knowledge of Madoff Securities' fraud. RR at 6-7. Motion practice under Rule 12(b)(6) narrowed the Trustee's claims to those seeking to avoid intentional fraudulent transfers under Section 548(a)(1)(A). *See Section 546(e) Decision* (Section 546(e) limits the Trustee's claims to avoidance of actual fraudulent transfers).

The common thrust of the Trustee's claims against the "good faith" customers is that the Trustee seeks to avoid and recover only transfers made within the two-year reach back period under Section 548(a)(1)(A), and only to the extent that the payments from the customers' Madoff Securities account exceeded their principal deposits. The Trustee characterizes these payments as "fictitious profits" of a "Ponzi scheme," two phrases not found in any applicable statute. Despite his goal of recovering the broker's payments, the Trustee brought no claims under Section 548(a)(1)(A) to avoid any obligations incurred by Madoff Securities to Defendants.

Each Defendant asserted common affirmative defenses. Their primary defense is that Section 548(c) of the Bankruptcy Code allows an initial transferee to retain any transfer where the defendant gave value in good faith to the debtor at the time of the transfer. Defendants claim two alternative forms of "value," which Section 548(d)(2) defines to include the payment of a present or antecedent debt of the debtor. First, Defendants contend that Madoff Securities received value for each transfer through the satisfaction or discharge of the broker's contractual and legal obligations under state law to pay Defendants the securities entitlements reported by the broker. RR at 7. Second, each payment also discharged state and federal tort claims for fraud

and breach of fiduciary duty that each Defendant held at the time of the transfer.  All Defendants invoked their substantive federal rights under Section 29(b) of the 1934 Act to enforce their contractual rights notwithstanding Madoff Securities' fraud.  Each Defendant also asserted defenses based on the express restriction of the Trustee's claims to the  two-year reach back period in Section 548(a)(1).[2]  *See*, *e.g.*, SF Ans., Affirmative Defenses at ¶¶ 6, 19.

These summary judgment proceedings followed.[3]

### 1.  SF Defendants

The proceedings against SF Defendants involve three Madoff Securities accounts separately owned or controlled South Ferry, South Ferry #2, and United Congregations Mesora ("Mesora"), a religious charity.  The Trustee's only remaining claims against the SF Defendants seek to avoid the *transfers* under Section 548(a)(1)(A).  The Trustee seeks to recover $6,620,000 from South Ferry, $21,955,000 from South Ferry #2, and $3,200,000 from Mesora.  The Trustee never attempted to avoid the broker's pre-existing obligations to them – the predicates for the transfers to the SF Defendants.

### 2.  Lowrey Defendants

The proceedings against the Lowrey Defendants involve three separate Madoff Securities accounts owned or controlled by James Lowrey in various capacities. One was a joint account

---

[2] All Defendants properly reserved their constitutional rights to adjudication of these non-core proceedings by an Article III court and did not consent to the bankruptcy court's jurisdiction to issue a final judgment.  *See SIPC v. Bernard L. Madoff Inv. Secs. LLC,* 490 B.R. 46 (S.D.N.Y. 2013).

[3] The Parties stipulated to all material facts for the purposes of this summary judgment proceeding.  In order to streamline this discussion, Defendants will not reiterate each fact for each defendant here.  For specific details on each account, they respectfully direct the Court to (and expressly incorporate by reference) the discussion of facts in their briefs and statements of material fact before the bankruptcy court.  *See, e.g.*, SF Mem. of Law in Support of Summary Judgment ("MOL") at 5-11; Lowrey MOL at 5-11; SF Statement of Material Facts ("SMF"); SF#2 SMF; Mesora SMF; and Lowrey SMF.

held by James and Marianne Lowrey. The second was an account held in the name of Turtle Cay Partners ("Turtle Cay"), for which James Lowrey was the general partner. The third was an account in the name of Coldbrook Associates Partnership ("Coldbrook"), for which Marianne Lowrey served as general partner until her death. In total, the Trustee seeks $9,520,673 for the transfers to the Lowrey defendants.

After Marianne Lowrey's death, in 2012 the Trustee filed an amended complaint. The substantive allegations remained the same except that the Trustee expanded his avoidance claims under Section 548 to avoid unparticularized obligations incurred by Madoff Securities to each of the defendants "in connection with the Account Documents or any statements or representations made by BLMIS or Madoff." Am. Comp. ¶ 48. The Trustee alleged that these obligations "were incurred with actual intent to hinder, delay, or defraud then existing and/or future creditors." *Id.* ¶ 49. The substantive count was amended to include, in addition to the alleged transfers detailed below, a claim to avoid the unidentified obligations.

As a result of the Second Circuit's *Section 546(e) Decision* and the Supreme Court's denial of review, the Trustee was left only with the Section 548(a)(1)(A) claims to avoid actual fraudulent transfers. In 2016, the parties stipulated, with approval of the bankruptcy court, to dismiss *with prejudice* all claims for avoidance of obligations of Madoff Securities. *See* Doc. No. 61, Stipulation & Order (Feb. 24, 2016).

### B.  Madoff Securities' fraudulent scheme

At all relevant times, Madoff Securities was a federally registered broker under the 1934 Act, a member of the Financial Industry Regulatory Agency (formerly the National Association of Securities Dealers), and an investment adviser. RR at 4, 5. Unknown to Defendants, at all relevant times for purposes of their cases Madoff Securities was running a fraudulent scheme

against them and others. *Id.* at 5-7. Madoff Securities defrauded brokerage customers by intentionally misrepresenting the securities positions in their accounts, among other misdeeds. *Id.*

### C. Madoff Securities' representations and Defendants' reliance

There is no dispute that all Defendants always acted in good faith, and had no knowledge of Madoff Securities' fraud until after Bernard Madoff's arrest in 2008. RR at 5-7. In good faith, Defendants relied on Madoff Securities' representations that it would receive and use their funds to trade securities for their benefit and would provide accurate accountings of each trade, the activity in their accounts, and the corresponding profits or losses in monthly statements reflecting their securities positions. *Id.* Defendants reasonably relied on the broker's statements, which reported their holdings and the securities transactions on their behalf. *Id.* Each time they instructed Madoff Securities to pay funds to them from their brokerage account in the ordinary course of the parties' dealings, Defendants reasonably believed they were lawfully entitled to receive those funds. *Id.*; *see also e.g.* Lowrey SMF ¶¶ 21, 26; RR at 8.

### D. Account and transaction history

The transaction history for each account appears in greater detail in the stipulated facts, and is summarized in Defendants' summary judgment motions below. Each Defendant's good faith dealings with Madoff Securities shared common characteristics with others:

Each Defendant entered into a written Account Agreement with Madoff Securities. *See*, *e.g.*, RR at 8; Lowrey SMF ¶ 3. Through these agreements, Defendants authorized Madoff Securities to trade in securities on their behalf and granted Madoff Securities investment discretion. *E.g.*, Lowrey SMF ¶ 4. Defendants received monthly account statements from Madoff Securities, detailing securities transactions made on their behalf and their end-of-month securities entitlements. RR at 8. Defendants reasonably relied on these reported securities

entitlements and, based on these reports, believed that Madoff Securities purchased the reported securities on their behalf.  *See* RR at 7-9; Lowrey SMF ¶¶4, 21.

Defendants periodically deposited principal and withdrew proceeds.  For example, between July 20, 2004 and December 11, 2008, James and Marianne Lowrey deposited a total of $2,500,000 into the account and withdrew a total of $3,082,182 from their account, of which $582,182 exceeded the aggregate deposits over the life of the account. Lowrey SMF ¶ 15.  The Trustee seeks to avoid and recover the entire $582,182.  *See* Lowrey SMF ¶ 27; RR at 7.

At the start of the applicable two-year period fixed by Section 548(a), *i.e.*, December 11, 2006, the Lowreys' last statement for their joint account reported a positive net account balance of $1,322,395.40. Lowrey SMF ¶ 25. As shown in Addendum 2,  the net amounts withdrawn during the two years preceding the liquidation by the Lowreys in excess of their broker's obligations for the securities entitlements shown on the last statement preceding December 10, 2006 was $259,786.60.   The obligation was never avoided by the Trustee.   Although the respective account figures vary, the same circumstances exist for the other Lowrey Defendants and are summarized in this chart:

| Customer | Trustee's "Net Investment Method" Calculation (reaching back to the start of the account) | Calculation Using Section 548's Repose Period | Difference in Claim Calculations |
|---|---|---|---|
| James and Marianne Lowrey | $582,182.00 | $259,786.60 | **$322,395.40** |
| Turtle Cay Partners | $7,845,089.00 | $1,867,465.80 | **$5,977,623.20** |
| Coldbrook Associates Partnership | $1,093,402.00 | $339,346.96 | **$754,055.04** |
| **Total** | $9,520,673.00 | $2,466,599.36 | **$7,054,073.64** |

The SF Defendants' account history shows a similar pattern of good faith deposits and withdrawals.  Between August 13, 2001 and December 11, 2008, South Ferry, for example

deposited a total of $45,000,000 and withdrew a total of $51,620,000 from its account, of which $6,620,000 exceeded deposits over the life of the account. SF SMF ¶ 9. The Trustee seeks to avoid and recover the entire $6,620,000. *See* SF SMF ¶ 20.

South Ferry's last account statement preceding December 11, 2006, showed a positive net account balance of $21,520,083.04. SF SMF ¶ 18. Thus, as shown below, the computation of the net amounts withdrawn during the two years preceding the liquidation by South Ferry in excess of the broker's obligations for the securities entitlements shown on that statement is $2,699,916.96.

Although the respective account figures vary, the same circumstances exist for the other SF Defendants and are summarized in the following chart:[4]

| Customer | Trustee's "Net Investment Method" Calculation (reaching back to the start of the account) | Calculation Using Section 548's Repose Period | Difference in Claim Calculations |
|----------|------------------|------------------|------------------|
| South Ferry | $6,620,000.00 | $2,699,916.96 | **$3,920,083.04** |
| South Ferry #2 | $21,955,000.00 | $3,353,786.45 | **$18,601,213.55** |
| Mesora | $3,200,000.00 | $194,854.00 | **$3,005,146.00** |

### E. Defendants' lost opportunity costs

Defendants retained an expert to quantify their lost opportunity costs resulting from their having unwittingly left their funds with Madoff Securities. These costs are significant. By way of example, had South Ferry invested during the same period in a standard model portfolio of securities with similar risk characteristics managed by an honest investment adviser instead of Madoff Securities, it would have earned over the life of the account $3,414,848 in excess of principal. SF SMF ¶ 26. Had South Ferry learned of the Madoff Securities' fraud at an earlier time and sought to rescind the account agreements under New York or federal law, South Ferry

---

[4] The complete computations for all of Defendants' accounts appear in Addendum 2.

would have been awarded simple interest at the New York statutory rate of 9% per year, or $4,492,973, in addition to its recessionary remedy.  SF SMF ¶ 28.  South Ferry  thus actually received from Madoff Securities only $2,127,027 in excess of the interest to which it would have been statutorily entitled.  SF SMF ¶ 29.[5]

### F.  Bankruptcy court proceedings

By agreement of the parties, these adversary proceedings were partially consolidated for cross-motions for summary judgment based on stipulated facts.  The stipulated facts and associated documents constituted the complete summary judgment record.

On December 6, 2017, the bankruptcy court heard oral argument.  During oral argument, the bankruptcy court, *sua sponte*, asked the parties for additional briefing on the potential implications of the SEC financial responsibility rules for this proceeding.

On March 22, 2018, the bankruptcy court issued the RR.[6]

## STANDARD OF REVIEW

Summary judgment is appropriate where a moving party provides admissible evidence for each element of its claim or defense that is not contradicted by other evidence in the record.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).  Further, courts "may not grant summary judgment *sua sponte* on grounds not requested by the moving party."  *Baker v. Metro. Life Ins. Co.*, 364 F.3d 624, 631-32 (5th Cir. 2004).  Under Rule 9033 of the Federal Rules of Bankruptcy Procedure, the district court may not defer to bankruptcy court recommendations for summary

---

[5] The stipulated record adequately supports each of these claims for Defendants.  *See, e.g.*, SF SMF ¶ 19, 26-29; SF#2; Mesora SMF ¶¶ 27-29; Lowrey SMF ¶ 34-36.  These facts are summarized in the Addendum 3.  Defendants respectfully request that the Court make findings based on these undisputed facts in the record.

[6] The bankruptcy court extended the time for Defendants to file objections to the RR until April 26, 2018.

judgment. Instead, the district court must conduct a full *de novo* review of the proposed factual findings and legal recommendations. Fed. R. Bank. P. 9033(d); *see Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1958 (2015); *Stern v. Marshall*, 564 U.S. 462, 475 (2011).

## OBJECTIONS TO PROPOSED CONCLUSIONS OF LAW AND FINDINGS OF FACT

**I.      The bankruptcy court erred by rejecting the statutory affirmative defenses.**

Several statutes control this litigation: SIPA, Sections 28 and 29 of the 1934 Act, and the Bankruptcy Code. Together, these laws dictate that Defendants are entitled to summary judgment on their (1) affirmative defense of value under Section 548(c), and (2) alternatively, on their affirmative defense of the operation of the statute of repose under Section 548(a) in protecting their right to payment of unavoided, pre-existing obligations of the broker.

As a matter of law, Defendants gave value to Madoff Securities when they exercised their state law rights to payment on their securities entitlements reported by Madoff Securities. SIPA limits the trustee's avoidance powers to those found in Title 11 of the Bankruptcy Code. Section 548(c) of that title provides a complete defense to an avoidance claim where the initial transferee received the transfer in good faith and for value in the form of satisfaction of a valid present or antecedent debt owed at the time. Here, at the time of all of the transfers, Defendants held an enforceable state law right against Madoff Securities to full payment of their securities entitlements under Section 8-501(b)(1) of the New York Uniform Commercial Code—in amounts equal to the face amount of the securities entitlements reported to them by their broker. *See Section 546(e) Decision*, 773 F.3d at 422. The 1934 Act, through Sections 28(a) and 29(b), expressly preserved these rights by giving Defendants (as innocent customers of the broker-dealer) the option to enforce the brokers' state law obligations to them *notwithstanding the broker's fraud*. Defendants invoked their Section 29(b) rights to enforce their contractual rights

14

to the reported securities entitlements, thereby rendering Madoff Securities' obligations enforceable for all purposes of these proceedings as a matter of law. By not exercising or by waiving his statutory remedy to avoid the broker's obligations under the Code, the Trustee lost his right to contest them, and was bound by them. As a result, each payment to a customer was a settlement payment or a payment in connection with a securities contract that resulted in receipt of account proceeds in satisfaction or discharge of the unavoided debts then owed by the broker.

Alternatively, the two-year statute of repose in Section 548(a)(1) bars the Trustee from avoiding Madoff Securities' obligations to Defendants – *i.e.*, the debts for the securities entitlements positions owed to Defendants based on Madoff Securities' written crediting of securities to Defendants' accounts – as they existed on December 10, 2006 (evidenced by the November 30, 2006 account statements). Because Section 548(a)(1)'s two-year reach-back limit is a statute of repose under established law, it bars any equitable claims to circumvent the statutory time limit. These obligations are set in stone or, to quote the leading bankruptcy commentator, "invulnerable." 5 *Collier on Bankruptcy* ¶ 548.09[1][a] (16th ed. 2017).

The bankruptcy court improperly escaped the effect of these statutes by asserting that SIPA's general treatment of customer property "impl[icit]ly" creates an equitable exception to the Bankruptcy Code's limits on avoidance, where it is later revealed that the debtor engaged in a Ponzi scheme. RR at 18, 23, 33. This equitable exception does not withstand scrutiny: There is no such exception in any relevant statute, including the 1934 Act (which includes SIPA) and the Bankruptcy Code. The bankruptcy court's rationale disregards all statutory protections granted to securities customers as described above, which Congress crafted to address just these kinds of situations in which a broker takes advantage of unwitting customers. The courts have no power

to summarily disregard these statutes; they must apply the statutory defenses as written.  On that basis, Defendants are entitled to summary judgment.

> **A. Section 548(c) bars the Trustee's claims: it precludes a trustee from avoiding any transfer where the transferee acted in good faith and received the payment in satisfaction of a present or antecedent debt owed, or an obligation incurred, by the transferor.**

This is a special proceeding for the liquidation of a stockbroker authorized and governed by the customer protection provisions of the 1934 Act.  Three provisions of the 1934 Act are relevant: SIPA, Section 28(a), and Section 29(b).  These laws protect innocent brokerage customers who receive payments in satisfaction of a broker's obligations. They: (1) incorporate without qualification the Bankruptcy Code's "value" defense, (2) preserve customers' state law rights to full payment of securities entitlements, and (3) operate as written even in the face of a widespread fraud perpetrated by the debtor-broker.

> **1. SIPA incorporates 548(c)'s value defense, thereby barring a trustee from avoiding transfers received in satisfaction of a valid obligation incurred by the broker under non-bankruptcy law.**

The 1934 Act makes clear that Bankruptcy Code §548 controls this SIPA avoidance proceeding.  After the *Section 546(e) Decision*, the Trustee could only seek avoidance under Section 548.  Section 548 includes a commonly invoked defense: Section 548(c).  If that value defense applies, the transfer is not "void or voidable."  Section 8(c)(3) of SIPA,[7] in turn, incorporates Section 548(c)'s limits on what is "void or voidable": "[T]he trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to *the extent that such transfer is voidable or void under the provisions of title 11 of the United States Code.*" 15 U.S.C. § 78fff-2(c)(3) (emphasis added).  Therefore, a SIPA

---

[7] Because the Trustee stands in the shoes of Madoff Securities, he has standing to institute a claim only through SIPA, which creates a limited exception to the Bankruptcy Code's standing requirements.  *See JPMorgan* and *Fairfield*, discussed *infra* at VII, VI.

trustee's avoidance powers, like a trustee's in an ordinary liquidation, are limited by Section 548(c). *See Section 546(e) Decision*, discussed *infra* at IV. If Section 548(c)'s defense applies – as it must under principles of statutory construction – the transfers in question are not "void or voidable" and are beyond the Trustee's reach.

Section 548(c) protects transfers made in satisfaction of valid obligations owed by the debtor at the time of the transfers: a "transferee or obligee of such a transfer or obligation that takes for value and in good faith . . . may retain any interest transferred . . . to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation." 11 U.S.C. § 548(c). A trustee, therefore, is powerless to set aside a transfer where the transferee: (1) took the transfer in good faith, and (2) received the transfer in satisfaction of an obligation or debt owed by the debtor.

Because the parties concede that Defendants acted in good faith, the only inquiries on summary judgment are whether, at the time of each transfer: (1) Madoff Securities owed debts or obligations to Defendants at that time, and (2) whether the transfers satisfied those debts or obligations.

The bankruptcy court erred by framing the relevant inquiry to be whether *non-parties to the transaction* owed obligations to Defendants. *See, e.g.*, RR at 29 ("Even if BLMIS owed obligations to Defendants, the [broker's other] customers did not, and the use of their property to pay fictitious profits was not supported by value."). This approach is contrary to the statutes and was previously rejected by the Second Circuit in *Sharp,* which held that the source of the transferred funds is irrelevant to a good faith transferee's defenses. *See infra* VIII.

### 2. Value is measured at the time of the transfer and from the transferee's perspective.

Value under Section 548(c) is tested solely from the perspective of the *transferee* as of the time of the transfer. By its plain terms, the defense applies when the *transferee* "takes" for value and provides that he "may retain" "any interest transferred" or "obligation incurred" "for "such transfer or obligation." 11 U.S.C. § 548(c). To that end, courts consistently look only from one vantage point: that of (1) the transferee (2) at the time of the underlying transfer. *See Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 802 (5th Cir. 2002) (fraudulent character of transfer, including value that the transferor received, is determined at the time of the transfer without the benefit of hindsight).

Accordingly, the dispositive question for the value defense is whether, from the transferee's perspective, the obligation paid was valid and enforceable *against the transferor at the time of the transfer*. Where the transferee acts in good faith, concerns about future creditors or what the debtor knew are irrelevant. *See Hannover*, 310 F.3d at 802. Determinations of value that consider such factors, as the bankruptcy court did here, must be rejected. *McHenry v. Dillworth (In re Caribbean Fuels of Am.)*, 2017 U.S. App. LEXIS 11043, at *10–11 (11th Cir. June 22, 2017) (reversing lower court's failure to evaluate objective consideration given by transferee). Nor does it matter if the transferee is later found to be a fraud victim. *See Sharp* (discussed *infra*). This follows because fraudulent transfer law does not punish innocent parties who engaged in good faith transactions, and does not allow avoidance of valid pre-petition transfers merely because they amount to preferences.

The perspective from which courts must analyze the value defense differs markedly from that employed in testing a trustee's *prima facie* case for avoidance. While the value defense analysis forbids consideration of the interests of future creditors, the fraudulent transfer cause of

action requires it.   Specifically, the *prima facie* avoidance inquiry depends on whether the "debtor" "made such transfer . . . with the actual intent to hinder delay or defraud any entity to which the debtor was *or became, on or after the date that such transfer was made*."   11 U.S.C. § 548(a)(1)(A) (emphasis added).   But these matters do not control the value defense, which tests only the exchange between the parties to the initial transfer under applicable non-bankruptcy law.

Because Defendants do not contest the Trustee's *prima facie* case, only one viewpoint matters in testing the defense—the transferee's—and only one time matters—*when each specific transfer occurred*.   Other considerations are irrelevant.   Therefore, the sole inquiry for this Court is: From the transferee's perspective, did he hold an enforceable debt or obligation against Madoff Securities at the time he received the broker's payment?   As shown in the next subsection, there can be no dispute that in these proceedings the answer must be "yes." Defendants are entitled to summary judgment on their value defense.

### 3. Section 28(a) of the 1934 Act preserves Defendants' state law rights and remedies against Madoff Securities.

State law rights and remedies are preserved for Defendants as the targets of avoidance in this SIPA proceeding.   Section 28(a)(2) of the 1934 Act, of which SIPA is a part, expressly preserves all of a customer's rights and remedies under state law.   15 U.S.C. § 78bb(a)(2).   *See also Butner v. United States*, 440 U.S. 48, 56 (1979) (a creditor must be "afforded in federal bankruptcy court the same protection he would have under state law").   If, at the time of the transfers, Defendants had state law rights to payment from Madoff Securities, those rights are enforceable as defenses to the Trustee's claims.

At the time of each transfer, each Defendant held a state law right to payment from Madoff Securities.   Regarding their securities entitlements, the Second Circuit recognized in the *Section 546(e) Decision* that the New York Uniform Commercial Code gives brokerage

customers a right to payment of the full value of securities positions reported to them.   The statute provides that, when a broker "indicates by book entry that a financial asset has been credited to the person's securities account," the customer has a statutory right to payment of that reported amount.   N.Y.U.C.C. § 8-501(b)(1).   Here, Defendants entered into Account Agreements with Madoff Securities that gave the broker investment discretion.   *See, e.g,* SF#2 SMF at ¶¶ 1-3.   These agreements necessarily contemplated that Madoff Securities would regularly report Defendants' securities positions, and, to that end, Madoff Securities regularly sent monthly account statements to Defendants showing each Defendant's securities positions, the trades conducted and securities positions sold or received as a result.   Because such securities were credited to Defendants' accounts, the statements established their statutory rights to payment.   *Section 546(e) Decision,* 773 F.3d at 422.

Defendants also had state law tort claims for fraud and breach of fiduciary duty against Madoff Securities.   *See* Section XI, *infra*.   The Bankruptcy Code's broad definition of "claim" includes "unliquidated" rights to payment like these tort claims.   *See* 11 U.S.C. § 101 (5)(A). The parties have stipulated to the facts necessary for establishing each element of these claims and the damages arising therefrom.   *See, e.g.*, RR 12; SF SMF ¶¶ 13-17; SF #2 ¶¶ 13-7; Mesora SMF ¶¶ 14-18; Lowrey SMF ¶¶ 17-22.   These claims were obligations owed to Defendants at the time of the transfers, and were thus antecedent debts of the debtors satisfied by payments made to Defendants for value under Section 548(c).

Defendants' state law rights to their securities entitlements were valid obligations of the broker.   An obligation is different from a transfer; it "is a preliminary aspect of a transactional process that must occur prior to or as a condition of transferring property or an interest in property."   *Lehman Bros. Holding v. JPMorgan Chase Bank, N.A., (In re Lehman Bros.*

*Holdings Inc.)*, 469 B.R. 415 (Bankr. S.D.N.Y. 2012).  An obligation "binds one to a specific performance (as payment)," ("*Obligation*," Merriam-Webster), and, in doing so imposes a "debt" on the obligor and gives a corresponding claim to the obligee.  *In re Asia Global Crossing Ltd.*, 333 B.R. 199, 203-05 (Bankr. S.D.N.Y. 2005). "Debt" means liability on a claim.  11 U.S.C. § 101 (12), and the term "claim" is broadly defined to include any "right to payment." *Id*. at (5). There can be no legitimate dispute that, at the time of each transfer, Madoff Securities was obligated to each Defendant for the amount of their reported securities entitlements or, in the alternative, for the compensatory equivalent of their tort claims.

### 4. Section 29(b) of the 1934 Act ensures that the broker's obligations are enforceable despite Madoff's fraud.

Congress concluded that, even where there was fraud, these state law obligations remain enforceable by good faith customers such as Defendants.  Implicit in the bankruptcy court's search for an equitable remedy is that Congress, under SIPA, did not anticipate a scenario where an innocent brokerage customer was defrauded in connection with a securities contract.  But Congress deliberately made SIPA "an amendment to" and "a section of" the 1934 Act; it therefore included Section 29(b)'s statutory protections in the fabric of any SIPA proceeding. *See* 15 U.S.C. §78bbb.

Section 29(b) of the 1934 Act anticipates this precise scenario: It confirms that a broker's *fraud cannot diminish an innocent securities customer's contractual rights*.  To the contrary, the presence of fraud gives an innocent customer additional protections, including the right to either void or to enforce a securities contract. *See Freeman v. Marine Midland Bank-N.Y.*, 419 F. Supp. 440, 453 (E.D.N.Y. 1976) (under Section 29(b), "the investor, at his option, [may choose] to void the contract as a defense to a lender's suit, to sue on the contract for damages, to enforce the

contract, or to seek rescission.").  The 1934 Act is explicit that the *wrongdoer may not enforce* a securities contract procured by the wrongdoer's own fraud:

> Every contract made in violation of any provisions of this [chapter] or of any rule or regulation thereunder, and every contract . . . the performance of which involves the violation of . . . any provision of this [chapter] or any rule or regulation thereunder, shall be void (1) *as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract*.

15 U.S.C. § 78cc(b) (emphasis added).[8]

### 5.  Each transfer was made in satisfaction of these state law obligations.

Defendants received their payments in satisfaction of the broker's state law obligations. As the Second Circuit recognizes, each Madoff Securities transfer satisfied those debts:

> [I]f I instruct my broker to sell my shares of ABC Corporation and remit the cash, that payment is a "settlement" even if the broker may have failed to execute the trade and sent me cash stolen from another client. . . .  [B]ecause the customer granted BLMIS discretion to liquidate securities in their accounts to the extent necessary to implement their sell orders or withdrawal requests, each transfer in respect of such an order or request constituted a settlement payment.

*Section 546(e) Decision*, 773 F.3d at 422–23.  As a *matter of law*, innocent customers' withdrawals from brokerage accounts are "settlement payments" "made in connection with securities contracts" that satisfy their enforceable securities entitlements—valid claims under state law.  *Id*.

The validity of this line of defense under Section 548(c) in a SIPA proceeding is conclusively confirmed by the 1934 Act, whose specific provisions preserve Defendants' state law rights and remedies.  SIPA directs that a trustee may avoid transfers *only* to the extent they

---

[8] Courts routinely enforce Section 29(b) to permit an innocent counter-party to enforce a fraudster's obligations under the customer's securities contract.  *See Mills v. Electric Auto-Lite Co*., 396 U.S. 375, 387–88 (1970) (collecting cases); *accord*, *Hanover Trading Corp.*, 34 F. Supp. 2d at 206 ("[C]ontracts made in violation of the securities laws, and thus subject to Section 29(b) . . . are merely voidable at the option of the innocent party."); *Found. Ventures, LLC v. F2G, Ltd*., 2010 U.S. Dist. LEXIS 81293, at *18–20 (S.D.N.Y. Aug. 11, 2010).

are void or voidable under the Bankruptcy Code, thereby incorporating Section 548(c)'s defense to a fraudulent transfer claim. Whether Madoff Securities defrauded Defendants is legally irrelevant, because Congress, in Section 29(b), gave only the innocent customer the option of enforcing any securities contractual obligation against the fraudster. The 1934 Act defenses, not considered by the bankruptcy court, entitle Defendants to summary judgment even where the Trustee makes out a *prima facie* case of avoidance.

### B. Alternatively, the text of Section 548(a), which precludes a trustee from avoiding any obligations incurred by the debtor more than two years before the liquidation case, severely limits the Trustee's potential right of recovery.

Independent of the value defense, Section 548's two-year look-back period imposes key constraints on the Trustee's avoidance powers. Section 548(a)(1) allows a trustee to avoid both transfers made and obligations incurred by the transferor during the two-year period. But to recover transfers, the Trustee also must avoid the obligations underlying the payments:

> [W]here a debtor makes prepetition payments on a contractual debt, in order for those payments to be avoidable as constructively fraudulent, it is necessary for the trustee to first avoid the underlying contract as a fraudulently incurred obligation. Absent avoidance of the underlying contract, the payments discharge the obligation and are, by definition, for reasonably equivalent value.

*Cox v. Nostaw (In re Central. Ill. Energy Coop.)*, 526 B.R. 786, 791 (Bankr. C.D. Ill. 2015) (citations omitted). It is well-settled that the avoidance of obligations is a necessary step to the avoidance of transfers related to the obligations. *See Daly v. Fusco (In re All-Type Printing, Inc.)*, 274 B.R. 316, 324 (Bankr. D. Conn. 2002) ("to have a chance of prevailing ... the Trustee needed to seek to avoid the *incurring* of an *obligation*—the Retirement Debt—as well as the *transfer* of *property*—the Payments.") (emphasis in original). *See also* cases cited in *e.g.*, *Picard v. South Ferry*, *et al.*, 10-4488, Doc. No. 90-1, MOL at I D 2.

The necessity of avoiding both transfers and their associated obligations is clear from the face of 11 U.S.C. § 548(a)(1)(A):

> (1) The trustee may *avoid any transfer* [ . . .] *or any obligation* [. . .] incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (A) *made such transfer or incurred such obligation* with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred . . .

This statutory focus on transfers made or obligations incurred is not accidental. Except in the case of gifts, monetary transfers usually discharge obligations owed to a payee. Thus, the statute anticipates that to successfully avoid and recover a fraudulent transfer, the Trustee must not only avoid transfers, but also escape the predicate for each transfer, *i.e.* the *obligations. See* Section X, *infra*. Here, Madoff Securities' payments to customers arose from obligations established by state law for reported securities entitlements, and those payments therefore were enforceable settlement payments and/or payments in connection with a securities contract, notwithstanding the broker's fraud. *See* IV *infra*.

Except for transactions within this narrow two-year reach back period, Section 548(a)(1) bars a SIPA trustee from avoiding any other transfers or obligations regarding a defendant. It also prohibits a trustee from avoiding any transfer made *or* obligation incurred by the broker more than two years before the petition date. In other words, any obligation to the defendant that existed before the two-year period cannot be avoided, and instead must be honored and credited to the defendant as obligations incurred and owed by Madoff Securities to which its payments related. Those obligations, in turn, were reduced by the payments challenged by the Trustee that were made during the two-year period. *See Ogle v. JT Miller, Inc. (In re HDD Rotary Sales, LLC)*, 512 B.R. 877, 886 (Bankr. S.D. Tex. 2014) ("transfers [were] not avoidable because they were transfers made in satisfaction of unavoidable obligations.").

SIPC filed its SIPA petition against Madoff Securities on December 11, 2008.  Section 548(a)(1) prevents the Trustee from avoiding transfers made and obligations incurred by Madoff Securities before December 11, 2006.  The bankruptcy court's refusal to give effect to obligations predating December 11, 2006 to measure the extent of value is contrary to established avoidance law.[9]  The effect of the statutory time frame is significant.  State law lets Defendants stand on their rights to receive the full value of reported securities entitlements where they did not know of the brokers' fraud.  Defendants therefore hold enforceable obligations against Madoff Securities at the time of the transfers.  Because the obligations existed before the two-year look back period, the Trustee cannot avoid them, such that the amount of the transfers made within the avoidance period will reduce or eliminate the broker's debt against those preexisting obligations.  The court must credit these pre-existing obligations in assessing what Madoff Securities owed the customers at the time of each transfer.  The charts set forth above at pages 11-12 show the effect on Defendants' right to retain amounts under this defense.  The bankruptcy court committed error by ignoring these temporal limits of Section 548(a) and failing to fully credit Defendants with Madoff Securities' obligations owed to them on December 10, 2006.

The two-year reach-back cannot be tolled or equitably expanded because Section 548(a) is a statute of repose.  "Many courts have confronted this issue and rejected the idea that §548(a)(1) is a statute of limitations subject to equitable tolling."  *Schlossberg v. Abell* (*In re Abell*), 549 B.R. 631, 657–59 (Bankr. D. Md. 2016).  As the Second Circuit recognizes, a statutory reach-back limit such as Section 548 vests "a *substantive* right in those protected [here,

---

[9]  *Accord, Silverman v. Paul's Landmark, Inc. (In re Nirvana Rest.)*, 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006) (applying New York state fraudulent conveyance statute; "[a] guaranty is an 'antecedent debt,' and the payment on account of an pre-existing guaranty is, therefore, supported by 'fair consideration'").

Defendants] to be free from liability after a legislatively-determined period of time." *Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*, 721 F.3d 95, 106 (2d Cir. 2013) (references omitted).

The bankruptcy court erred in denying this affirmative defense of statutory repose and disregarding the stipulated facts in support of that defense.  (The bankruptcy court's erroneous rejection of this statutory time limit and disregarding the stipulated facts submitted in support of that defense is further discussed at IX, *infra.*)  Any avoidance remedy is constrained by the time limit fixed by Section 548.  Defendants were entitled at least to partial summary judgment on this alternative defense.

## II.     The bankruptcy court erred because it did not apply the statutory defenses as written and improperly permitted equitable concerns to override statutory directives.

The relevant statutory provisions, as written, require the granting of summary judgment to Defendants.  The bankruptcy court was required, but failed, to follow the plain text of these statutes regardless of its views of the equities.  The bankruptcy court ignored the plain text of the relevant statutes because it believed that limiting the Trustee's avoidance claims in the specific context of these cases was inconsistent with the policy goals of SIPA.  This was error.[10]

### A.     In a SIPA case, the court must apply the substantive terms of both the 1934 Act and Bankruptcy Code.

Bankruptcy courts must apply statutory terms as enacted, regardless of their views of equities in a particular case.  They may not disregard express statutory language based on policy or equitable considerations.  *See Law v. Siegel*, 134 S. Ct. 1188, 1194–95 (2014) (bankruptcy court's equitable powers are "subordinate to valid statutory directives"); *see also Grede v. FCStone, LLC*, 746 F.3d 244, 254 (7th Cir. 2014) (citing *Law* and discussing Supreme Court's

---

[10] The bankruptcy court refused to follow the 1934 Act and the Bankruptcy Code for two reasons: the terms of those statutes led to what the court perceived to be inequitable results; or SIPA impliedly repealed the avoidance limits in those statutes.  Neither rationale withstands scrutiny. We address the first error in Section II here and the second in Section III, *infra.*

command that courts apply statutory language).  The Second Circuit confirmed in three Madoff-related decisions that the Trustee's avoidance powers are limited by the Bankruptcy Code.  *See* Section III, *infra* (discussing application of the Bankruptcy Code in this SIPA proceeding in *JPMorgan*, *Fairfield*, and the *Section 546 (e) Decision*).  For these reasons, the bankruptcy court erred in refusing to apply the statutory defenses invoked by Defendants as written.

### B.  The bankruptcy court disregarded the text of the controlling statutory provisions in favor of equitable principles.

The bankruptcy court refused to credit valid state law obligations to the customers not because it disagreed with Defendants' interpretation of Section 548(c) but because it believed that 548(c) was inequitable here.  It therefore wrongly concluded that the broker's transfers could never satisfy a valid obligation to the customers for purposes of this SIPA case because Madoff Securities was a "thief" misusing "stolen" funds;[11] crediting obligations based on such "fictitious profits" and account statements would violate principles governing SIPA net equity claims; and such a result would unfairly create "net winners/losers."[12]  Further, the court erroneously found that Defendants were subject to the equitable remedy of disgorgement of payments received because *Madoff Securities* may have violated the SEC's financial responsibility rules in making the transfers.[13]

---

[11] This conclusion defies the Second Circuit's holding in *Sharp* that fraudulent transfer law does not reach transfers merely because the transferor may have obtained the funds through theft or fraud.  The test of the defense is whether the transfer related to *a valid debt as between the parties to the transfer*.  *See* Section VIII, *infra*.

[12] To this end the court erroneously embraced the rationale of Judge Rakoff's *Antecedent Debt Decision*, a ruling that has been superseded by later authority and no longer can be considered good law.  *See* Section V *infra*. Moreover, the bankruptcy court also misread the mandate of the Second Circuit's *Section 546(e) Decision*, which held net equity principles of SIPA do not supersede the Bankruptcy Code's avoidance provisions.  *See* Section IV, *infra*.

[13] This new-found contention was never pleaded by the Trustee in these cases and does not withstand scrutiny.  *See* Section VIII, *infra*.

By departing from statutory directives for public policy reasons, the bankruptcy court violated well-established Supreme Court precedents that admonish courts to apply statutes as written. The Trustee, as legal successor to the debtor, points to no equitable authority beyond that fixed by the Bankruptcy Code. *See* VII, *infra*. The bankruptcy court's reliance on equitable considerations to deny Defendants' defenses must be rejected.

### III. The bankruptcy court erred in concluding that SIPA repeals part of the Bankruptcy Code's avoidance statute and grants a SIPA trustee greater rights than an ordinary bankruptcy trustee because SIPA does not "necessarily imply" that the Code governs exclusively.

To the extent the bankruptcy court's decision was not based on equity but on its own interpretation of SIPA, this, too, was error. The bankruptcy court nowhere disputes Defendants' interpretation of Section 548(c). Instead, the court stated that SIPA §6(b), 15 U.S.C. § 78fff(b), broadly exempts the Trustee from the Bankruptcy Code's value defense in this SIPA avoidance action, endowing him with greater rights than a bankruptcy trustee in an ordinary bankruptcy. Section 6(b) says no such thing; it requires that SIPA trustees *follow* the Bankruptcy Code unless a provision of the Code is "inconsistent" with a provision of SIPA. The bankruptcy court points to no relevant, inconsistent provision of SIPA. To the contrary, SIPA borrows the Bankruptcy Code avoidance provisions wholesale, including the Section 548(c) defense, thereby preventing any conclusion that the defense somehow is inconsistent with SIPA.

Nothing in SIPA supports the bankruptcy court's interpretation; the only relevant provisions prove the court wrong. Because SIPA explicitly incorporates limitations on the Trustee's bankruptcy avoidance powers, there is no conflict. *See Lutz v. Chitwood (In re Donahue Secs., Inc.),* 304 B.R. 797, 798-99 (Bankr. S.D. Ohio 2003) ("it is not inconsistent with SIPA to hold that a SIPA trustee is vested with the same rights as a bankruptcy trustee

under §541(a) [of the Bankruptcy Code] where SIPA itself expressly dictates the same under §78fff-1(a).").

**A. SIPA borrows Section 548's avoidance statute and its defenses which are integral to the federal avoidance remedy.**

As discussed in Section I.A *supra*, SIPA § 8(c)(3) makes clear that the Code's avoidance protections apply in SIPA proceedings as written.  The statute permits a SIPA trustee to seek to avoid a transfer of what would have been customer property "*to the extent that such transfer is voidable or void*" under the Bankruptcy Code.   15 U.S.C. § 78fff-2(c)(3) (emphasis added).  Because the Section 548(c) value defense and Section 548(a)'s statute of repose limit the extent to which a transfer is "voidable or void," they necessarily restrict a SIPA trustee's avoidance remedies and must be addressed in adjudicating the case.

**B. The bankruptcy court's statutory analysis ignores the provision of SIPA that adopts the Code's avoidance statute in whole and is directly contrary to fundamental norms of statutory construction**

The bankruptcy court asserts that it can ignore the Code's core avoidance limitations because  SIPA does not "necessarily imply" that the Section 548(c) defense be applied in the same way to the SIPA customer property estate as it would to a general bankruptcy estate.  This argument ignores the language of SIPA § 8(c)(3) and misapplies principles of statutory construction.  The court must apply the express language—which incorporates the Code without qualification—and may not search for inconsistencies to achieve its own equitable ends.

The principle that SIPA implicitly repeals express limitations on the federal avoidance remedy is contrary to norms of statutory construction.  Courts have a duty to reconcile provisions in related federal statutes, not search for a conflict between them.  *Kawasaki Kisen Kaisha, Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 108 (2010) (statutes should be construed to be consistent with one another where the text permits); *Nat'l Union Fire Ins. Co. v. Camp (In re Gov't Secs. Corp.)*,

972 F.2d 328, 330 (11th Cir. 1992) (in testing consistency of SIPA and Bankruptcy Code provisions, "a court should interpret a statute so as to give effect to each of its provisions") (citations omitted).  This requires a court to consider not how it can evade the operation of a specific statute in favor of a more general one, but rather whether the provisions can be harmonized in their application.

SIPA commands that a broker  liquidation "shall be conducted in accordance with, and as though it were being conducted under" the Bankruptcy Code, "[t]o the extent consistent with the provisions of [SIPA]." SIPA § 6(b), 15 U.S.C. § 78fff(b). Congress did not create two irreconcilable statutory schemes when it enacted SIPA to facilitate broker liquidations and borrowed the bankruptcy avoidance remedies. Instead, Congress specifically made a SIPA trustee's ability to avoid transfers of customer property *dependent on* the extent to which such transfers are avoidable under the Bankruptcy Code.  *See* 15 U.S.C. § 78fff-2(c)(3).

The general "to the extent consistent" clause in SIPA § 6(b) cannot be read to prohibit the specific defense under Section 548(c) because a more specific statute–SIPA § 8(c)(3)–adopts the bankruptcy avoidance provisions wholesale in a SIPA avoidance proceeding. "However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment." *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228 (1957) (internal quotation marks omitted). If Congress wished to limit Section 548(c) defenses in SIPA avoidance actions, it would have done so explicitly. *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 453 (2007) (citations omitted) ("where Congress has intended to provide . . . exceptions to provisions of the Bankruptcy Code, it has done so clearly and expressly").

Because SIPA unconditionally *and unqualifiedly* incorporates the Bankruptcy Code's avoidance provisions, the general caveat in SIPA § 6(b) cannot be read to eviscerate the Section 548(c) defense, which defines when transfers are void or voidable. "A provision is 'inconsistent' with SIPA if it conflicts with an *explicit* provision of the Act." *SIPC v. Charisma Secs. Corp.*, 506 F.2d 1191, 1195 (2d Cir. 1974) (emphasis added); *see also Lutz*, 304 B.R. at 798 ("it is not inconsistent with SIPA to hold that a SIPA trustee is vested with the same rights as a bankruptcy trustee."). Because the sole SIPA provision allowing the Trustee to pursue transfers of what would have been customer property is expressly limited by the scope of the avoidance powers of an ordinary bankruptcy trustee, any other reading of the statute does not withstand scrutiny. [14]

### C. The bankruptcy court's conclusion disregards controlling Second Circuit holdings in these cases that limit a SIPA trustee to the same avoidance powers as an ordinary bankruptcy trustee.

On three occasions in the Madoff Securities proceedings, the Second Circuit rejected the bankruptcy court's conclusion that SIPA "impliedly repeals" the Bankruptcy Code and provides a SIPA trustee with greater avoidance powers. The law is clear: A "SIPA trustee has *no* greater legal interest in unadjudicated fraudulent transfers than does a trustee in bankruptcy." *Fairfield,* 762 F.3d at 212; *accord*, *JPMorgan*, 721 F.3d at 58 ("Although a SIPA liquidation is not a traditional bankruptcy, a SIPA trustee is vested with the "same powers and title with respect to the debtor and the property of the debtor . . . as a trustee in a case under Title 11."); *Section 546(e) Decision*, 773 F.3d at 423 (refusing to apply SIPA net equity principles, however "compelling" they may seem, to limit the Code's avoidance provisions).

---

[14] Nor does SIPA presume that every transfer of what would have been customer property will be recovered. As discussed in Section VI, *infra*, fraudulently conveyed property is not "considered property of the estate until it is recovered." *FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 131 (2d Cir. 1992); *accord*, *Fairfield*, 762 F.3d at 207, n.7. Any consideration therefore of how the SIPA estate would treat a transfer avoided and recovered from a defendant puts the cart before the horse.

The bankruptcy court's conclusion that SIPA impliedly repeals the Bankruptcy Code's avoidance limits is clearly erroneous.  SIPA net equity principles have no relevance until an avoidable transfer is actually avoided and recovered in accordance with the Bankruptcy Code.

**IV.     The bankruptcy court erred in disregarding the Second Circuit's mandate in the *Section 546(e) Decision*: Madoff Securities' fraud did not abrogate Madoff Securities' preexisting obligation to pay settlement payments and contractual debts, and SIPA does not alter the Bankruptcy Code's avoidance statutes.**

The bankruptcy court decision rests on two mistaken propositions: (1) because of Madoff Securities' fraud, Defendants' state law rights to payment are not enforceable, and (2) SIPA's priority for customer net equity claims renders the Bankruptcy Code's avoidance rules inapplicable.  RR at 21.  Each thesis was rejected by the Second Circuit in the *Section 546(e) Decision*.  Under that decision and its mandate, Madoff Securities' payments to customer of their reported securities entitlements were treated as legally meaningful "settlement payments" or "payments made in connection with a securities contract." Because all Defendants were parties to this decision, the mandate has special force in these proceedings on remand from that decision.

**A.     The *Section 546(e) Decision* established that Defendants' contracts with Madoff Securities are enforceable in these proceedings, even though Madoff acted fraudulently, and that the Bankruptcy Code controls here.**

The Second Circuit's *Section 546(e) Decision* decided two critical issues governing these cases: (1) Defendants' brokerage contracts are enforceable in a SIPA avoidance proceeding, and (2) the Bankruptcy Code controls avoidance of transfers in a SIPA avoidance proceeding.  Both principles were essential to the Second Circuit's holding; any contrary treatment of either determination – as attempted by the bankruptcy court – necessarily undercuts the *Section 546(e) Decision* and, therefore, is foreclosed.

In the *Section 546(e) Decision*, the Second Circuit ruled that Madoff Securities' transfers to innocent customers were payments made in connection with securities contracts and/or were

settlement payments by the broker to the customers in response to their requests for withdrawals. 773 F.3d at 418-22.   This triggered the application of Section 546(e) to limit the scope of Trustee's claims.   The holding rested on two key principles.

First, allegedly fraudulent transfers—payments made by Madoff Securities to good faith customers like Defendants—retain their underlying legal character and consequence even after the broker's fraud was exposed.   Addressing this issue from the perspective of the customer, the Circuit instructed:

> Certainly SIPC and the Trustee are correct that these transfers [by Madoff Securities to its innocent customers] were also made "in connection with" a Ponzi scheme and, as a result, were fraudulent . . . .   Indeed, BLMIS's conduct was in flagrant breach of the agreements it made with its customers.   But *the fact that a payment was made in connection with a Ponzi scheme does not mean that is was not at the same time made in connection with a (breached) securities contract*. After all, a transfer can be connected to, and can be made in relation to, multiple documents or purposes simultaneously.
> * * *
> *[I]f I instruct my broker to sell my shares of ABC Corporation and remit the cash, that payment is a "settlement" even if the broker may have failed to execute the trade and sent me cash stolen from another client* . . . .   [B]ecause the customer granted BLMIS discretion to liquidate securities in their accounts to the extent necessary to implement their sell orders or withdrawal requests, *each transfer in respect of a such an order or request constituted a settlement payment.*

*Id.* at 422-23 (emphasis added).

Second, the Bankruptcy Code applies according to its terms in SIPA avoidance actions— there are no special avoidance rules or exceptions in SIPA cases that allow departure from the bankruptcy remedy borrowed from the bankruptcy code.   The Circuit explicitly directed that policy goals and equitable  principles of SIPA have no bearing here:

> In our earlier [Net Equity] decision, we interpreted 'net equity' in a manner that would harmonize it with the SIPA statutory framework as a whole. *Section 546(e), however, is part of the Bankruptcy Code, not SIPA* …   This is important because, in enacting the Bankruptcy Code, Congress struck careful balances between the need for an equitable result for the debtor and its creditors, and the need for finality. . . . We are obliged to respect the balance Congress struck.

*Id.* at 423 (emphasis added).

### B. The bankruptcy court's proposed conclusions violate the express holdings of the *Section 546(e) Decision* and its mandate.

A plain reading of the *Section 546(e) Decision* leaves no question that the Bankruptcy Code's avoidance provisions apply according to their plain terms.   The bankruptcy court's contrary conclusion is manifestly erroneous.

"[W]here issues have been explicitly or implicitly decided on appeal, the [lower] court is obliged, on remand, to follow the decision of the appellate court."   *United States v. Minicone*, 994 F.2d 86, 89 (2d Cir. 1993).   This principle bars lower courts "from reconsidering or modifying any of its prior decisions that have been ruled on by the court of appeals."   *Id.* (citation omitted).   The prohibition is broad and applies not only to the specific dictates of the appellate court's decision but also to the "broader spirit of the mandate."   *Statek Corp. v. Development Specialists, Inc. (In re Coudert Bros. LLP)*, 809 F.3d 94, 99 (2d Cir. 2015) (citations omitted).   This "broader spirit" includes issues that are "necessarily implied" in the circuit's ruling and negates those that would otherwise undercut the circuit's decision. *Id.* at 99–100 (bankruptcy court committed reversible error when ruling on remand failed to give effect to the mandate's "focus").[15]

Here, in the words of *Minicone*, 994 F.2d at 89, the bankruptcy court faced "issues [that] have been explicitly [and] implicitly decided on appeal" in the *Section 546(e) Decision*.   As a

---

[15] *Rousset v. Atmel Corp.*, 2017 U.S. App. LEXIS 8786 at *7 (2d Cir. May 19, 2017)  (rejecting argument that, if accepted, would "undercut" basis for previous ruling); *Grede v. FC Stone LLC*, 867 F.3d 767, 776 (7th Cir. 2017) (affirming district court's refusal to reach merits of a bankruptcy trustee's argument "that, if decided in the trustee's favor, would have eviscerated our prior holding" in an earlier appeal in the case); *cf. Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 175–76 (2d Cir. 2014) (no violation of mandate rule where lower court addressed "on remand an issue that was not decided by this Court in the original appeal," that "[t]he [original] appeal did not raise").

result, the court was "obliged . . . to follow the decision of the appellate court." *Id.* It failed in three respects.

First, the mandate rule forecloses any notion that special, non-statutory "Ponzi scheme rules" regarding alleged "fictitious profits" limit the enforceability of Defendants' securities entitlements. The Second Circuit specifically held that, notwithstanding the broker's fraud, the customers held rights entitling them for purposes of the Bankruptcy Code's avoidance provisions to the broker's settlement payments made in connection with securities contracts. *Section 546(e) Decision*, 773 F.3d at 422. Nonetheless, the bankruptcy court improperly relied upon Ponzi scheme case law grounded on an opposite, non-statutory premise, *i.e.*, that an investor's contract with the fraudster was unenforceable merely because it perpetrated a Ponzi scheme. By applying a Ponzi scheme lens to limit a retail securities customer's rights as an avoidance defendant to his principal deposits, the bankruptcy court adopted the view that the securities contracts are inherently unenforceable, a view diametrically opposite to the Second Circuit determinations. The mandate rule defeats the bankruptcy court's proposed result.

Second, the mandate rule barred the bankruptcy court from choosing which sections of the Bankruptcy Code's avoidance procedures should be given full effect in a SIPA case. The bankruptcy court strains to limit the effect of the *Section 546(e) Decision* to the specific section of the Bankruptcy Code at issue in that case—Section 546(e)—by artificially trying to differentiate between the safe harbor of Section 546(e) and the avoidance remedy of Section 548(a)(1)(A) that Section 546(e) leaves in place for stockbroker transfers. Such reasoning, however, ignores the Circuit's holding and its underlying logic: Section 546(e) must be applied as written because it is "part of the Bankruptcy Code." *Id.* at 423. The Second Circuit rejected the theory that SIPA grants a court discretion to change or override any the avoidance provision

of the Bankruptcy Code, whether based on the presence of fraudulent scheme or otherwise. Lower courts are bound to apply *all* of Section 548, including its statutory defense, as written.

Third, the mandate rule prevents lower courts from circumventing the appellate ruling by relying on inapposite case law that would undermine the appellate holding. Here, the bankruptcy court justified its departure from the *Section 546(e) Decision* under the pretext of following a later, non-precedential Second Circuit summary order—*Silverman v. Cullin* (*In re Agape World, Inc.*), 633 Fed. App'x. 16 (2d Cir. Feb. 4, 2016). *Silverman* is wholly inapposite to the matters now before this Court that are controlled the *Section 546(e) Decision*.[16]

Because the bankruptcy court declined to recognize and apply the clear import of the *Section 546(e) Decision*—that Defendants have enforceable securities contracts that gave rise to settlement payments and contractual payments notwithstanding Madoff Securities' fraud—the RR must be rejected and the Second Circuit's earlier mandate given full effect.

The only issue open for the bankruptcy court to consider was whether Ponzi scheme cases involving *equity investors* may properly be extended to the stipulated facts. That inquiry was foreclosed by the parties' stipulation that Defendants *were not equity investors in the business of Madoff Securities*, but rather *customers of a registered stockbroker*. *See*, *e.g.*, RR at 6, 29-31. As discussed *supra* at I.A.4, Section 29(b) is dispositive in giving effect to customers' contractual rights.

---

[16] Specifically, (1) *Silverman* dealt with state fraudulent conveyance laws, not the Bankruptcy Code, and did not involve defense Section 548(c) defense; and (2) the "Ponzi scheme" involved unenforceable equity financing arrangements for the business, not a broker's contracts with retail securities customers. If the mandate rule means anything, it bars reliance on wholly inapplicable authority contrary to a question expressly decided by the prior appeal— here, that the customers' securities contracts were enforceable.

**V.    The bankruptcy court erred in deferring to the *Antecedent Debt Decision*, which has been superseded by later controlling authority and the precedential value, if any, is cabined by its limited procedural posture.**

The bankruptcy court improperly rested on the 2013 *Antecedent Debt Decision*, 499 B.R. 416 (S.D.N.Y. 2013) in holding that Section 29(b) did not preserve Defendants' state law right to payment.  That decision has no bearing here for two reasons.  First, the decision is no longer viable because its reasoning was superseded by later Second Circuit holdings in the Madoff Securities liquidation and by later Supreme Court decisions.  *See, e.g.*, IV, VI-IX.  The bankruptcy court's effort to distinguish those later authorities is not defensible.

Second, the *Antecedent Debt Decision* does not control because it only tested the adequacy of the Trustee's complaints, and assumed the truth of factual allegations that are no longer true as alleged.  That decision involved Rule 12(b)(6) motions by many good faith defendants to dismiss commonly-stated complaints, without examining the affirmative defenses later advanced by the Defendants here which had not even been pleaded in 2013.

**A.  The *Antecedent Debt Decision* was superseded by later controlling Second Circuit holdings.**

The *Antecedent Debt Decision* rested on two grounds that were explicitly rejected by the later *Section 546(e) Decision*: (1) Madoff Securities' customer contracts were not enforceable by innocent customers because of Madoff Securities' fraud, and (2) the priority of customer net equity claims in SIPA cases precludes giving effect to the value defense under Section 548(c) beyond the amount of the customer's principal deposits.  Neither premise withstands scrutiny under the *Section 546(e) Decision*.  SIPA § 8(c)(3) borrows the avoidance provisions of the Bankruptcy Code without qualification, and those laws must be applied according to their plain terms. The *Antecedent Debt Decision* cannot control here because it does not comport with the later mandate of *Section 546(e) Decision.*  Reliance on that decision, therefore, is manifestly

erroneous. *See* Section IV, *supra*. Likewise, that court's deference to SIPA net equity principles before avoidance and recovery was later overruled by *Fairfield*. *See* VI, *infra*.

Moreover, in deferring the *Antecedent Debt Decision*'s rejection of the two-year reach back limit in the Section 548 for the calculation of transferee exposure, the bankruptcy court's rationale rested on principles overruled by the later Supreme Court decisions in *CTS* and *CalPER*S which define the judicial limits in addressing statutes of repose. *Se*e Section IX, *infra*.

> **B.  In any event, the *Antecedent Debt Decision* is inapposite because subsequent facts developed in discovery and later affirmative defenses not at issue in 2013 Rule 12(b)(6) motions have altered the key operative questions at issue.**

Section 29(b) of the 1934 Act controls this litigation by preserving Defendants' state and federal law rights to payment, which are plain bases on which to find value under Section 548(c). However, the bankruptcy court identified the Section 29(b) defense in a single line of a chart of issues the court believed to have been briefed (and therefore decided) in the *Antecedent Debt Decision.*[17]  RR at 16. From that fact alone, the bankruptcy court inferred that the Section 29(b) defense was denied on its merits. This reasoning is fatally flawed.

First, the 2013 decision was made under Rule 12(b)(6), which could not address later-raised affirmative defenses or later-stipulated facts. For that threshold ruling, the only question before the court in the *Antecedent Debt Decision* was whether Trustee alleged facts in the complaint that, if true, stated a plausible claim for relief?  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In answering this question, the district court had to confine itself to whether allegations *in the complaints* established a *prima facie* case of fraudulent transfer or

---

[17]  The *Antecedent Debt Decision* invoked prior determinations in *Picard v. Greiff*, 476 B.R. 715 (S.D.N.Y. 2012). Defendants were not parties to *Greiff* and therefore are not bound by the decision. The *Antecedent Debt* proceeding gave persons who were not parties in *Greiff* an opportunity to address the issues raised in that case and the question of whether to extend the ruling to all good faith defendants. The *Antecedent Debt Decision*, therefore, was the District Court's determination of the adequacy of the Trustee's complaints against SF and Lowrey Defendants.

unequivocally established or foreclosed a defense. *Gowan v. Patriot Grp., LLC (In re Dreier LLP)*, 452 B.R. 391, 418, 434 (Bankr. S.D.N.Y. 2011) (merits of facts and defenses are considered at trial or on summary judgment and do not factor into the Trustee's burden on a motion to dismiss); Fed. R. Civ. P. 12(d).

The Trustee's complaints did not provide a factual predicate for the Section 29(b) defense or Defendants' other affirmative defenses. To the contrary, the Trustee alleged that Defendants were Madoff "investors." *E.g.*, Lowrey Complaint ¶¶ 37-41. This allegation was taken as true in 2013 and was central to the district court's reliance on the so-called "Ponzi scheme exception" for recovery from *equity investors* in such schemes. That is, the "investor" allegation allowed the court to infer that Madoff Securities' customer contracts were not enforceable against the broker for the amounts of purported gains in customers' accounts. *See*, *e.g.*, Lowrey Amended Compl. at ¶¶ 37–41.

While—at the motion to dismiss stage—the "investor" allegation was accepted as true, the summary judgment record requires a different conclusion. The stipulated record establishes that Defendants were *not investors in the business of Madoff Securities*, but rather were innocent retail securities customers of the broker. RR at 6; Lowrey SMF ¶¶9-10; SF#2 SMF ¶¶7-8. Accordingly, the *Antecedent Debt Decision,* premised for purposes of Rule 12(b)(6) on now-disproved factual allegations, is not controlling on the different record now before the Court.[18]

Consideration of Section 29(b) at the motion to dismiss stage would have been premature for another reason. Section 29(b) gives a fraud victim the *option* of enforcing his rights under his securities contract. When (as here) the debtor engaged in fraud, Section 29(b) affords a victim

---

[18] As discussed in Section I supra, this difference is significant because the status as a securities "customer" carries two protections: (1) the state law right available only to customers to receive full payment of reported securities entitlements; and (2) the federal protections in Section 29(b).

the right to enforce its securities obligations or to seek rescission.  *See, e.g.*, *Freeman*, 419 F. Supp. at 453.  Thus, only by electing to stand on his contractual rights, as asserted in his affirmative defenses, does the defendant elect to enforce his contractual remedies against the broker.  Until properly raised by their answers to the complaints, the possible Section 29(b) defense (and its then-unpleaded facts) was neither properly before the court nor determined in the 2013 litigation in a manner that could control this proceeding.

Thus, only now—where factual support has been established and the affirmative defense raised—is the Section 29(b) defense ripe for decision.  It was error for the bankruptcy court  to conclude otherwise.[19]

Second, and in all events, the bankruptcy court misread the *Antecedent Debt Decision*. The opinion never mentioned Section 29(b), did not engage in any reasoning on the enforceability of state law obligations of the broker to its customers, and cannot be construed to have decided for all purposes a defense not apparent on the face of the complaints.  Indeed, the bankruptcy court appears to have rested its decision solely on the fact that Rule 12(b)(6) briefs by defendants *mentioned* Section 29(b).  But the analysis of precedent is not so simplistic for purposes of a Rule 56 determination:  The question is not whether a party mentioned an issue in its briefs, but whether the issue was joined by the pleadings and whether there was a factual predicate for any all-governing ruling.  The answer to that question cannot be determined by a chart.  It turns on what the *court* said in the earlier decision.  Because no prior court addressed

---

[19] The bankruptcy court also erred by disregarding the procedural order controlling this case. The *Antecedent Debt Decision's* procedural order made clear that all claims not supported by the facts of the Complaint are preserved.  *Picard v. South Ferry #2, et al*. 10-4350 Doc. No. 109-1 (this proceeding "is without prejudice to ... any matter that cannot properly be raised or resolved on a Rule 12 motion, all of which are preserved").  Because the Complaints did not raise Section 29(b) or the potential affirmative defense facts, this decision could not address Defendants' later affirmative defenses.

the Section 29(b) defense, and had no factual predicate for doing so, the earlier decision does not bind this Court and could not bind the bankruptcy court.

For these reasons, this Court should give no weight to the *Antecedent Debt Decision* in determining whether Defendants established their affirmative defense under Section 29(b).  The Court should conclude that, notwithstanding Madoff Securities' fraud, the contracts and their reported securities entitlements were enforceable at the time of each transfer.[20]

### C. The other cases relied upon by the bankruptcy court are also inapposite for the same reasons the *Antecedent Debt Decision* is inapplicable.

The other cases relied upon by the bankruptcy court are inapposite because, like the *Antecedent Debt Decision*, they did not address the defense under Section 29(b) for securities contractual entitlements.  Rather, they addressed net equity principles rather than avoidance of transfers, they involved equity investors and not retail securities customers, and they do not comport with the mandate of the *Section 546(e) Decision* that governs this remand proceeding.

Many of those decisions do not involve avoidance principles at all; they are "net equity" cases, involving the SIPA claims process. *E.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, *In re BLMIS*, 654 F.3d 229, 233 (2d Cir. 2011) ("*Net Equity Decision*") (calculation of SIPA customer claims).[21]  Individually, and as a group, *Fairfield, JPMorgan and* the *Section 546(e) Decision* teach that the SIPA claims process is wholly irrelevant in deciding avoidance cases.  *See*

---

[20] To the extent the court relied on prior opinions applying the *Antecedent Debt Decision*, such as *Picard v. Cohen*,  2016 WL 1695296, at *5-10 (Bankr. S.D.N.Y. Apr. 25, 2016) (report and recommendation), *adopted by*, No. 16 CV 5513(LTS), slip op. (S.D.N.Y. Feb. 24, 2017), it likewise erred.

[21] *See also SIPC v. 2427 Parent Corp.* (*In re BLMIS*), 779 F.3d 74, 77 (2d Cir. 2015) ("In a SIPA liquidation, a fund of customer property, separate from the broker-dealer's general estate, is established for *priority distribution*…") (emphasis added); *Rosenman Family, LLC v. Picard*, 395 F. App'x 766, 768 (2d Cir. 2010) (discussing who are SIPA *claimants*).

Sections IV, VI, VII.[22]   Moreover, the cases cited by the bankruptcy court rest on decisions (*Sender* and *Silverman*) which determined – unlike the special rights of retail securities customers – that equity investors did not have legally cognizable rights to payment but held only a rescission right to principal; or that contracts between equity investors and a fraudster were unenforceable.[23]

**VI.   The bankruptcy court erred in concluding that a valid payment of a pre-petition claim owed by a debtor at the time of the transfer is inconsistent with SIPA because it adversely affects the later distribution of customer property in a subsequent SIPA estate; the decision is in direct disregard of the holding in *Fairfield*.**

The bankruptcy court erroneously refused to credit pre-petition payments made in satisfaction of state law obligations owed to Defendants because it believed doing so would unfairly deplete the customer property estate created by the later SIPA liquidation.   This logic rests on the flawed notion that "net equity" principles governing the SIPA claims process supplant the determination of "value" under the Section 548(c) defense.   Stated differently, relying on the *Antecedent Debt Decision*, the bankruptcy court erroneously concluded that a SIPA avoidance defendant should be treated identically to a SIPA net equity claimant who seeks a post-petition distribution of customer property for his lost account value as of the petition date. *See* RR at 18 ("More fundamentally, the assertion of a general damage claim as an offset against the recovery of customer property [in an avoidance action] has the same effect as the assertion of that claim against the customer property estate.")

---

[22] The Second Circuit recently reaffirmed that net equity principles have no application to avoidance cases.  *Sagor v. Picard (In re Bernard L. Madoff Inv. Sec., LLC)*, 2017 U.S. App. LEXIS 9842, at *6 (2d Cir. June 1, 2017).

[23] Others decisions are farther afield.  For instance, *Teamsters of Upstate N. Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 567 (2d Cir. 2016), involved a pension fund's claims for ERISA violations based on its investment manager's alleged breach of fiduciary duty by not earlier closing the fund's account at Madoff Securities.  The cited language has nothing to do with the value defense; it only addressed whether the fund's trustees had standing to assert the claims.

This conclusion conflicts with the Second Circuit's holdings in *Fairfield* and *Colonial*, which rejected this circular argument. They direct that pre-petition transfers are not part of the bankruptcy estate or subject to provisions regarding administration of SIPA estate property *unless and until the trustee avoids and recovers the transfers*, *i.e.,* until a trustee actually brings the transferred property back into the estate. *Fairfield,* 762 F.3d at 212 ("assets targeted by a fraudulent conveyance action do not become property of the debtor's estate under the Bankruptcy Code until the Trustee obtains a favorable judgment") (citing *Colonial*, 980 F.2d at 131). The way in which the Code and SIPA administer property of the estate is, therefore, irrelevant to the determination of a SIPA trustee's avoidance claim. *Id.*

These holdings are binding: They dictate that the Trustee's avoidance powers are limited to those enunciated by the Code. Neither SIPA's treatment of "customer property" nor its redistributive purpose and structure is relevant for avoidance cases. The bankruptcy court's reliance on SIPA net equity claims allowance and administration wrongly disregards the controlling precedents.

### A. SIPA's net equity principles have no bearing on an avoidance action.

Defendants are not SIPA net equity claimants and filed no SIPA claims; they are strangers to the SIPA proceeding, except for having been targeted by the Trustee's avoidance actions. They received payments from the broker long before there was a SIPA estate. The value of the payments made to them is measured at the time of payment under substantive non-bankruptcy law, not by SIPA net equity principles that only come into play in a later liquidation proceeding.

The Second Circuit has confirmed this point against the Trustee on two occasions, and nothing in SIPA says otherwise. Consideration of SIPA claims principles is, therefore, erroneous and barred by the principles of collateral estoppel.

### 1. Transferred property is not part of the SIPA estate unless and until avoided and recovered by the trustee.

As the Second Circuit established in *Colonial*, unavoided transfers are not property of the estate unless and until they are avoided. 980 F.2d at 131 ("if property that has been fraudulently transferred is included in the Section 541(a)(1) definition of property of the estate, then Section 541(a)(3) is rendered meaningless."). Later, in *Fairfield,* the Circuit reiterated that "assets obtained by a fraudulent conveyance action do not become property of the debtor's estate under the Bankruptcy Code until the [SIPA] Trustee obtains a favorable judgment." *Fairfield*, 762 F.3d at 212 (citing *Colonial*, 980 F.2d at 131). Until the pre-petition transfers are successfully avoided and the monies are recovered under the Bankruptcy Code, the funds do not become SIPA estate property and are not part of the fund of customer property.

### 2. A SIPA trustee has no greater power over unavoided property than an ordinary bankruptcy trustee.

To escape the dictates of *Colonial* and *Fairfield*, the bankruptcy court posits that although the Bankruptcy Code may limit a trustee's control over unavoided property, SIPA does not: "[A] SIPA trustee's rights in a fraudulent transfer litigation are [] greater than the rights of an ordinary bankruptcy trustee." RR 18.

This could not be a clearer violation of the Second Circuit's admonishment that: a "SIPA trustee has *no* greater legal interest in unadjudicated fraudulent transfers than does a trustee in bankruptcy." *Fairfield*, 762 F.3d at 199.

In *Fairfield*, the Trustee sought to enjoin third-party settlements involving avoidance defendants who had received allegedly improper pre-petition distributions of customer property. *Id* at 212. As in this case, the Trustee asserted his power over customer property to argue that— even though the transfers had not been avoided—SIPA nevertheless gave him special powers over the transfers because their effect would diminish his potential avoidance recoveries or the

44

overall separate fund of customer property.  *Id*.  According to the Trustee, that the property was not then part of the SIPA estate was immaterial because the property would eventually come into the estate.

The Second Circuit rejected this argument.  It first applied the holding of *Colonial* and reaffirmed that, under the Code, unavoided transfers are not "property of the debtor's estate before the Trustee obtains a favorable judgment."  *Id*.  It then determined that SIPA's provisions provide no special power over unavoided transfers beyond those in ordinary bankruptcy liquidations.

"[SIPA] merely engrafts special features onto the familiar framework of a liquidation proceeding under Chapter 7 of the Bankruptcy Code to address the concerns peculiar to the orderly liquidation of a brokerage."  *Id.*  Accordingly, on the plain language of the statutes, the unavoided transfers fell outside the scope of the trustee's control regarding "property of the estate."

*Fairfield* is dispositive.  Its holding that customer's receipts are not "property of the estate" unless and until avoided and recovered controls here.  Until property is recovered through the bankruptcy avoidance process, it would be premature for a court either to address how the customer property would be treated when and if recovered, or to make broad pronouncements establishing treatment and distribution priorities and procedures not expressly legislated by Congress.

### 3.  SIPA §8(c)(3) does not change this treatment of unavoided and unrecovered transfers.

The bankruptcy court improperly looked to SIPA §8(c)(3) to determine whether it could treat unavoided, unrecovered transfers as customer property.  The court erred in two respects.

First, the issue is no longer open for further consideration.  It was conclusively rejected by *Fairfield*.

Second, the bankruptcy court misunderstood the purpose of SIPA §8(c)(3).  The statute does not expand a trustee's avoidance powers or change the character of the property *beyond* an ordinary bankruptcy case; rather, it creates a legal fiction only to ensure that a SIPA trustee's avoidance powers as they relate to customer property are *equivalent* to those of a trustee relating to a debtor's transferred property in an ordinary liquidation.  As *Fairfield* explained, "[j]ust as in an ordinary, non-SIPA bankruptcy, a SIPA trustee stands in the shoes of a liquidating firm." 762 F.3d at 212.

The Court explained that a broker's liquidation presents a peculiar situation.  Money held by a broker on behalf of customers is not the broker's property under state law; thus, "it would not be recoverable by a trustee in an ordinary bankruptcy."  *Id*. at 213. SIPA responded to this issue with a specific *statute*—Section 8(c)(3) —which expressly provide a limited departure from the Code provisions.  This "statutorily created legal fiction . . . confers standing on a SIPA trustee by treating customer property as though it were 'property of the debtor' in an ordinary liquidation." *Id*. at 213.  In this way, SIPA does not vest the SIPA trustee with *more* power than any other bankruptcy trustee.   Rather, it ensures that the unique circumstances involving "customer property" do not give the SIPA trustee *fewer* avoidance powers.

SIPA's text confirms that transfers must first be avoided before they are recovered.  SIPA § 8(c)(3) mirrors Code Section 541(a)(3) in requiring successful completion of the avoidance and recovery process to bring the transferred property into the estate.  Like Section 541(a)(3), Section 8(c)(3) states that "*such recovered property* shall be deemed as customer property."   If the

transferred funds were treated as customer property from the inception of the SIPA case – before

avoidance and recovery – the statutory clause would be wholly redundant.

### B.  The bankruptcy court prematurely treated the unavoided transfers as customer property.

Notwithstanding *Fairfield's* direct holding, the bankruptcy court improperly applied

SIPA's customer property rules to the unavoided transfers received by Defendants years before

the SIPA case even began.  Specifically, the court characterized the value defense as akin to "the

assertion of a general damage claim as an offset against the recovery of customer property,"

refusing to credit the otherwise valid defense because "[t]he satisfaction of general claims owed

by BLMIS from the customer property estate would defeat the priority that SIPA intended

customers to have against the separate and distinct customer property estate."  RR at 18.  The

bankruptcy court even went so far as to conclude that the transfers could not have been made for

value because the satisfaction of obligations owed by Madoff Securities did not give value to *all

other customers of the broker whose deposits were customer property*.  RR at 29 ("Even if

BLMIS owed obligations to Defendants, the [broker's other] customers did not, and the use of

their property to pay fictitious profits was not supported by value.").  Not only does this

conclusion disregard the established timing for evaluating the avoidability of transfers – the time

of the transfer – it also defies the requirement that, under Section 548(c), value is measured only

from the perspective of the transferee, not that of the debtor or its other creditors.  The

bankruptcy court indefensibly transformed this avoidance proceeding into a SIPA claims

proceeding.[24]

---

[24] The contents of the RR remove any doubt that in upholding the Trustee's avoidance claim, the bankruptcy court improperly treated an avoidance proceeding as the equivalent of a SIPA net equity claims proceeding.  *E.g.* RR at 17 (citing *Rosenman Family, LLC v. Picard*, 395 F. App'x 766, 768 (2d Cir. 2010) (summary order) ("claims are satisfied from a customer property estate, which is separate from the general estate used to satisfy the claims of general unsecured

**VII.    The bankruptcy court erred in granting the Trustee an unpleaded claim against innocent Defendants and concluding that the debtor violated the SEC's financial responsibility rules; in all events, the Second Circuit's decision in *JPMorgan* confirms that the Trustee has no standing to assert any non-bankruptcy claim.**

The bankruptcy court committed blatant error by suggesting that the Trustee had standing to assert claims based on the SEC financial responsibility rules ("SEC Rules") and that he could assert these claims *against* innocent Defendants years after they received transfers in good faith, and then by adjudicating the validity of that previously-unpleaded theory.  This contradicts the holding of *JPMorgan,* where the Second Circuit made clear that Trustee has no standing to pursue any claims outside those established by the Bankruptcy Code.  As a party to *JP Morgan*, the Trustee is collaterally estopped from asserting otherwise.  *Boguslavsky v. Kaplan*, 159 F.3d 715, 721 (2d Cir. 1998).  Indeed, while the Trustee did not raise possible SEC rule violations in these actions, he previously attempted to argue them – and lost – in *JP Morgan*, leaving the district court "mystified by the suggestion that Rule 15c3-3—a rule that is indisputably not a part of SIPA—may somehow confer upon a SIPA trustee broad authority that is neither available to an ordinary bankruptcy trustee nor provided by SIPA."  *Picard v. HSBC Bank PLC*, 454 B.R. 25, 32 (S.D.N.Y. 2011), *aff'd sub nom. Picard v. JPMorgan Chase & Co.,* 721 F.3d at 73.    This precedent forecloses the bankruptcy court's attempted construction and consideration of the SEC Rules to sustain the Trustee's claims in this proceeding.

---

creditors. . . .  To effectuate its purposes, SIPA accords 'those claimants in a SIPA liquidation proceeding who qualify as 'customers' of the debtor priority over the distribution of 'customer property.''") (footnote and citations omitted); *id.* at 14 (citing *Picard v. Greiff (In re BLMIS)*, 476 B.R. 715, 727 (S.D.N.Y. 2012).  The controlling Second Circuit jurisprudence is to the contrary, and confirms that SIPA net equity principles and customer property priorities are wholly irrelevant to the avoidance and recovery of a transfer, that the process for administration of customer property under SIPA does not reach unavoided transfers.   The only proper considerations are whether the Trustee proves a prima facie case of avoidance and recovery and, if he does, whether the customer's defenses defeat the claim in whole or part.  See Section I *supra*.

The bankruptcy court committed other errors by invoking the SEC Rules.  The SEC Rules address only segregation and bookkeeping by a broker; they do not invalidate lawful payments of a broker's legal obligations actually owed at the time of the payment.  Even if the rules went so far, no person other than the SEC has authority or standing to allege violations, let alone this Trustee as successor to the debtor.  Even assuming that Madoff Securities violated the rule's requirements, nothing in those rules punishes good faith customers who received payments due them from their broker at the time.  Finally, the Trustee never pleaded this claim in this case, nor does the factual record support the proposed finding. The RR, based on the ostensible SEC rule violation, is fatally flawed.

### A. The bankruptcy court erred in determining that the Trustee had standing to assert an equitable claim because JPMorgan expressly holds that he does not.

#### 1. Even if the SEC rules allowed a private right of action, JPMorgan would bar the Trustee from asserting it, because the Trustee inherits the debtor's bad faith status and therefore lacks standing to assert such claims on the debtor's or its creditor's behalf.

In *JPMorgan*, the Second Circuit held that the Trustee lacks standing to assert claims outside the Bankruptcy Code, including common law and equitable claims.  721 F.3d. at 63 n.12, 71.  As *JPMorgan* makes clear, the *in pari delicto* doctrine bars the Trustee from invoking common law remedies to avoid the broker's contractual obligations, regardless of the equities. *Id.* at 63 n.12, *accord HSBC Bank*, 454 B.R. at 37 (quoting *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87(2d Cir. 2000) (citation omitted) (*in pari delicto* "'bars a trustee from suing to recover for a wrong that the debtor whose estate he represents essentially took part in'").

Standing in the debtor's shoes, the Trustee lacks any basis to invoke the SEC's financial responsibility rules to avoid a payments made to the innocent retail customers.

### 2. The bankruptcy court disregarded *JPMorgan* by granting the Trustee powers outside the Bankruptcy Code.

The Trustee argued below that he was entitled to "disgorge [Defendants'] winnings." Trustee MSJ at 21. "Disgorgement" is an equitable remedy not codified in the Bankruptcy Code. A disgorgement claim is barred by the rule of *JPMorgan*. The Trustee lacks standing to pursue equitable remedies, and is limited to statutory avoidance remedies. *See JPMorgan*, 721 F.3d at 63–64.

Similarly, violations of the SEC Rules are beyond the Trustee's reach. By recommending a judgment based on the Trustee's avoidance of the transfers under those rules, the bankruptcy court wrongly created a new, but legally unsupportable, equitable remedy never asserted by the Trustee in this proceeding.

### B. Even if the Trustee had standing to invoke them, the SEC's financial responsibility rules have no bearing on Defendants' state law rights to receive the specific transfers at issue.

#### 1. The bankruptcy court misreads the SEC's financial responsibility rules: they do not prohibit a broker from paying a valid debt to a customer at the time of payment.

Aside from its error in creating a new remedy for the Trustee, the bankruptcy court misreads the SEC's Customer Protection Rule (Rule 15c3-3, 17 C.F.R. § 240.15c3-3). As the bankruptcy court recognized, this Rule prohibits brokers from paying general debts out of customer funds. *See* RR at 24–27. However, the SEC rule does not directly prohibit a broker from making any particular payments using customer segregated funds. Rather, the rule accomplishes its goals indirectly, under a two-fold regulatory structure: First, if the broker makes an improper payment from customer funds, it must replenish the customer fund. Second, if the broker cannot replenish the funds, it must report the failure to the SEC. 17 C.F.R. § 240.15c3-3

(requiring weekly calculation of customer fund reports to the SEC); *see also id.* § 15c3-3(e) (broker must promptly replenish bank account that holds customer funds).

In other words, the Rule does not preclude a broker from paying general debts with customer funds; rather, it requires the broker to top up customer funds to the extent deployed. The bankruptcy court missed the point of the Rule: It was promulgated *to protect customers*, *not brokers*, confirmed by its stated purposes as having been "designed to protect broker-dealer customers in the event the brokerage firm becomes insolvent." *See SEC v. Goble*, 682 F.3d 934, 940–41 (11th Cir. 2012).

To that end, the rule provides clear guidance that "nothing stated in this section shall be construed as affecting the absolute right of a customer of a broker or dealer. . . to receive . . . following demand made on the broker or dealer . . . [f]ully-paid securities to which he is entitled." 17 C.F.R. § 240.15c3-3(1)(1).  *See  Harris v. TD Ameritrade, Inc.*, 805 F.3d 664, 666–67 (6th Cir. 2015).  A customer's demand for cash is akin to a demand for fully paid securities because it would be necessary for the broker convert reported securities positions into cash to satisfy the demand.  *See Section 546(e) Decision*, 773 F.3d at 422–23 (transfer by broker upon customer's instruction to broker to liquidate securities is a settlement payment.)  Even assuming that Madoff Securities violated Rule 15c3-3, nothing in that rule supports an avoidance action against—or other otherwise diminishes the rights of—a customer who received payment in good faith on account of a valid obligation owed to them at the time of payment.

> ### 2.  Even if the rules prohibited such payments, the action would be brought against the offending party—Madoff Securities—in whose shoes the Trustee stands.

Violations of the SEC Rules are actionable against the broker and its agents, but not against innocent recipients of amounts due them.  Put another way, Madoff Securities' diversion of customers' funds to satisfy valid obligations to other customers created regulatory duties *for*

*Madoff Securities* but did not somehow vitiate the payments to innocent customers.  Indeed, even if the SEC had timely discovered Madoff Securities' fraud, it would have had no recourse against Defendants who held legitimate good faith entitlements to the payments made to them.  The SEC could bring an enforcement action against Madoff Securities.  *Goble*, 682 F.3d at  940–41, but even the SEC could not bring the disgorgement claim that the bankruptcy court constructs for the Trustee here.  *CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192 (2d Cir. 2002) (citing *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998)) (disgorgement not available against persons receiving payment of valid debts).

Thus, the controlling question remains whether Defendants have legitimate claims to the funds they received, as of the time of the transfers.  Where a recipient of ill-gotten funds has a "legitimate claim" to receive and keep them, the recipient has a complete defense to an equitable action against him, even if the debtor originally obtained the funds by malfeasance.  *Cavanagh*, 155 F.3d at 136 (identifying "legitimate claim" as critical factor for defense); *cf. SEC v. Ross*, 504 F.3d 1130, 1142–44 (9th Cir. 2007) (only a "mere puppet" or "empty vessel into which the actual wrongdoers funneled their proceeds" would be a legitimate disgorgement defendant).[25]

These principles apply to any interpretation of SIPA or application of its avoidance statute.  Nothing in SIPA grants the Madoff Trustee greater powers than the federal government to recover the same assets.  For SIPA cases, Congress simply borrowed the familiar bankruptcy avoidance remedy with its familiar value defense.  Thus, receiving funds duly owed to them, innocent customers of a broker in a SIPA case who held entitlements for the transfers have complete defenses to a SIPA trustee's avoidance claims.

---

[25] Any other result would be a penalty, which can only be recovered on a proper showing of wrongful conduct under an express cause of action. *Kokesh v. SEC*, 137 S. Ct. 1635, 1642–45 (2017) (SEC administered its disgorgement claim as a penalty, for which the SEC remedy is limited to claims within the statute of limitations).  *A fortiori*, the SEC has no power to proceed against innocent persons such as Defendants.

### 3. Even if the SEC rules prohibited a broker from paying a valid debt to its customer, the SEC rules do not provide the wrongdoer or its successor with a private right of action to recover money from a good faith customer.

Neither Madoff Securities—nor the Trustee in its shoes—can recover from the innocent customers under non-bankruptcy law. *JPMorgan*, 721 F.3d at 57–58. *JPMorgan* likewise bars the Trustee from pursuing claims on behalf of creditors. *Id.* at 62-63. In any event, creditors would lack standing to pursue claims for the broker's failure to segregate customer property as required by the SEC Rules. Rule 15c3-3 does not establish a private right of action. *See Harris*, 805 F.3d at 666–67; *Kidder Peabody & Co. v. Unigestion Int'l, Ltd.*, 903 F. Supp. 479, 493 (S.D.N.Y. 1995).

### 4. In all events, the bankruptcy court improperly assumed, without any factual basis in the record that there was a violation of the SEC's financial responsibility rules; the stipulated facts do not address how customer funds were segregated or what source Madoff Securities used to pay the defendants.

The RR's rationale concerning the SEC Rule suffers from a further basic error. There are no specific facts, proposed findings or conclusions establishing SEC Rule violations or any bases for disgorgement against the customers. *See Greater Buffalo Press, Inc. v. Fed. Reserve Bank*, 866 F.2d 38, 43 (2d Cir. 1989) ("In order to survive a summary judgment motion, the [Trustee] had to present supporting facts and arguments showing some legal basis for liability on the part of the defendants; it was not enough simply to put forth conclusory allegations of wrongdoing."). To establish a Rule 15c3-3 violation, the factual record must establish through admissible evidence: (1) how Madoff Securities segregated and administered customer funds, and (2) that these Defendants' payments were made from a pool of funds subject to the rule. The bankruptcy court never identifies any facts that connect Defendants' receipts to Rule 15c3-3 violations— much less demonstrate that there are material, undisputed facts justifying summary judgment on

53

this point.  The stipulated facts – the only facts in the record—are bereft of any facts probative of

an SEC Rule violation.  The bankruptcy court's proposed disposition of this point is unsupported.

### C.  The bankruptcy court's decision is procedurally improper because it raises unpleaded claims, thereby depriving Defendants of basic procedural rights.

#### 1.  In a summary judgment proceeding, the bankruptcy court has no authority to amend a complaint *de facto* to consider a claim that no party ever raised.

The bankruptcy court wrongly enlarged the basis for granting summary judgment to the

Trustee by resting on the SEC Rule violations.  A complaint cannot be amended unless *a party*,

not the court, amends it in accordance with the rules of civil procedure.  *See* Fed. R. Civ. Pro.

15(a) (identifying bases on which a *party* may amend its pleading).  The Trustee never made a

motion to seek relief based on a claim of Madoff Securities' asserted violations of SEC rules in

making payments to Defendants.  That failure bars the court's consideration of the new theory

for relief.

The federal rules are clear: Given the limited ways to amend pleadings, a party's failure

to utilize those methods will not support amendment.  Indeed, Rule 15 precludes the court from

unilaterally adding an unfiled claim at any stage of the proceedings; even if the bankruptcy court

believed that the Trustee could have added a disgorgement  claim when the Trustee first filed suit

in 2010, it was improper for the court to suddenly add a new claim in 2017.  *See Patel v. Hall*,

849 F.3d 970, 985 (7th Cir. 2017) ("'[w]here a request for leave to amend was not presented to

the trial court, there is nothing for the appellate court to review regarding amendment'").

The bankruptcy court's approach—injecting an unpleaded claim at the summary

judgment stage deprives Defendants of procedural due process.  Courts should not grant

judgment on claims that defendants have not had the chance to fully litigate before the summary

judgment phase.  *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 727

(2d Cir. 2010) (affirming denial of motion to amend, after defendants moved for summary judgment, because of "significant prejudice resulting from permitting [plaintiffs] to file their amended complaint in light of the circumstances presented, the length and complexity of these proceedings, and the late stage of litigation at which the motion was made").

Any grant of relief recommended against Defendants that is predicated on disgorgement under the bankruptcy court's imagined violation of the SEC rule is unsupportable.

### 2.   There is no evidence to support relief based on the SEC rules.

Summary judgment may be granted only where the *evidence properly before the court* satisfies each element of a claim or defense.   Fed. R. Civ. P. 56(c)(1) (party must point to evidence in the record));  *Celotex*, 477 U.S. at 323  (moving party must identify portions of the record that "it believes demonstrate the absence of a genuine issue of material fact").   A motion for summary judgment must fail if the non-moving party "can point to an absence of evidence to support an essential element of the nonmoving party's claim."   *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322–23).

The bankruptcy court's proposed conclusions granting relief against Defendants based on the broker's SEC Rule violations lack any evidentiary support.   In fact, the bankruptcy court identifies no evidence probative of an SEC Rule violation, let alone evidence sufficient to grant summary judgment on such a theory.   The lack of facts in the record to support such a claim is fatal.   Even if a basis for relief under the SEC Rule was properly pleaded, the absence of evidence supporting each element of such a precludes any grant of summary judgment on that basis.   Even if the claim were considered, summary judgment must be granted to the Defendants on such a claim.

**VIII.   The bankruptcy court erred in concluding that Madoff Securities' fraud matters because its treatment of property stolen by a thief contradicts the Second Circuit's *Sharp* holding that fraudulent transfer law does not govern such a transaction..**

The bankruptcy court's erroneous conclusions regarding the SEC Rules are also irrelevant even if the funds paid to Defendants were stolen, whether from a trust or otherwise. According to the bankruptcy court:

> BLMIS stole customer funds to pay fictitious profits in satisfaction of BLMIS' own liabilities. A thief has no right to steal another person's property simply because he is obligated to pay it back.

RR at 28.  This conclusion is not the law in this (or any other) circuit.  Whether stolen from a trust or any other source, payments that a thief makes to a good faith transferee in satisfaction of the thief's antecedent debt to the payee are valid.  Fraudulent transfer law *does not* limit a transferee's rights to receive and retain payment of a valid debt, *even when the debtor uses funds stolen as part of a fraudulent scheme*.  *See Sharp,* 403 F.3d at 54–55 (adopting *Boston Trading Grp., Inc. v. Burnazos,* 835 F.2d 1504, 1508 (1st Cir. 1987) (Breyer, J.)*.

Neither the transferred funds' ultimate origin nor the broker's secret fraud affects the validity of the underlying obligation to the defendant or the payment of that debt.  Fraudulent transfer law protects innocent defendants by testing the circumstances of the transfer, as between the transferor and the transferee, *at the time of the transfer* and from the *innocent transferee's perspective*.  In this light, it makes no difference that the debtor was a "thief" or "ha[d] no right to steal" the money, so long as the defendant took in satisfaction of a valid obligation.  *Compare* RR at 27-28.  To be sure, Madoff Securities' decision to use funds converted from other customers to pay these Defendants is not without consequences *for Madoff Securities*.  Its misconduct (unknown to the payees) created a *new, separate* liability from Madoff Securities to the customers whose funds may have been diverted.  But there is no legal claim under fraudulent transfer law – the sole remedy available to the Trustee to regain them for the SIPA estate.

Madoff Securities' liability for tortious conduct perpetrated upon others has no effect on the validity of Defendant's rights to the retain payments lawfully owed them by the broker.

The bankruptcy court's analysis on this conclusion is wrong in three respects, each of which are each addressed elsewhere in this brief.  First, its reasoning disregards the Second Circuit's mandate and other jurisprudence, which renders Madoff Securities' fraud irrelevant in assessing the vitality of Defendants' value defense to avoidance.  *See* IV *supra*.  Second, the proposed relief amounts to an impermissible disgorgement claim, which the Trustee lacks standing to assert. There is no basis in the Bankruptcy Code to force the return of funds merely because they were involved in a fraudulent scheme; the only basis for recovery is equitable disgorgement, a theory barred by *JPMorgan*.  *See* Section VII *infra*. Finally, by reasoning that SIPA implicitly limits a customer's right where the transferor engaged in theft or fraud, the court disregards Sections 28(a) and Section 29(b) of the 1934 Act as well as the text and jurisprudence of Bankruptcy Code Section 548(c).  *See* Section III, *supra*.

### A. Controlling precedent—including the Second Circuit's *Sharp* holding—dictates that a good faith transferee may retain payments made in satisfaction of a valid debt, even if that payment is derived from stolen funds.

A central thesis of the bankruptcy court's proposed conclusion is that a broker's innocent retail customer must return all amounts received in excess of principal deposits if the money came from other innocent customers and it is later discovered that the broker was engaged in fraud.  This is wrong for three principal reasons: it tests the transfer from the wrong legal perspective; it ignores the 1934 Act's unambiguous protections for fraud victims; and it disregards the Second Circuit's holding in *Sharp*.

### 1. Madoff Securities' fraud is irrelevant to the Section 548(c) inquiry because value is measured at the time of the transfer from the transferee's perspective.

Fraudulent conveyance statutes operate to provide relief against *collusive* transfers, not to punish unwitting victims. *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1587 (2016); *Hannover*, 310 F.3d at 802 (Section 548(c) "protects the transferee from his unfortunate selection of business partners"). To that end, the statutes allow for avoidance of a "transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration." *Husky*, 136 S. Ct. at 1587; *see also BFP v. Resolution Trust Corp.*, 511 U.S. 531, 540–41 (1994) (citation omitted). But they have never prohibited good faith transfers for value or consideration, nor have they ever before been used to punish innocent customers of a broker for good faith, arm's length transactions as between the parties to the transfer. Courts effectuate Section 548(c)'s protections and ferret out *collusive* transfers by testing the transaction from only the innocent transferee's perspective at the time of the transfer. *See* Section IA2, *supra*.[26]

The bankruptcy court seemingly recognized this principle but then wholly disregarded it. RR at 13, 15. Because value is measured at the time of the transfer from a transferee's perspective, it does not matter what the broker knew or what source of funds it used; by definition, a "good faith" defendant which the Trustee stipulates to be the status of all Defendants – can have no knowledge of such bad acts. Thus, the source of the funds and Madoff Securities' fraud have no bearing on the Section 548(c) defense. The bankruptcy court's analysis

---

[26] *See, also, Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 802 (5th Cir. 2002) (determining fraudulent nature of transfer, including the value that the transferor received, at the time of the transfer without the benefit of hindsight); *Redmond v. SpiritBank ( In re Brooke Corp.)*, 541 B.R. 492, 510–11 (Bankr. D. Kan. 2015)) (same); *Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570, 589 (Bankr. N.D. Ill. 2005) ("value must be measured as of the time of the transfer"); *see generally* 5-548 *Collier on Bankruptcy* 548.03 (transfer "valued as of the date of the transfer").

here, taking into account facts and circumstances unknown to Defendants at the time of the transfers, and using those circumstances to limit the transferee's rights, necessarily turns improperly on hindsight or confusion between the transferee's perspective and that of the debtor. Each is erroneous.

> **2.    Section 29(b) of the 1934 Act gives an innocent fraud victim the option of enforcing securities contractual rights against the wrongdoing broker notwithstanding any fraud.**

Section 29(b) of the 1934 Act recognizes that a broker's innocent customers have a federal right to enforce their securities contractual obligations notwithstanding any fraud by the broker. As discussed *supra* at IA4, Congress made clear that the broker's fraud does not undermine any rights of innocent securities fraud victims; rather, under Section 29(b), *they* have the option of enforcing all contractual obligations. By resting its denial of the value defense on its conclusion that Madoff Securities was a "thief", the bankruptcy court wrongly disregarded Defendants' federal statutory rights.

> **3.    The Second Circuit's holdings teach that a good faith defendant may keep stolen funds if the payments satisfied valid obligations at the time of the payments: any cause of action lies against the thief who chose to use stolen funds, and not the good faith recipient of the stolen funds.**

The principles explained above require that this Court reject the bankruptcy court's proposed denial of the Section 548(c) defense based on the broker's use of stolen funds to pay Defendants. The bankruptcy court's proposed conclusion is contrary to the Second Circuit holding in *Sharp* that fraudulent transfer law does not reach a thief's payments of a *bona fide* debt and the debtor's "theft" is irrelevant. *Sharp*, 403 F.3d at 54–55 (debtor's "loot[ing]" does not render obligations unenforceable).

In adopting now-Justice Breyer's reasoning in *Boston Trading*, the Second Circuit recognized a good faith transferee's rights to retain value are the same whether the funds

originated from a legitimate source or were stolen.  *Sharp*, 403 F.3d at 54–55.  The focus of the fraudulent transfer inquiry is not on the debtor's bad faith, but on whether the *transferee* (1) acted in good faith (as stipulated by the Trustee here), and (2) was owed a valid debt at the time of the transfer.  Thus, the "the manner in which specific debts were created" is irrelevant.  *Id*. at 55.  Fraudulent transfer law will not unwind transactions where the transferee acted in good faith and received payment in satisfaction of an outstanding debt, even where the *debtor* may have been involved in blatant fraud or the funds were stolen.  *Id.* at 46.

The facts here are, in essence, the same as *Sharp*.  Like Madoff Securities, the *Sharp* debtor engaged in a fraudulent scheme involving tens of millions of dollars.  It "falsified sales, inventory, and accounts receivable, and invented customers in order to report fictitious revenue." *Id*.  After using these inflated revenue figures to support increased borrowings from commercial lenders, the debtor "looted" those "fraudulently raised funds."  *Id.*  The *Sharp* debtor then used the ill-gotten funds to pay off debts owed to banks, including State Street Bank. The debtor "looted" those "fraudulently raised funds."  *Id.*  The *Sharp* debtor then used the ill-gotten funds to pay off debts owed to banks, including State Street Bank, to satisfy the preexisting, valid loan debts.

The trustee sought to avoid and recover the payments on the grounds that the funds paid to State Street Bank originated from an improper source and were used to further a fraudulent scheme.  But the Second Circuit flatly rejected these arguments.  Even though the payments were made in connection with a fraudulent scheme and with fraudulently obtained funds looted from third-parties, the underlying loan debt was a valid legal obligation between the debtor and the bank transferee.  Thus, the payments from the debtor satisfied a valid debt and were not avoidable.  *Sharp*, 403 F.3d at 55 ("Here, the payment was on account of an antecedent debt, was

made to an outsider, and there is no admission of subjective bad faith (if indeed that would matter).").

As *Sharp* explains, drawing from the Second Circuit's prior decision in *HBE Leasing* and from the First Circuit's *Boston Trading* opinion, it is of no moment that this payment necessarily limited the funds available to other creditors or that it amounted to a preference, so long as the transaction between the parties to the transfer is valid under applicable state law:

> Even the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors, because 'the basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy some of his creditors; it normally does not try to choose among them.'. . .

403 F. 2d at 54 (quoting *HBE Leasing Corp. v. Frank,* 61 F.3d 1054, 1058-59 (2d Cir. 1995) (citing *Boston Trading,* 835 F.2d at 1509 (Breyer, J.)).

> To find a lack of "good faith" where the transferee does not participate in, but only knows that the debtor created the other debt through some form of [ ] dishonesty is to void the transaction because it amounts to a kind of "preference"—concededly a most undesirable kind of preference, one in which the claims of alternative creditors differ considerably in their moral worth, but a kind of preference nonetheless to find a lack of "good faith" where the transferee does not participate in, but only knows that the debtor created the other debt through some form of[] dishonesty is to void the transaction because it amounts to a kind of "preference"—concededly a most undesirable kind of preference, one in which the claims of alternative creditors differ considerably in their moral worth.

*Sharp*, 403 F.2d. at 54–55 (adopting *Boston Trading's* analysis).  In short, the breadth of Madoff Securities' fraud is a red herring.  It makes no difference whether Madoff Securities used stolen money to pay its obligations owed customers, or that others were deprived of funds to which they may have had claims.  The relevant question under Section 548(c) is whether the *transferee* gave value to the transferor.  The bankruptcy court's "thief" analysis was misplaced.[27]

---

[27]  The Second Circuit's decision in *Sharp* to disregard equitable principles in avoidance cases is especially important in light of the facts of that case.  The transferee in *Sharp* actually "suspected the fraud and extricated itself in a way that, according to *Sharp*, facilitated the victimization of

**B.  The bankruptcy court's conclusion that a thief cannot satisfy valid obligations with stolen money is directly contrary to *Sharp*.**

When viewed from the proper perspective, the Section 548(c) analysis is simple: these cases are just like *Sharp*. At the time of the transfer, Defendants held enforceable rights to payment (based on their securities contracts and reported securities entitlements); they took the transfers in satisfaction of those rights; and they believed in good faith that they were entitled to the funds.  The bankruptcy court's disregard of that analysis while divining a "thief" exception to Section 548(c) is contrary to *Sharp*.

The First Circuit's decision in *Boston Trading*—expressly adopted by the Second Circuit in *Sharp*—directly addresses and rejects the bankruptcy court's reasoning.  In *Boston Trading*, the debtor used stolen funds to satisfy valid debts it owed to transferees who were not participants in the fraud.  835 F.2d at 1510 (the debtors "obtain[ed the third party's] money through dishonest means (larceny, fraud, etc.) and use[d] it to pay a debt that [debtors] owe[d to] B, a transferee who knows of, *but did not participate in*, [debtor's] dishonesty.") (italics added).  The trustee challenged the transfers on the basis that stolen funds cannot satisfy underlying debts.

Rejecting the trustee's arguments as contrary to fraudulent transfer law, now-Justice Breyer enunciated three paradigms under which a transfer may be avoided:

> First (and most important), . . . a debtor conveys property to a friend whom he expects will use the property in a way that benefits the debtor . . . . Second . . . the debtor transfers his property to a family member or friend or someone else in a 'special relationship'. . . Third . . . the debtor exchanges assets a creditor might readily reach (say, shares of stock) for assets that are difficult for a creditor to seize (illiquid assets, or, say, a homestead).

---

other lenders and the continued looting of Sharp itself."  403 F.2d at 46, 52 ("State Street knew that there would likely be victims of the [] fraud, and arranged not to be among them.").  Indeed, the bank in *Sharp* knew "that the funds used to repay the . . . debt were fraudulently obtained" and knowingly took steps to ensure that they were the preferred creditors. *Id*. Despite those "repugnant" facts, the Second Circuit refused to find that the transfers to the bank were avoidable.  In these proceedings, where the parties stipulated that Defendants received payments in good faith, *Sharp* applies with even greater force.

*Id*. at 1508 (internal references omitted).

A debtor's use of stolen money to fund transfers to persons to whom it is indebted in the ordinary course of business (even a fraudulent one) does not fall into any of these established categories.  Whatever the debtor's misconduct, the good faith *transferee* does not enjoy any "special relationship" with the debtor, nor is the transfer a gift.  Rather, the transferee is a stranger to the illegal activity, the payments made to him satisfy a valid debt owed to a non-participant in an arm's length transaction.  *Id*. at 1510.  Absent collusion between the parties to the transfer or "gifting" for no consideration, the transfers are not avoidable.

Most relevant here, *Boston Trading* also rejected the trustee's contention that a transfer could be avoided for equitable reasons based on the transferor's use of stolen funds.  Rejecting this so-called fourth paradigm as nothing more than a theory of "preference" avoidance, Judge Breyer summarized its shortcomings in the realm of fraudulent conveyances:

> Suppose a debtor owes A $ 10,000 and B $ 20,000. He has only $ 8000, which he uses to satisfy his debt to A. This conveyance may be unfair to B, but it is not a 'fraudulent conveyance' because it satisfies a debt owed to a person who is, at least, a legitimate creditor. B must find a remedy in bankruptcy, or in some other law. *See* 1 G. Glenn, *supra*, § 289 (explaining that the intent of fraudulent conveyance statutes "is not to provide equal distribution of the estates of debtors among their creditors; there are other statutes [in bankruptcy] which have that effect.'"

*Id*. at 1508-09 (citation omitted).  Stated simply, "[t]he basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors."  *Id*. at 1509.  Therefore, courts will not avoid a pre-petition transfer as a fraudulent transfer merely because it preferred one creditor over others.

The bankruptcy court's reasoning erroneously creates a "fourth paradigm" – preference – contrary to *Sharp*.  Defendants' stipulated good faith precludes any finding of collusion or

"gifting."   Indeed, the bankruptcy court seemed to understand the basic state law right to payment.   Nevertheless, the court refused to credit the underlying right to payment on the grounds that Madoff Securities essentially gave Defendants a preference.   *See* RR at 29 (calling it a "pre-filing diversion").   Any theory of preference is irrelevant to a fraudulent transfer claim for the very reasons stated in *Boston Trading* and *Sharp*.   All that matters for the purposes of Section 548(c) is that Madoff Securities paid valid debts or obligations owed to Defendants. Although the bankruptcy court saw the result as unfair to other creditors, a payment under those circumstances "is not a 'fraudulent' conveyance because it satisfies a debt owed to a person who is, at least, a legitimate creditor."   *Boston Trading*, 835 F.2d at 1508.

The bankruptcy court also found that Defendants did not give value under Section 548(c) because the customer funds were held in a "trust," (the customer property trust of the broker) that owed no obligation to Defendants.   RR at 24, 29 ("Even if BLMIS owed obligations to the Defendants, the [other] customers did not, and the use of their property to pay fictitious profits was not supported by value.").   Once again, Madoff Securities' conversion of funds from a trust – tantamount to a theft –  makes no difference under *Sharp* or *Boston Trading*.   Indeed, as *Boston Trading* instructs, trust principles do not matter because "we are concerned *not* with the well-established principles of restitution, but with Fraudulent Conveyance Law, a set of legal (not equitable) doctrines designed for very different purposes."   835 F.2d at 1508.   The only relevant measure of value is the exchange between the actual parties to the initial transfer.   *See* Section I.A.1., *supra*.   Because other customers were not parties to those transactions, they (and their separate rights or entitlements) have no bearing on this case.

**IX.    The bankruptcy court erred in concluding that Section 548(a)'s two-year reach back limit is not a statute of repose.**

The bankruptcy court *de facto* avoided all obligations incurred by Madoff Securities over the full life of Defendants' accounts (many incurred far earlier than the two year avoidance period) because it found "no reason why a line should be drawn at the beginning of the reach-back period in determining whether a transfer was for value."  RR at 32-33 (quoting *Antecedent Debt Decision*, 499 B.R. at 427).  In fact, the legal basis of this "line" is well-established under a long line of authority: Section 548(a)(1) is statute of repose.  As the Supreme Court recently explained, a statute of repose draws lines at the beginning of the reach-back period.  *CalPERS*, 137 S. Ct. 2042.  In all events, the bankruptcy court's view cannot be squared with the language of Section 548(a).

**A.   Federal bankruptcy courts consistently treat the time limits in Section 548(a) as a statute of repose.**

The bankruptcy court's refusal to treat Section 548(a) as a statute of repose places it in a distinct minority, as every other federal bankruptcy court to address the questions has found it to be a statute of repose.  *See Sandburg Mall*, 563 B.R. at 896 (citing *In re Petters Co.*, 557 B.R. 711, 722–23 (Bankr. D. Minn. 2016)); *Schlossberg*, 549 B.R. at 657–60.[28]  This Court should adhere to persuasive bankruptcy precedent and controlling Supreme Court authority to conclude that the time limit in Section 548(a) is a statute of repose.

**B.   The Supreme Court's *CalPERS* decision treats statutes like Section 548 as statutes of repose.**

The Supreme Court's 2017 decision in *CalPERS* removes any doubt that Section 548(a) is a statute of repose.  The bankruptcy court perfunctorily dismissed *CalPERS* as inapposite

---

[28]    *Accord, In re Pitt Penn Holding Co.*, 2012 Bankr. LEXIS 325 (Bankr. D. Del. 2012); *Industrial Enters. of Am., Inc. v. Burtis*, 2012 Bankr. LEXIS 325, at *14 (Bankr. D. Del. Jan. 24, 2012); *In re Maui Indus. Loan & Fin. Co.*, 454 B.R. 133 (Bankr. D. Haw. 2011); *In re Lyon*, 360 B.R. 749 (Bankr. E.D.N.C. 2007); *In re Bethune*, 18 B.R. 418 (Bankr. N.D. Ala. 1982)); *In re Davis*, 138 B.R. 106 (Bankr. M.D. Fla. 1992)).

because it "did not concern section 548 or the Bankruptcy Code." RR at 34–35. This view of principles of statutory construction should not be credited; Section 548(a) cannot be so easily disregarded.

In *CalPERS*, the Supreme Court held that Section 13 of the Securities Act of 1933 was a statute of repose not subject to tolling. As a result, the petitioner's untimely claim for relief was dismissed. *CalPERS*, 137 S. Ct. at 2049-51. The Court found that Section 13 provided two different time bars: a one-year statute of limitations and a three-year statute of repose. *Id.* at 2049-50. The same is true of the Bankruptcy Code provisions applicable to the Trustee's claims: Section 546(a) sets the two-year time period within which the avoidance suit must be filed, while Section 548(a) prescribes the two years of transfers or obligations that may be challenged. 11 U.S.C. §§ 546(a), 548(a).

The reasoning in *CalPERS* controls this case. The first sentence of the 1933 Act provision barred an action barred an action unless "brought within one year after the discovery of the untrue statement. . . ." The Supreme Court held that this language created a statute of limitations because it ran from the time the plaintiff discovered the securities law violation. *CalPERS*, 137 S. Ct. at 2049-50. The second sentence of Section 13, however, provided that no "such action[may] be brought to enforce a liability created under [Section 11] more than three years after the security was bona fide offered to the public." *Id.* Relying on the plain text of this sentence and the overall structure of the section, the Court held that the three-year provision was a statute of repose for two reasons. First, the statute "runs from the defendant's last culpable act (the offering of the securities), not from the accrual of the claim (the plaintiff's discovery of the defect in the registration statement)." *Id.* at 2049. Second, such a "pairing of a shorter statute of limitations and a longer statute of repose is a common feature of statutory time limits." *Id.*

Under the rationale of *CalPERS*, the same is true of the statutory time limits found in Code Sections 546 and 548. Section 546(a), entitled "Limitations on avoiding action," dictates the time frame within which the Trustee must "commence" an avoidance proceeding which, like the statute of limitations in *CalPERS*, begins to run when a cause of action accrues (here the commencement of the SIPA liquidation proceeding against Madoff Securities). Section 548(a), in turn, looks back two years from the petition date to identify the transfers that may be attacked but says nothing about the claim's accrual. *See Sandburg Mall*, 563 B.R. at 896. Other bankruptcy courts read the distinction between the provisions in the same way. *See, e.g.*, *Industrial Enters.*, 2012 Bankr. LEXIS 325, at *11–13.[29]

Structurally, it makes no sense for the Bankruptcy Code to have two separate limitations periods for the same potential claim. "Interpreting the two year look back period in § 548 as a statute of limitations would make § 546 superfluous, running counter to the cannons of statutory construction." *Petters*, 557 B.R.at 723 n.16. Instead, like the statutes in *CalPERS*, Sections 546 and 548 work together and, as a matter of statutory construction – must be read together – to provide the post-petition limitations period for the Trustee to bring claims against a defendant and the two-year statute of repose to cut off potential liability for transfers or obligations preceding the reach-back period. In short, *CalPERS* applies neatly to the language of Sections 546(a) and 548(a) and supports reading the latter as a statute of repose.

This analysis also renders improper the bankruptcy court's reliance on the *Antecedent Debt Decision*. Not only does the *Antecedent Debt Decision* depart from the line of multiple bankruptcy court decisions holding that the reach back limits for Section 548(a) create a statute

---

[29] *See also Smith v. American Founders Fin. Corp.*, 365 B.R. 647, 678 (S.D. Tex. 2007) (Section 24.005 of Texas's fraudulent transfer act is a statute of repose and Section 548 "is a near mirror image of most states' fraudulent-transfer acts").

of repose, but it was issued several years before the two leading Supreme Court decisions governing the construction of statutes of repose, *CTS* and *CalPERS*.[30]  In short, the *Antecedent Debt Decision*'s reasoning is no longer good law and the bankruptcy court's reliance on that outdated decision was error.

### C.  As a statute of repose, Section 548(a)(1) cannot be tolled.

Because Section 548(a) is a statute of repose, federal bankruptcy courts have consistently refused to toll it.

> Many courts have confronted this issue and rejected the idea that §548(a)(1) is a statute of limitations subject to equitable tolling ...  Here, the text of §548 does not provide a specified time period to pursue a claim.  Rather, the time limitation by which a trustee must commence an avoidance action is provided in §546.

*Schlossberg*, 549 B.R. at 657–59).  *Accord, Industrial Enters.*, 2012 Bankr. LEXIS 325, at *14 ("The two-year look-back period in § 548 is not a statute of limitations that may be equitably tolled; rather, it is a substantive element of a § 548 claim.").

Section 548(a), unlike a statute of limitations, is not subject to equitable tolling. *Sandburg Mall*, 563 B.R. at 896  ("Of the bankruptcy courts that have addressed whether the lookback period under section 548 is a statute of limitations that is subject to equitable tolling, the clear majority hold that it is not.").  Section 548(a) thus creates a substantive protection against litigation after a set time, and it cannot be tolled, which sets it apart from any statute of limitations.

The Second Circuit observed that, "in contrast to statutes of limitations, statutes of repose create a *substantive* right in those protected to be free from liability after a legislatively-

---

[30] Moreover, the *Antecedent Debt Decision* improperly relied on the Ninth Circuit's decision in *Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008), a case that did not consider or discuss any statute of repose.  Rather, the court only addressed the effect of the statute of limitations in California's Fraudulent Transfer statute.  *See id.* at 772.  *Donell* is inapposite, and provides no justification to disregard the difference between statutes of repose and limitations explained by *CalPERS*.

determined period of time." *Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*, 721 F.3d 95, 106 (2d Cir. 2013) (quoting *Amoco Prod. Co. v. Newton Sheep Co.*, 85 F.3d 1464, 1472 (10th Cir. 1996) (emphasis in original) (internal quotation marks omitted). This distinction "carries significant practical consequences," including the fact that "a statute of repose may bar a claim *even before the plaintiff suffers injury*, leaving her without any remedy." *Id.* (quoting *Federal Hous. Fin. Agency*, 712 F.3d at 140) (emphasis in original)).  Further, statutes of repose are "subject only to legislatively created exceptions, and not to equitable tolling." *Id.* (internal citations and marks omitted).

Accordingly, there can be no dispute that the reach-back time limit in Section 548(a) is a statute of repose, which the bankruptcy court was required to apply to restrict the scope of the Trustee's avoidance claims.

### D. The bankruptcy court erred in adopting the Trustee's calculation method because it directly negates the effect of the statute of repose in Section 548(a) and disregards material facts establishing this defense.

Contrary to the bankruptcy court's explanation, the proposed calculation of Defendants' avoidance exposure reaches more than just the transfers within the two-year period established by Section 548(a).  *See* RR at 35 ("In any event, and assuming the two-year lookback period in section 548(a)(1) is a statute of repose, the Trustee is only attempting to recover transfers made within the Two Year Period.").  In fact, the Trustee takes into account all prior transfers to each Defendant by Madoff Securities – every transfer made before December 10, 2006 – while giving no effect to the broker's unavoidable obligations outstanding at those times.

Because the Trustee's petition for relief was filed on December 11, 2008, Section 548(a)'s two-year statute of repose limits the Trustee to avoiding transfers made and obligations incurred between December 11, 2006 and December 11, 2008.  Because the November 30, 2006 customer statements are the last reported securities entitlements issued before December 11,

2006, the obligations created by the reported securities entitlements contained therein are unavoidable.[31]   *See* Section IA3, *infra*.   In other words, the value listed on the November 30, 2006 statement is a protected obligation, which must be included as the starting point of the calculation.   Therefore, the approach required by the statute of repose is as follows:

- Last reported obligations before 12/10/2006 (reported securities entitlements);
- Plus cash deposited within the two-year period;
- Minus cash withdrawn within the two-year period.

But the bankruptcy court does not follow this approach.   Instead, the court adopts the Trustee's net investment method for calculating net equity claims, which has no place in these avoidance actions.   *See supra* Section VI.   Though the court claims to reach only transfers that occurred within the two-year period, in fact the court assigns *no value or significance to unavoidable obligations arising from the reported securities entitlements existing before 12-11-06*.   This decision effectively avoids those obligations (by ignoring them) in direct disregard of the statute of repose.   This methodology is erroneous and must be rejected.

The error in this approach is best highlighted by the bankruptcy court's improper computation of the claims against Mesora.   All claims against Mesora for pre-December 2006 transfers were dismissed in this case in 2012 by the district court because of Section 546(e). During the two-year period, Mesora withdrew only $200,000 in excess of deposits: added $3,000,000; and withdrew only $3,200,000.   *See* Addendum 2.   Properly computed, and putting aside the value defense, the maximum amount that could be subject to avoidance should be the $200,000, the amount exceeding principal during the two years permitted by the statute of repose.

---

[31] The reported entitlement amounts, which are discussed in Addendum 2, are not disputed by the Trustee or SIPC.   The bankruptcy court erred in not making any findings as to these amounts, and Defendants ask this Court to enter findings and conclusions in their favor on the reported entitlements based on the stipulated statements of material fact including SF ¶ 18; SF #2 ¶ 18; Mesora ¶ 19; Lowrey ¶¶ 23-25.

The bankruptcy court, however, permitted the Trustee to set off the $3,000,000 new deposit against the time barred, and previously dismissed, avoidance claim, and thus effectively ignored the transactions within the two-year period.  This sleight of hand is plain error.

The Trustee's claims should (at the least) be narrowed by taking into account the face value of the protected, unavoidable pre-December 2006 obligations of the broker to the Defendants—while respecting the statute's two-year restriction on the operation of the avoidance remedy.  Each Defendant should receive partial summary judgment reducing or eliminating the Trustee's avoidance claims based on the amounts of those obligations shown in Addendum 2.

**X.    The bankruptcy court erred in concluding that the Trustee need not avoid obligations incurred in addition to transfers within the two-year period; the Trustee's failure to plead any avoidance of obligation claims is fatal to his case.**

The bankruptcy court erred in proposing to grant the Trustee summary judgment notwithstanding the Trustee failed to satisfy an essential predicate to recovery of transfers: avoiding of any the obligations incurred by Madoff Securities within the two year reach back limit of Section 548.  This is fatal to his claims.  By not avoiding those obligations, the Trustee has an incomplete case while Defendants have a complete defense: With the obligations not avoided, the Trustee cannot defeat the value defense, because each transfer to a Defendant *indisputably* was made in satisfaction of an enforceable and unavoided obligation owed by Madoff Securities at the time of each transfer.

It is widely accepted that, where a trustee seeks to avoid a debtor's transfer that was supported by an existing obligation for the payment, he must first avoid the obligation.  *See, e.g.*, *Cox*, 526 B.R. at 791.  The court in *In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 444 (Bankr. S.D.N.Y. 2012), explained the interplay: The incurrence of an obligation "is a preliminary aspect of a transactional process that must occur *prior to or as a condition* of transferring property or an

interest in property."  (Emphasis added).  In other words, if Madoff Securities did not owe

binding obligations to Defendants, there never would have been any payments to the customers.

When a trustee fails to avoid an obligation, as here, that unavoided obligation necessarily

provides the transferee with a defense under Section 548(c) that will insulate the later transfer:

> [W]here a debtor makes prepetition payments on a contractual debt, in order for
> those payments to be avoidable as constructively fraudulent, it is necessary for the
> trustee to first avoid the underlying contract as a fraudulently incurred obligation.
> Absent avoidance of the underlying contract, the payments discharge the
> obligation and are, by definition, for reasonably equivalent value.

*Cox*, 526 B.R. at 791 (citations omitted).  For example, in *Jahn v. Char (In re Incentium, LLC)*,

473 B.R. 264, 272 (Bankr. E.D. Tenn. 2012), the court relied on Section 548(c) to defeat a

trustee's attempt to avoid payments in satisfaction of a severance obligation incurred outside of

the lookback period. "The transfers of severance pay to the defendant satisfied the prior,

unavoidable severance obligation, so the debtor received 'value' in exchange for the transfers."

*Id.*  Likewise, in *Daly v. Fusco (In re All-Type Printing, Inc.)*, 274 B.R. 316 (Bankr. D. Conn.

2002), the trustee could not avoid health care payments made four years before the debtor's

bankruptcy filing because he never avoided the underlying obligation—which was time barred.

"Simply put, in order to have a chance of prevailing . . . the Trustee needed to seek to avoid the

*incurring* of an *obligation*—the Retirement Debt—as well as the *transfer* of *property*—the

Payments."  *Id.* at 324 (emphasis in original); *accord*, *Ogle*, 512 B.R. at 886 ("transfers are not

avoidable because they were transfers made in satisfaction of unavoidable obligations");

*Silverman v. Paul's Landmark, Inc. (In re Nirvana Rest.)*, 337 B. R. 495, 502 (Bankr. S.D.N.Y.

2006) (same as to guaranty and rent recapture).

In this respect, a SIPA trustee stands in no different position from ordinary bankruptcy

trustees.  He has no power to sidestep the process of formally avoiding obligations that underpin

a payment by the broker—a process that requires making a formal claim of avoidance.  *See* Fed.

R. Bankr. P. 7001(1).  The Trustee's failure to pursue his statutory remedy is fatal to his claims.

Even assuming, *arguendo*, the propriety of the conclusory position of the *Antecedent Debt Decision*—that any *obligations* of the broker in excess of Defendants' principal deposits are unenforceable, *and* cannot now be credited to Defendants—the rationale does not excuse the Trustee's failure to take the necessary step to avoid those obligations.  The bankruptcy court erred in not considering the unavoided obligations of the debtor in considering Defendants' value defense.  Properly considered, each obligation was satisfied or discharged to the extent of each payment, thereby providing value to the debtor at the time of each transfer.  This affords Defendants a complete defense under Section 548(c), which the bankruptcy court wrongly rejected.  This Court should recognize this defense and grant summary judgment to Defendants.

## XI. The bankruptcy court erred in ignoring Defendants' alternative grounds for summary judgment: the value defense also allows them to retain amounts due them at the time of the transfers based on their unliquidated state and federal tort claims

Finally, Defendants have moved for summary judgment on two alternative theories of value given in exchange for the broker's payments: the payments (1) satisfied contractual obligations based on reported securities entitlements and/or (2) discharged tort obligations arising from Madoff Securities' previously unknown fraud and breaches of fiduciary duty against the customers.  For the Trustee to prevail here, he must avoid both categories of antecedent debts or obligations of the debtor.  *See* Section X, *infra.*  His failure to do so leaves each of these elements of value intact.  The RR omits any reference to Defendants' alternative tort claims as a basis for the value defense, which, under the stipulated facts, entitled Defendants at the least to judgment to partial summary judgment on this basis.  The bankruptcy court's failure to address this alternative value of defense was plain error.  Such claims are clearly within the scope of the antecedent debts recognized in Section 548(d)(2) as value.  *See* I.A.3, *supra.*  This Court should

determine that, in addition to their contractual and statutory rights, the antecedent tort remedies existing at the time of the transfer also entitle Defendants to summary judgment of the amount of the stipulated damages and pre-judgment interest arising from such claims.[32]

The stipulated facts conclusively established that: Madoff Securities received customer deposits intended for the purchase and sale of securities, did not purchase any securities, and sent brokerage statements to Defendants reflecting securities transactions and net securities positions on which they reasonably relied.  *See, e.g.,* SF SMF ¶¶ 13–17; RR at 5-8.  *See also* SF MOL at Section II; Lowrey MOL at Section II.  The parties stipulated to the amounts of liquidated damages and interest arising from such claims.  *See* Note 30, *supra*.  The Defendants cited law in support of these alternative claims confirming that, at the time of each transfer, each Defendant also had multiple state and federal law tort claims against Madoff Securities, including fraud and breach of fiduciary duty.  *See Breeden v. Thomas (In re Bennett Funding Group, Inc.)*, 1999 Bankr. LEXIS 1843 at *25–26 (Bankr. N.D.N.Y. Apr. 29, 1999) (Ponzi operators "face[] contingent liability to Defendant (on theories ranging from fraud to restitution) from the moment they were entrusted with his money").

These obligations are material.  For the fraud claim against Madoff Securities, Defendants were owed an obligation equal to rescission plus simple interest to be calculated at the New York statutory rate of 9%.  N.Y.C.P.L.R. § 5004 ("interest shall be at the rate of nine percent per annum, except otherwise provided by statute").  Further, had an honest broker managed these funds, Defendants would have received agreed returns as stipulated by the parties. The specific effect of these obligations is set out below:

---

[32]  In Addendum 3, the Defendants present a chart showing the agreed amounts of the transfers that each Defendant would retain based on these tort claims.  These amounts are supported by the following statements of material fact: SF ¶¶41-46; SF #2 ¶¶ 41-46; Mesora ¶¶43-48; Lowrey ¶¶34-37.

| Defendants | Lost Time Value Resulting from Fraud[33] | Partial Summary Judgment Reducing Trustee's Claim |
|---|---|---|
| SF | $4,492,973 | ($2,127,027) |
| SF#2 | $12,077,605 | ($9,877,395) |
| Mesora | $6,459,542 | $3,259,542 |
| Lowrey | $5,062,340 | ($4,458,333) |

Though these unavoided tort obligations materially reduce or, in the case of Mesora, defeat the Trustee's claims, the bankruptcy court simply ignored the arguments and underlying supporting facts.  This Court should so determine, and in the alternative enter judgment, or partial summary judgment, in favor of the respective Defendants.[34]

## CONCLUSION

For the foregoing reasons, Defendants request this Court:

- Grant them summary judgment on their affirmative value defense based on their unavoided securities contractual entitlements at the time of each transfer, and deny the Trustee's cross-motions for summary judgment;

- Grant them judgment or partial judgment on their affirmative value defense based on their unavoided tort remedies at the time of each transfer in the amount quantified by agreement of the parties;

- Grant them partial summary judgment on their affirmative timeliness defense by recognizing the value given to the debtor based on the unavoidable obligations existing at the beginning of the two-year reach back limit in Section 548(a), *i.e.*, before December 11, 2006; and

- Dismiss all remaining claims against Defendants with prejudice.

---

[33] The calculations for the lost time value are set forth in Addendum 3.  The numbers reflected in this column represent the greater of the two obligations.

[34] If this Court credits Defendants' contractual obligations and awards summary judgment to them on that basis, it need not reach this alternative ground for relief.  However, if the Court finds that the contractual obligations were not preserved by Sections 28 and 29 of the 1934 Act, or are otherwise unavailable, then it should find at least that each Defendant is entitled to summary judgment reducing, or defeating, as may be the case, the Trustee's claims based on their rights to payment based upon the unavoided tort claims.

Dated: April 26, 2018

**BAKER & MCKENZIE LLP**

By: _/s/Richard A. Kirby_
    Richard A. Kirby
    Graham R. Cronogue
    Raija C. Churchill
    815 Connecticut Avenue, N.W.
    Washington, D.C. 20006
    Tel: (202) 452-7020
    Email: richard.kirby@bakermckenzie.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 26, 2018, I arranged for electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record via the CM/ECF system.

BAKER & MCKENZIE LLP

By: <u>/s/ Richard A. Kirby</u>
  Richard A. Kirby
  815 Connecticut Avenue, N.W.
  Washington, District of Columbia  20006
  Tel:  (202) 452-7020
  Email:  richard.kirby@bakermckenzie.com

# Addendum 1

# Parties to Objections

# PARTIES TO OBJECTIONS

| Case name | Adversary Proceeding No. |
|---|---|
| *Picard v. James Lowrey, et al.*<br>• James Lowrey<br>• Estate of Marianne Lowrey<br>• Turtle Cay Partners<br>• Coldbrook Associates Partnership | 10-4387-SMB |
| *Picard v. South Ferry, et al.*<br>• South Ferry Building Company<br>• Emmanuel Gettinger<br>• Abraham Wolfson<br>• Zev Wolfson | 10-4488-SMB |
| *Picard v. South Ferry #2, et al.*<br>• South Ferry #2 LP<br>• Emmanuel Gettinger<br>• Aaron Wolfson<br>• Abraham Wolfson | 10-4350-SMB |
| *Picard v. United Congregations Mesora*<br>• United Congregations Mesora | 10-5110-SMB |

# Addendum 2

# Effect of Statute of Repose

**Section 548 Statute of Repose - Net Withdrawals**

**James Lowrey & Marianne Lowrey**

| Account Obligations / Net Withdrawals | Account Value (USD) |
|---|---|
| Market value of securities net – 11/30/2006 statement . . . . . . . . . . . | 1,322,995.40 |
| Net options - balance – 11/30/2006 statement . . . . . . . . . . . . . . . . | (600.00) |
| **Net statement value – 11/30/2006 . . . . . . . . . . . . . . . . . . . . . . . . .** | **1,322,395.40**[1] |
| Deposits after 11/30/2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 500,000.00 |
| Withdrawals after 11/30/2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,082,182.00[2] |
| **Net withdrawals in excess of 11/30/2006 obligations . . . . . . . . . . .** | **(259,786.60)** |

---

[1] Lowrey SMF ¶ 25.

[2] Lowrey SMF ¶ 16.

**Section 548 Statute of Repose - Net Withdrawals**

**Coldbrook Associates Partnership**

| Account Obligations / Net Withdrawals | Account Value (USD) |
|---|---|
| Market value of securities net – 11/30/2006 statement . . . . . . . . . . . . | 3,055,465.04 |
| Net options - balance – 11/30/2006 statement . . . . . . . . . . . . . . . . . | (1,410.00) |
| **Net statement value – 11/30/2006 . . . . . . . . . . . . . . . . . . . . . . . . .** | **3,054,055.04[3]** |
| Deposits after 11/30/2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - |
| Withdrawals after 11/30/2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,393,402.00[4] |
| **Net withdrawals in excess of 11/30/2006 obligations . . . . . . . . . . .** | **(339,346.96)** |

---

[3] Lowrey SMF ¶ 24.

[4] Lowrey SMF ¶ 14.

**Section 548 Statute of Repose - Net Withdrawals**

**Turtle Cay Partners**

| Account Obligations / Net Withdrawals | Account Value (USD) |
|---|---|
| Market value of securities net – 11/30/2006 statement . . . . . . . . . . . | 11,983,173.20 |
| Net options - balance – 11/30/2006 statement . . . . . . . . . . . . . . . . | (5,550.00) |
| **Net statement value – 11/30/2006** . . . . . . . . . . . . . . . . . . . . . . . . . | **11,977,623.20**[5] |
| Deposits after 11/30/2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,000,000.00 |
| Withdrawals after 11/30/2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16,845,089.00[6] |
| **Net withdrawals in excess of 11/30/2006 obligations** . . . . . . . . . . . | **(1,867,465.80)** |

---

[5] Lowrey SMF ¶ 23.

[6] Lowrey SMF ¶ 11, 12.

**Section 548 Statute of Repose Calculations**

**Lowrey Defendants**

| Customer | Trustee's "Net Investment Method" Calculation | Calculation Using Section 548's Repose Period | Difference in Claim Calculations |
|---|---|---|---|
| James and Marianne Lowrey | $582,182.00[7] | $259,786.60 | **$322,395.40** |
| Turtle Cay Partners | $7,845,089.00[8] | $1,867,465.80 | **$5,977,623.20** |
| Coldbrook Associates Partnership | $1,093,402.00[9] | $339,346.96 | **$754,055.04** |
| **Total** | $9,520,673.00[10] | $2,466,599.36 | **$7,054,073.64** |

---

[7] RR at 7.

[8] RR at 7.

[9] RR at 7.

[10] Lowrey SMF ¶ 27

## Section 548 Statute of Repose - Net Withdrawals
## South Ferry Building Company

| Account Obligations / Net Withdrawals | Account Value (USD) |
|---|---|
| Market value of securities net – 11/30/2006 statement . . . . . . . . . . . | 21,530,163.04 |
| Net options - balance – 11/30/2006 statement  . . . . . . . . . . . . . . . . . | (10,080.00) |
| **Net statement value – 11/30/2006** . . . . . . . . . . . . . . . . . . . . . . . . . | **21, 520,083.04[11]** |
| Deposits after 11/30/2006  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - |
| Withdrawals after 11/30/2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 24,220,000.00[12] |
| **Net withdrawals in excess of 11/30/2006 obligations** . . . . . . . . . . . | **(2,699,916.96)** |

---

[11] SF SMF ¶ 18.
[12] SF SMF ¶ 10.

## Section 548 Statute of Repose - Net Withdrawals
## South Ferry #2

| Account Obligations / Net Withdrawals | Account Value (USD) |
|---|---|
| Market value of securities net – 11/30/2006 statement . . . . . . . . . . . | 36,818,463.55 |
| Net options - balance – 11/30/2006 statement  . . . . . . . . . . . . . . . . | (17,250.00) |
| **Net statement value – 11/30/2006 . . . . . . . . . . . . . . . . . . . . . . . .** | **36,801,213.55[13]** |
| Deposits after 11/30/2006  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | - |
| Withdrawals after 11/30/2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . | 40,155,000.00[14] |
| **Net withdrawals in excess of 11/30/2006 obligations  . . . . . . . . . . .** | **(3,353,786.45)** |

---

[13] SF#2 SMF ¶ 18.
[14] SF#2 SMF ¶ 10.

**Section 548 Statute of Repose - Net Withdrawals**

**United Congregations Mesora**

| Account Obligations / Net Withdrawals | Account Value (USD) |
|---|---|
| Market value of securities net – 11/30/2006 statement . . . . . . . . . . . | 5,146.00 |
| Net options - balance – 11/30/2006 statement . . . . . . . . . . . . . . . . . | - |
| **Net statement value – 11/30/2006 . . . . . . . . . . . . . . . . . . . . . . . . .** | **5,146.00**[15] |
| Deposits after 11/30/2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,000,000.00[16] |
| Withdrawals after 11/30/2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,200,000.00[17] |
| **Net withdrawals in excess of 11/30/2006 obligations . . . . . . . . . . .** | **(194,854.00)** |

---

[15] Mesora SMF ¶ 19.

[16] Mesora SMF ¶ 11.

[17] Mesora SMF ¶ 11.

# Addendum 3

# Effect of Federal and State Tort Obligations

**Summary of Alternative State and Federal Tort Obligations**

**South Ferry Building Company**

| **Obligations/Net Withdrawals** | **Account Value (USD)** |
|---|---|
| Amount of Trustee's claim………………………………… | ($6,620,000)[1] |
| Additional value of fraud rescission claim, including loss of time value of money (New York statutory 9% interest)…………………………………………….. | $4,492,973[2] |
| Partial summary judgment based upon fraud obligations……………………….. | ($2,127,027) |
| Additional value of breach of fiduciary duty claim………………………………. | $3,414,848[3] |
| Alternative partial summary judgment  based on breach of fiduciary duty claim……….. | ($3,205,152) |

---

[1] RR at 7.
[2] SF SMF ¶ 28.
[3] SF SMF ¶ 26.

**Summary of Alternative State and Federal Tort Obligations**

**South Ferry #2**

| Obligations/Net Withdrawals | Account Value (USD) |
| --- | --- |
| Amount of Trustee's claim……………………………… | ($21,955,000 )[4] |
| Additional value of fraud rescission claim, including loss of time value of money (New York statutory 9% interest)………………………………………….. | $12,077,605[5] |
| Partial summary judgment based upon fraud obligations……………………….. | ($9,877,395) |
| Additional value of breach of fiduciary duty claim………………………………. | $5,431,224[6] |
| Alternative partial summary judgment  based on breach of fiduciary duty claim……….. | ($16,523,776) |

---

[4] RR at 7.
[5] SF#2 SMF ¶ 28.
[6] SF#2 SMF ¶ 26.

**Summary of Alternative State and Federal Tort Obligations**

**Mesora**

| Obligations/Net Withdrawals | Account Value (USD) |
|---|---|
| Amount of Trustee's claim………………………………… | ($3,200,000)[7] |
| Additional value of fraud rescission claim, including loss of time value of money (New York statutory 9% interest)…………………………………………….. | $6,459,542[8] |
| Partial summary judgment based upon fraud obligations……………………….. | $3,259,542 |
| Additional value of breach of fiduciary duty claim……………………………. | $6,019,359[9] |
| Alternative partial summary judgment  based on breach of fiduciary duty claim……….. | $2,819,359 |

---

[7] RR at 7.
[8] Mesora SMF ¶ 29.
[9] Mesora SMF ¶ 27.

**Summary of Alternative State and Federal Tort Obligations**

**Lowrey Customers**

| Obligations/Net Withdrawals | Account Value (USD) |
|---|---|
| Amount of Trustee's claim…………………………… | ($9,520,673)[10] |
| Additional value of fraud rescission claim, including loss of time value of money (New York statutory 9% interest)………………………………………….. | $5,062,340[11] |
| Partial summary judgment based upon fraud obligations……………………….. | ($4,458,333) |
| Additional value of breach of fiduciary duty claim………………………………. | $2,354,352[12] |
| Alternative partial summary judgment  based on breach of fiduciary duty claim……….. | ($7,166,321) |

---

[10] RR at 7.
[11] Lowrey SMF ¶ 35.
[12] Lowrey SMF ¶ 33.